No. 25-1673

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

IN RE: CLEARVIEW AI, INC. CONSUMER PRIVACY LITIGATION.

RODELL SANDERS, *et al.*,

Plaintiffs-Appellees,

v.

CLEARVIEW AI, INC., *et al.*,

Defendants-Appellees,

APPEAL OF: ROBERT WEISSMAN and RICK CLAYPOOL,
Objectors-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:21-cv-00135
The Honorable Judge Sharon Johnson Coleman

**APPELLANTS' BRIEF AND REQUIRED SHORT APPENDIX**

July 7, 2025

Michael T. Kirkpatrick
Karla Gilbride
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-7728

*Counsel for Objectors
Weissman and Claypool*

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1673

Short Caption: IN RE: CLEARVIEW AI, INC. CONSUMER PRIVACY LITIGATION

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Robert Weissman and Rick Claypool

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Public Citizen Litigation Group

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Karla Gilbride    Date: 07/07/2025

Attorney's Printed Name:  Karla Gilbride

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☐

Address:  1600 20th Street NW

Washington, DC 20009

Phone Number: (202) 588-7783    Fax Number:

E-Mail Address: kgilbride@citizen.org

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-1673

Short Caption: IN RE: CLEARVIEW AI, INC. CONSUMER PRIVACY LITIGATION

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Robert Weissman and Rick Claypool

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Public Citizen Litigation Group

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

    N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: s/ Michael T. Kirkpatrick     Date: 07/07/2025

Attorney's Printed Name: Michael T. Kirkpatrick

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☑    No ☐

Address: 1600 20th Street NW

Washington, DC 20009

Phone Number: (202) 588-7728      Fax Number:

E-Mail Address: mkirkpatrick@citizen.org

rev. 12/19 AK

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS...................................................i

TABLE OF AUTHORITIES ...................................................v

STATEMENT OF JURISDICTION.........................................1

STATEMENT OF THE ISSUE.................................................2

STATEMENT OF THE CASE ...............................................2

    A. Clearview's Business Model............................................2

    B. The Lawsuit, Proposed Settlement, and Preliminary
       Approval ...................................................................7

    C. Opposition to Final Approval.........................................12

    D. The District Court's Approval of the Settlement ...........15

SUMMARY OF ARGUMENT ...............................................18

STANDARD OF REVIEW.....................................................19

ARGUMENT .......................................................................20

I.  The settlement is not fair, reasonable, and adequate because
   it does not stop the challenged conduct and releases claims
   that might have achieved that goal.....................................21

II. The settlement is not fair, reasonable, and adequate because
   the amount of future monetary relief, if any, is unknown and
   tied to the future success of Clearview's business model that
   harms the class. ...............................................................27

    A. A settlement fund might never be established. ...........28

B. The value of any future settlement fund is unknown. .................. 30

C. The settlement stake is not comparable to the monetary relief provided in class settlements of other data privacy cases. ................................................................. 32

D. Clearview's financial condition does not justify a settlement tied to Clearview's success in continuing the conduct that harms the class ................................................. 34

III.  The settlement should have been rejected because the nationwide class lacked representation ......................................... 35

CONCLUSION ......................................................................... 40

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B) ............................. 42

CIRCUIT RULE 30(d) STATEMENT ...................................... 43

REQUIRED SHORT APPENDIX

Judgment in a Civil Case (ECF No. 641, May 2, 2025) .................. App. 1

Memorandum Opinion and Order (ECF No. 631, Mar. 20, 2025) ... App. 2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Clearview AI, Inc.,*
No. 2020 CH 04353 (Cook Cty. Cir. Ct. 2022)..............................16, 22

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591 (1997)....................................................................37

*Boone v. Snap Inc.,*
No. 2022-LA-708 (DuPage Cty. Cir. Ct. Aug. 4, 2022)......................17

*Brown v. Google, LLC,*
685 F. Supp. 3d 909 (N.D. Cal. 2023)...............................................25

*Collins v. Conifer Value-Based Care,*
2025 WL 1140788 (C.D. Cal. Feb. 28, 2025) .....................................24

*Cox Broadcast Corp. v. Cohn,*
420 U.S. 469 (1975)......................................................................26

*Creative Montessori Learning Centers v. Ashford Gear LLC,*
662 F.3d 913 (7th Cir. 2011)...........................................................21

*Dewey v. Volkswagen Aktiengesellschaft,*
681 F.3d 170 (3d Cir. 2012) ...........................................................39

*Eubank v. Pella Corp.,*
753 F.3d 718 (7th Cir. 2014)..............................................21, 37, 40

*Fox v. Dakkota Integrated Systems, LLC,*
980 F.3d 1146 (7th Cir. 2020)............................................................5

*Gibson v. Warrior Met Coal Inc.,*
2024 WL 4399433 (N.D. Ala. Oct. 3, 2024) ......................................24

*In re 23andMe, Inc. Customer Data Sec. Breach Litigation,*
2024 WL 4982986 (N.D. Cal. Dec. 4, 2024) ........................................ 26

*In re Facebook Biometric Information Privacy Litigation,*
185 F. Supp. 3d 1155 (N.D. Cal. May 5, 2016) ................................... 17

*In re Facebook, Inc. Internet Tracking Litigation,*
956 F.3d 589 (9th Cir. 2020) ............................................................... 26

*In re Facebook, Inc. Internet Tracking Litigation,*
2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) ................................... 26

*In re Katrina Canal Breaches Litigation,*
628 F.3d 185 (5th Cir. 2010) ................................................. 28, 30, 31

*In re Literary Works in Electronic Databases Copyright Litigation,*
654 F.3d 242 (2d Cir. 2011) ........................................................ 38, 39

*In re Subway Footlong Sandwich Marketing & Sales Practices Litigation,*
869 F.3d 551 (7th Cir. 2017) ........................................................ 20, 28

*In re TikTok, Inc., Consumer Privacy Litigation,*
617 F. Supp. 3d 904 (N.D. Ill. 2022) .................................................. 27

*In re TikTok, Inc., Consumer Privacy Litigation,*
713 F. Supp. 3d 470 (N.D. Ill. 2024) .................................................. 17

*In re Vizio, Inc., Consumer Privacy Litigation,*
2019 WL 12966638 (C. D. Cal. Jul. 31, 2019) ................................... 27

*In re Walgreen Co. Shareholder Litigation,*
832 F.3d 718 (7th Cir. 2016) ............................................................... 28

*Koby v. ARS National Services, Inc.,*
846 F.3d 1071 (9th Cir. 2017) ............................................................. 28

*Maynard v. Nygren*,
   332 F.3d 462 (7th Cir. 2003)............................................................20

*MetroPCS v. Devor*,
   215 F. Supp. 3d 626 (N.D. Ill. 2016)..................................................24

*Murray v. Grocery Delivery E-Services USA Inc.*,
   55 F.4th 340 (1st Cir. 2022)..............................................................38

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999).........................................................................37

*Pearson v. NBTY, Inc.*,
   772 F.3d 778 (7th Cir. 2014)............................................................21

*Redman v. RadioShack Corp.*,
   768 F.3d 622 (7th Cir. 2014)............................................................21

*Retired Chicago Police Ass'n v. City of Chicago*,
   7 F.3d 584 (7th Cir. 1993)................................................................35

*Reynolds v. Beneficial National Bank*,
   288 F.3d 277 (7th Cir. 2002)................................................21, 30, 35

*Rivera v. Google, LLC*,
   No. 2019-CH-990 (Cook Cty. Cir. Ct. 2022) .....................................17

*Rodriguez v. ByteDance, Inc.*,
   2025 WL 672951 (N.D. Ill. Mar. 3, 2025) .........................................26

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
   726 F.3d 936 (7th Cir. 2013)............................................................35

*Secretary of Labor v. Fitzsimmons*,
   805 F.2d 682 (7th Cir. 1986)............................................................40

*Smith v. Sprint Communications Co., L.P.*,
   367 F.3d 612 (7th Cir. 2004)............................................................37

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*,
    463 F.3d 646 (7th Cir. 2006) ............................................... 19, 21, 30, 31

*Uhl v. Thoroughbred Technology & Telecommunications, Inc.*,
    309 F.3d 978 (7th Cir. 2002) .............................................................. 33

*United States v. Lowe*,
    632 F.3d 996 (7th Cir. 2011) .............................................................. 19

*Wong v. Accretive Health, Inc.*,
    773 F.3d 859 (7th Cir. 2014) ......................................................... 20, 28

*Zimmerman v. Highmark, Inc.*,
    2025 WL 1220364 (W.D. Penn. Apr. 28, 2025) .................................. 24

## Statutes

28 U.S.C. § 1291 ................................................................................... 2

28 U.S.C. § 1332(d)(2) .......................................................................... 1

## Rules

Fed. R. App. P. 4(a)(2) .......................................................................... 2

Fed. R. Civ. P. 23(a)(4) ........................................................................ 35

Fed. R. Civ. P. 23(e)(2) ...................................................... 19, 20, 25, 35

Fed. R. Civ. P. 23(e)(2)(C) ................................................................... 20

Fed. R. Civ. P. 23, advisory committee note to 2018 amendments ........ 28

Fed. R. Civ. P. 58(a) .............................................................................. 2

## Other Authorities

Vera Bergengruen, *Ukraine's 'Secret Weapon' Against Russia Is A Controversial U.S. Tech Company*, Time (Nov. 14, 2023), https://time.com/6334176/ukraine-clearview-airussia ........................4

James Clayton & Ben Derico, *Clearview AI Used Nearly 1m Times By U.S. Police, It Tells BBC*, BBC (Mar. 27, 2023), https://www.bbc.com/news/technology-65057011 ...............................4

Drew Harwell, *Facial recognition firm Clearview AI tells its investors it's seeking massive expansion beyond law enforcement*, Wash. Post (Feb. 16, 2022), https://www.washingtonpost.com/technology/2022/02/16/clearview-expansion-facial-recognition/ ...........................................4

Rebecca Heilweil, *The world's scariest facial recognition company, explained*, Vox (May 8, 2020), https://www.vox.com/recode/2020/2/11/21131991/clearview-ai-facial-recognition-database-law-enforcement .....................................5

Kashmir Hill, *The Secretive Company that Might End Privacy as We Know It*, N.Y. Times (Jan. 18, 2020), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html) ..........................................4

Ryan Mac, et al., *Clearview's Facial Recognition App Has Been Used By The Justice Department, ICE, Macy's, Walmart, and the NBA*, Buzzfeed News (Feb. 27, 2020), https://www.buzzfeednews.com/article/ryanmac/clearview-ai-fbi-ice-global-law-enforcement ...........................................4

Senator Edward Markey, Letter to Clearview Founder and Chief Executive Hoan Ton-That (June 8, 2020), https://www.markey.senate.gov/imo/media/doc/Clearview%20protests%2006.08.20.pdf ..........................................................6

Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024), https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true ...............................6

Luke O'Brien, *The Shocking Far-Right Agenda Behind the Facial Recognition Tech Used by ICE and the FBI,* Mother Jones (May 2025), https://www.motherjones.com/politics/2025/04/clearview-ai-immigration-ice-fbi-surveillance-facial-recognition-hoan-ton-that-hal-lambert-trump/ ........................................................6

Margaret Schaack, *Injury Equity: The Rise of Future Stakes Settlements,* 92 U. Chi. L. Rev. 1125 (2025) ........................................34

Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen to Anyone Else*, Time (June 29, 2024), https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/ ......................................6

Restatement (Second) of Torts § 652(B) (A.L.I. 1977) ............................26

Restatement (Third) of Restitution and Unjust Enrichment Ch. 7, Topic 2, Intro. Note (A.L.I. 2011) ........................................................23

# STATEMENT OF JURISDICTION

The district court had jurisdiction under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d)(2), because Plaintiffs' Third Amended Consolidated Class Action Complaint alleged that "there are more than 100 Plaintiff Class Members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one class member is a citizen of a state different from one of the Defendants."[1] R. 573 ¶ 17. Although Plaintiffs' complaint did not allege the citizenship of the named Plaintiffs or any other class member, instead alleging only the named Plaintiffs' states of residence, *id*. ¶¶ 5–8, Plaintiffs corrected that deficiency by filing a statement in this Court establishing the diversity of citizenship required for the district court to have exercised jurisdiction under 28 U.S.C. § 1332(d)(2). *See* Plaintiffs-Appellees' Corrected Response to Objectors-Appellants' Amended Docketing Statement (filed May 14, 2025).

On March 20, 2025, the district court entered a Memorandum Opinion and Order, App. 2, granting Plaintiffs' motion for final approval

---

[1] Citations to "R." refer to docket entries in the district court and the page numbers shown in the ECF header. Citations to "App." refer to the required short appendix attached to this brief.

of the class action settlement. On May 2, 2025, the district court entered judgment in a separate document as required by Federal Rule of Civil Procedure 58(a). App. 1. Objectors-Appellants' Notice of Appeal, R. 632, was filed on April 18, 2025, and "is treated as filed on the date of and after the entry" of the judgment. Fed. R. App. P. 4(a)(2). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court erred in approving a class settlement that allows the conduct challenged in the complaint to continue and provides only a possibility of future compensation of unknown value, and where class members outside the four state-specific subclasses lacked representation.

## STATEMENT OF THE CASE

This appeal is brought by nationwide class members Robert Weissman and Rick Claypool, who objected below to approval of the settlement of this class action.

### A.    Clearview's Business Model

Defendant Clearview AI, Inc., was founded in 2017 by Defendants Hoan Ton-That and Richard Schwartz. Clearview uses a proprietary tool

to continually add to a massive biometric database containing billions of photographs scraped from the internet and social media without the knowledge or consent of the platforms or their users. App. 3; R. 573 ¶¶ 1, 3. Clearview uses artificial intelligence algorithms to analyze the images and harvest each individual's biometric facial geometry, creating "faceprints" for every individual. *Id.* Clearview allows customers to upload an image of a person to Clearview's platform, and if its facial recognition software generates a hit, the customer receives the matching images and links to the websites where they originated. This information enables Clearview users to identify the individual and collect further information found on the linked websites. *Id.*

In January 2020, a New York Times article exposed the privacy and civil rights implications of Clearview's business model. The article revealed that law enforcement agencies were using Clearview to collect personal data without a search warrant or probable cause, and that private corporations—like Defendant-Appellant Macy's—were using Clearview to identify people whose images appeared in surveillance camera footage. App. 4 (citing Kashmir Hill, *The Secretive Company that*

*Might End Privacy as We Know It*, N.Y. Times (Jan. 18, 2020))[2]; *see* Ryan Mac, et al., *Clearview's Facial Recognition App Has Been Used By The Justice Department, ICE, Macy's, Walmart, and the NBA*, Buzzfeed News (Feb. 27, 2020).[3]

Clearview's biometric database has grown to more than 40 billion images of people's faces from around the world, placing everyone in a "perpetual police lineup." Vera Bergengruen, *Ukraine's 'Secret Weapon' Against Russia Is A Controversial U.S. Tech Company*, Time (Nov. 14, 2023);[4] *see* James Clayton & Ben Derico, *Clearview AI Used Nearly 1m Times By U.S. Police, It Tells BBC*, BBC (Mar. 27, 2023).[5] Clearview intends to grow its database to 100 billion images—equal to about 14 photos for each person on Earth. Drew Harwell, *Facial recognition firm Clearview AI tells its investors it's seeking massive expansion beyond law enforcement*, Wash. Post (Feb. 16, 2022).[6]

---

[2] https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

[3] https://www.buzzfeednews.com/article/ryanmac/clearview-ai-fbi-ice-global-law-enforcement.

[4] https://time.com/6334176/ukraine-clearview-airussia/

[5] https://www.bbc.com/news/technology-65057011.

[6] https://www.washingtonpost.com/technology/2022/02/16/clearview-expansion-facial-recognition/.

As alleged in the complaint, Clearview's database is ripe for misuse. R. 573 ¶ 3; *see* App. 33 (recognizing the dangers of the misuse of biometric data). Because Clearview provides its customers with both the matching images and links to the websites where they originated, a Clearview user can build a detailed profile of their target by collecting further information found on the websites, such as political and religious affiliations and the identities of family, friends, and romantic partners. *See* Rebecca Heilweil, *The world's scariest facial recognition company, explained*, Vox (May 8, 2020).[7] A person's faceprint is immutable. *See Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1155 (7th Cir. 2020) (biometric identifiers "are meaningfully different because they are immutable, and once compromised, are compromised forever"). Once a person's faceprint is in Clearview's database, they lose any meaningful anonymity in public life through the constant potential for identification and tracking by Clearview customers. R. 573 ¶ 3.

Clearview's practices disproportionately harm people of color. "'[N]umerous studies have shown that face recognition technology

---

[7] https://www.vox.com/recode/2020/2/11/21131991/clearview-ai-facial-recognition-database-law-enforcement

misidentifies Black people and other people of color at higher rates than white people,' leading to higher incidence of wrongful arrest." App. 33 (quoting Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024));[8] *see also* Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen to Anyone Else*, Time (June 29, 2024).[9] Clearview's practices also have the potential to stifle First Amendment protected speech. *See*, *e.g.*, Senator Edward Markey, Letter to Clearview Founder and Chief Executive Hoan Ton-That (June 8, 2020)[10] (addressing use of Clearview to surveil individuals who took part in Black Lives Matter protests). Indeed, media reports have revealed that, from the outset, Clearview's creators intended for its technology to be deployed against immigrants, people of color, and the political left. *See* Luke O'Brien, *The Shocking Far-Right Agenda Behind*

---

[8] https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true.

[9] https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/

[10] https://www.markey.senate.gov/imo/media/doc/Clearview%20protests%2006.08.20.pdf.

*the Facial Recognition Tech Used by ICE and the FBI,* Mother Jones (May 2025).[11]

## B. The Lawsuit, Proposed Settlement, and Preliminary Approval

This class action consolidates multiple cases challenging Clearview's unlawful collection, use, and sale of biometric identifying information. App. 4. Plaintiffs filed a series of consolidated class action complaints, R. 29, 116, 428, and 573, on behalf of themselves and all individuals in the United States with biometric information in the Clearview database (the nationwide class), and all residents of Illinois, California, New York, and Virginia with biometric information in the Clearview database (the Illinois, California, New York, and Virginia subclasses), against Defendants Clearview, its co-founders (Hon Ton-That and Richard Schwartz), a Clearview corporate shell (Rocky Mountain Data Analytics LLC), and Clearview's general counsel and Rocky Mountain's vice president (Thomas Mulcaire). App. 5. Plaintiffs also sued Macy's, Inc. and other Macy's entities, individually and as

---

[11] https://www.motherjones.com/politics/2025/04/clearview-ai-immigration-ice-fbi-surveillance-facial-recognition-hoan-ton-that-hal-lambert-trump/.

representatives of a defendant class of private entities that purchased access to and used the biometric information in the Clearview database. *Id.* ¶ 30.

Plaintiffs brought claims for violations of the Illinois Biometric Information Protection Act (BIPA), Virginia, California, and New York state laws, and for unjust enrichment. Plaintiffs' complaint seeks (i) monetary damages; (ii) a declaration that Defendants' ongoing collection and use of Plaintiffs' biometric information is unlawful, *id.* ¶ 198; and (iii) an injunction requiring the Defendants to delete all the Plaintiffs' biometric information and cease further collection and distribution, purchase or sale of that information, *id.* ¶ 199.

On June 12, 2024, the parties filed a joint motion for preliminary approval of a proposed settlement. R. 578. The proposed settlement requires class members to release all claims asserted in the complaint and "any and all state law claims … and federal statutory, constitutional, and common law claims" that could have been alleged "regarding the images held in the Biometric Database." R. 621-1 ¶ 1.46. In exchange, however, they receive none of the injunctive relief sought in the complaint. The settlement does not require Clearview to delete any

person's biometric information, does not require Clearview to delete the biometric database, does not require Clearview to provide a mechanism for class members to request the removal of their biometric information, and does not prohibit Clearview from allowing others to access the database. Instead, the settlement allows Clearview to continue engaging in the very practices that the case was brought to stop and, through the release, insulates those practices from further challenge.

The "relief" offered by the settlement is the *possibility* of future compensation to class members who submitted approved claims.[12] Those class members receive shares in a Settlement Fund that does not exist but *could* be established, if one of four potential triggering events occurs:

1) if Clearview completes an Initial Public Offering (IPO);

2) if Clearview is liquidated by a merger, consolidation, or sale of all or substantially all of Clearview's assets;

3) if the Settlement Master makes a cash demand for 17% of Clearview's revenue after the date of final settlement approval and before September 30, 2027; or

---

[12] The settlement administrator received about 189,000 claims but suspects that about 124,000 are fraudulent, leaving an estimated 65,000 legitimate claims. R. 621-2 ¶ 39.

4) if the Settlement Master sells the class members' settlement stake to an investor for a commercially reasonable price.

App. 12; R. 621-1 ¶¶ 3.3–3.4.

There is no guarantee that a Settlement Fund will be established in the future because there is no guarantee that any triggering event will occur. Moreover, if a triggering event occurs, the value of the Settlement Fund that might be established is unknown. For instance, if there is an IPO or liquidation event, Clearview will put into the Settlement Fund an amount equal to the value of a 23% equity stake in Clearview as of September 6, 2023. App. 12; R. 621-1 ¶ 1.57. The settling parties have not revealed Clearview's estimated value as of that date but have estimated that Clearview's value in January 2024 was approximately $225 million, meaning that the settlement stake might have been worth about $51.75 million in January 2024 assuming that its value had not been diluted by additional investment between September 2023 and January 2024. App. 12, 28. The estimated value of the settlement stake can, of course, go up or down by the time of an IPO or liquidation event, if any, so there is no way to accurately predict what the class might receive in the event of a future IPO or liquidation event.

The value of a Settlement Fund established by one of the other two triggering events is even less clear. The Settlement Master can sell the settlement stake for a commercially reasonable price, if a buyer can be found, R. 621-1 ¶ 3.4, but there is no estimate of what a rational investor would pay for a stake in Clearview equal in value to a 23% share of the company on September 6, 2023. And the value of the cash-demand option is unknowable because it is tied to 17% of Clearview's revenue, if any, from an unknown future date until the cash-demand is made.[13] *Id.* ¶ 3.3(c). Again, there is no evidence in the record by which to estimate Clearview's future revenue.

In the event a Settlement Fund is established following one of the four potential triggering events, up to 39.1% of the fund will be paid to class counsel as attorneys' fees, and each class representative will receive an incentive award. Whatever remains (the Net Settlement Fund) will be distributed on a pro rata basis to approved claimants based on state of residence: Approved claimants who resided in Illinois during the relevant

---

[13] The cash-demand option is based on revenue from the date of final settlement approval, R. 621-1 ¶3.3(c), which cannot occur until, at the earliest, the resolution of this appeal and the expiration of any deadlines for seeking rehearing or certiorari, *id.* ¶1.25.

time period will be entitled to 10 shares of the Net Settlement Fund; those who resided in California, New York, or Virginia during the relevant time period will be entitled to 5 shares of the Net Settlement Fund; and those who resided outside of any of the four subclass states (Illinois, California, New York, and Virginia) will be entitled to 1 share of the Net Settlement Fund. App. 13.

In seeking preliminary approval, class counsel conceded that the settlement structure is unconventional and that the total class recovery is unknown. Counsel explained that Clearview is undercapitalized "and the costs of litigation itself would bankrupt Clearview before the case ever got to trial, leaving nothing for the Class members." R. 578 at 8. Such a result would, however, stop Clearview from continuing to violate the class members' privacy rights.

The district court held a hearing on June 18, 2024. R. 648. On June 21, 2024, the district court entered the preliminary approval order proposed by class counsel. R. 580.

## C.  Opposition to Final Approval

Sixteen separate objections to final approval were filed by absent class members, R. 581, 585–586, 590–602, and 22 states and the District

of Columbia filed an amicus brief urging the district court to reject the settlement, R. 609. Fourteen pro se objectors argued, among other things, that the settlement is not fair because 1) it does not stop Clearview from collecting and selling the class members' biometric data without their consent, and thus does not address the harm caused by Clearview or achieve the goal of the litigation; 2) the potential value of the monetary relief is tied to the future success of Clearview's business model, creating a perverse incentive for the class to support continuation of the actions that harm them; and 3) the class would benefit more from continued litigation than from allowing Clearview to continue operating in exchange for an entirely speculative future settlement payment. *See* R. 581, 585, 585–586, 592–602. Objector Joshua De Leon, represented by counsel, argued for rejection of the settlement as unfair to the California subclass because it fails to address Clearview's ongoing conduct and violations of California laws intended to protect the rights to privacy and control of personal information. R. 591 at 12–20. He explained that those laws could stop Clearview from harvesting and selling class members' faceprints without their consent, but the settlement sacrifices "those avenues for injunctive relief for only a speculative and inadequate

promise of a *future* monetary award—an award contingent on Clearview's success in its business of using class members' biometric data without consent." R. 591 at 7.

Objectors-Appellants Weissman and Claypool emphasized that the settlement provides no injunctive relief to halt Clearview's collection, use, and sale of the class members' biometric data, but instead rewards Clearview with a broad release that allows Clearview's conduct to continue while insulating it from further challenge. R. 590 at 17–20. They also argued that the settling parties failed to show that the class will receive any meaningful monetary relief because the value of any future payment is unknown. *Id.* at 13–17. Finally, Weissman and Claypool argued that the nationwide class lacked representation because all of the class representatives are members of the favored subclasses. *Id.* at 22–23.

The Amici States opposed the settlement for similar reasons, arguing that the settlement provides no injunctive relief and that the value of any monetary relief is unknown and tied to the future success of Clearview's business model that harms the class. R. 609. They concluded that "the Settlement has severe flaws that undermine consumers'

fundamental right to privacy and does not meaningfully redress the harms suffered by class members [and] those flaws outweigh the benefits of the (extremely speculative) monetary relief." *Id.* at 2.

Notably, none of the original named plaintiffs or their counsel supported the settlement. Although they did not file formal objections, class counsel noted that their co-counsel "declined to endorse the settlement," R. 578 at 29; R. 621 at 40, and all eight of the original class representatives had to be replaced after the settlement was negotiated because they would not agree to it. *See id.*; R. 648 at 11–12 ("[T]here has been some disagreement along the way amongst the plaintiffs' counsel group. … [T]heir clients did not want to sign this settlement agreement."); App. 18 n.7.

## D. The District Court's Approval of the Settlement

The district court held a fairness hearing on January 30, 2025, *see* R. 649, and, on March 20, 2025, issued an opinion approving the settlement. App. 2. The district court found that the settling parties' use of a respected mediator and the "contentiousness of the motion practice and discovery prior to settlement discussions" indicated that the settlement was negotiated in good faith. App. 23–24. The court then

compared the value of the settlement to the strength of Plaintiffs' case, considering the lack of injunctive relief, the uncertainty of future compensation, and the breadth of the release. App. 24.

First, the court found that the lack of any injunctive relief did not undermine the fairness of the settlement because only the Illinois BIPA claims "directly target[] data privacy and biometrics," other legal theories are "square-peg-round-hole in nature," and "had yet to serve as a basis for judgment in a case involving facial recognition technology." App. 25. The court concluded that claims for injunctive relief other than those under BIPA were weak, and that the settlement reached in *ACLU v. Clearview AI, Inc.*, No. 2020 CH 04353 (Cook Cty. Cir. Ct. 2022), rendered superfluous "any additional injunctive relief stemming from BIPA." App. 26.

Second, the district court found that the unknown value and uncertainty of any future monetary relief did not render the settlement unfair because Clearview's financial constraints meant that any monetary relief would have to come in the form of an equity stake whose value "could shrink or grow depending on the performance of the company." App. 28. The court relied on the settling parties' estimate that

the equity stake might have been worth as much as $51.75 million in January 2024, which the court found significant compared to other BIPA cases, even though the other cases settled for cash rather than an equity stake that might never be monetized. App. 29 (citing *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155 (N.D. Cal. May 5, 2016) ($650 million settlement); *Rivera v. Google, LLC*, No. 2019-CH-990 (Cook Cty. Cir. Ct. 2022) ($100 million settlement); *In re TikTok, Inc., Consumer Priv. Litig.*, 713 F. Supp. 3d 470 (N.D. Ill. Jan. 25, 2024) ($92 million settlement); *Boone v. Snap Inc.*, No. 2022-LA-708 (DuPage Cty. Cir. Ct. Aug. 4, 2022) ($35 million settlement)).

Third, the district court found that the breadth of the release did not impact the fairness of the settlement because the claims against released parties that contribute nothing to the settlement are weak, and it is not uncommon for settlements to release claims that plaintiffs did not, but could have, brought. App. 30.

Finally, the district court recognized that the settlement leaves unresolved the question whether Clearview's conduct violates class members' right to privacy, even as it allows the conduct to continue aided by the release. App. 32–33 (noting that the objectors want the conduct

stopped, rather than to receive a tiny fraction of the profits from it). Although the court found that such concerns "are not wholly without merit," App. 33, it characterized them as "policy concerns" and held that the court need not "address whether Clearview's past, present, or future conduct is fundamentally violative of the privacy rights provided by the federal Constitution or state constitutions … to determin[e] whether the proposed settlement is fair, reasonable, and adequate in the face of the claims brought by Plaintiffs and in its provision of relief to the Settlement Class." App. 33–34.

## SUMMARY OF ARGUMENT

This lawsuit had two goals: to stop Clearview from collecting, storing, and selling class members' biometric data without their consent, and to compensate the class for Clearview's violations of their privacy rights. The settlement abandons the first goal and provides Clearview with a windfall release that allows it to continue using the class members' biometric data with impunity. In exchange, the class receives only a possibility of future compensation of unknown value, perversely tied to

Clearview's success in continuing to engage in the very conduct this lawsuit was supposed to stop.

The district court's order granting final approval of the settlement should be reversed because the settlement is not fair, reasonable, and adequate as required by Federal Rule of Civil Procedure 23(e)(2), and because class members outside the four state-specific subclasses were not represented.

## STANDARD OF REVIEW

This Court reviews a district court's approval of a class action settlement for abuse of discretion, and "insist[s] that district courts exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006) (citation modified). "Abuse of discretion occurs when the district court commits a serious error of judgment, such as the failure to consider an essential factor." *United States v. Lowe*, 632 F.3d 996, 997 (7th Cir. 2011) (citation omitted). "A district court by definition abuses its discretion when it makes an error of law." *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003) (citation omitted).

# ARGUMENT

A court may approve a class settlement "only on finding that it is fair, reasonable, and adequate" after considering, among other things, whether "the relief provided for the class is adequate." Fed. R. Civ. P. 23(e)(2), (e)(2)(C). This Court has identified six factors relevant to the fairness determination: (1) the strength of plaintiff's case on the merits compared to the settlement offer; (2) the complexity, length, and expense of further litigation; (3) the amount of opposition to settlement; (4) the reaction of members of the class to the settlement; (5) the opinion of competent counsel; and (6) the stage of the proceedings and the amount of discovery completed. *Wong v. Accretive Health, Inc.,* 773 F.3d 859, 863 (7th Cir. 2014) (citation omitted).

"Underpinning [Rule 23's] requirements is a concern for the unnamed class members whose interests the named plaintiffs represent and the settlement is meant to serve." *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.,* 869 F.3d 551, 556 (7th Cir. 2017). Accordingly, this Court has repeatedly emphasized the need for "intense judicial scrutiny" of class settlements and diligence in watching for "red flags" that would suggest an unfair settlement. *Eubank v. Pella Corp.,*

753 F.3d 718, 721 (7th Cir. 2014); *see also Synfuel*, 463 F.3d at 652. Approval of a class settlement "requires more than a judicial rubber stamp." *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). The court must act "as 'a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.'" *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 280 (7th Cir. 2002)). To ensure fairness, "the court takes the place, as monitor of counsel, of the nominal clients." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC,* 662 F.3d 913, 917 (7th Cir. 2011).

## I. The settlement is not fair, reasonable, and adequate because it does not stop the challenged conduct and releases claims that might have achieved that goal.

Plaintiffs' operative complaint alleges that the class has no adequate remedy at law and that monetary damages alone are inadequate, and it demands that Clearview be enjoined from continuing to collect, retain, use, and sell the class members' biometric data without their consent. R. 573 ¶¶ 64(h), 81, 89, 96, 103, 110, 117, 125, 155, 176,

185, 190–192, 199. Nevertheless, the district court approved a proposed settlement that lacks any injunctive relief.

In so doing, the court stated that the settlement in another case, *ACLU v. Clearview AI, Inc.*, provided sufficient injunctive relief for the BIPA claims, and that the other legal theories provided a "weaker basis for relief." App. 25. But the *ACLU* settlement does not justify the lack of nationwide injunctive relief in the settlement here, because this case involves more claims and sought broader relief than *ACLU*. Like this case, *ACLU* alleged that Clearview's practices violate BIPA. With some exceptions, the *ACLU* settlement prohibits Clearview from granting access to its database to entities other than law enforcement, precludes Clearview from operating in Illinois until May 11, 2027, requires Clearview to maintain an opt-out portal for Illinois residents to request that Clearview remove their facial vectors from its database, and requires Clearview to screen Illinois-based photographs from its database until May 11, 2027. *See* Settlement Agreement and Release, *ACLU v. Clearview AI, Inc.*, No. 2020 CH 04353 (Cook Cty. Cir. Ct.

2022).[14] The *ACLU* settlement cannot substitute for the nationwide injunctive relief sought here because some of its most important terms—like allowing individuals to request removal of their biometric data from Clearview's website—apply only to Illinois residents, and some of its terms expire less than two years from now.

Furthermore, the complaint in this case asserts claims on behalf of the nationwide class that provide a basis for injunctive relief under legal theories other than BIPA. For example, Plaintiffs allege a nationwide, common law unjust enrichment claim based on Clearview's profiting from the unauthorized and uncompensated collection and sale of the Class Members' biometric data. R. 573 ¶¶ 186–193. Because unjust enrichment is a claim derived from equity, "remedies … are to be flexibly applied" and courts "may structure a remedy to meet particular circumstances." Restatement (Third) of Restitution and Unjust Enrichment Ch.7, Topic 2, Intro. Note (A.L.I. 2011). Accordingly, courts have confirmed the availability of injunctive relief in cases with unjust

---

[14] https://www.courthousenews.com/wp-content/uploads/2022/05/aclu-v-clearview-settlement.pdf.

enrichment claims, especially where, as here, Plaintiffs have alleged an ongoing harm, or a substantial risk of recurring harm.

For example, in *MetroPCS v. Devor*, 215 F. Supp. 3d 626, 635, 639 (N.D. Ill. 2016), the district court granted judgment to the plaintiff on multiple claims, including its unjust enrichment claim, and held that it was entitled to injunctive relief. The court noted that "Defendants' entire business model is predicated on the unauthorized and willful exploitation of [the Plaintiff]" and "absent permanent injunctive relief, [Plaintiff] would be forced to repeatedly file suit" any time the Defendants violated Plaintiff's rights in the future. *Id.* at 638–39; *see also Zimmerman v. Highmark, Inc.*, -- F. Supp. 3d --, 2025 WL 1220364 at *2, *5 (W. D. Penn. Apr. 28, 2025) (allowing plaintiffs to seek damages, declaratory relief, and injunctive relief for their claims, which include unjust enrichment); *Collins v. Conifer Value-Based Care*, 2025 WL 1140788 at *6, *8, *10 (C.D. Cal. Feb. 28, 2025) (allowing plaintiff to seek injunctive relief pursuant to unjust enrichment claim, where damages alone "will not end" Defendant's privacy violations); *Gibson v. Warrior Met Coal Inc.*, 2024 WL 4399433 at *3–*4 (N.D. Ala. Oct. 3, 2024) (partially denying injunctive relief for multiple claims, including unjust enrichment, only

because of a lack of redressability); *Brown v. Google, LLC.*, 685 F. Supp. 3d 909, 925–26 (N.D. Cal. 2023) (allowing plaintiffs to seek injunctive relief where Google continued to collect users' data without consent).

Nonetheless, the settlement provides no injunctive relief to stop the continuation of the challenged conduct. That this omission renders the settlement unfair, inadequate, and unreasonable, *see* Fed, R, Civ. P. 23(e)(2), becomes even more apparent when one considers the scope of the release. The settlement releases "any and all claims, theories, or causes of action … including … any and all state law claims … and federal statutory, constitutional, and common law claims that were, or could have been, advanced regarding the images held in the Biometric Database." R. 621-1 ¶ 1.46. Although the district court acknowledged that Clearview's activities implicate "privacy rights provided by the federal Constitution or state constitutions," App. 34, it did not consider those claims in assessing the fairness of the settlement that provides no injunctive relief, even though such claims are released.

The court should have done so, because constitutional and common law right-to-privacy claims are often pursued in cases challenging data collection without consent. *See, e.g., Rodriguez v. ByteDance, Inc.*, 2025

WL 672951 at *10 (N. D. Ill. Mar. 3, 2025) (allowing plaintiffs to proceed with California constitutional and common law privacy claims based on collection of their photos, videos, location data, and biometric data); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601, 606 (9th Cir. 2020) (plaintiffs sufficiently stated common law privacy claims based on Facebook's collection of internet-browsing data). Indeed, common-law privacy rights have been recognized in most states, *see Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 488 (1975); *see also* Restatement (Second) of Torts § 652(B) (A.L.I. 1977), and such claims can support injunctive relief. *See, e.g.*, *In re 23andMe, Inc. Customer Data Sec. Breach Litig.*, 2024 WL 4982986 at *4, *9 (N. D. Cal. Dec. 4, 2024) (resolving data privacy class action with multiple common law claims, including invasion of privacy and unjust enrichment, for $30 million and multiple changes to business practices); *In re Facebook, Inc. Internet Tracking Litig.*, 2022 WL 16902426 at *2 (N. D. Cal. Nov. 10, 2022) (resolving data privacy class action with common law privacy claims for $90 million and an agreement to sequester and delete all wrongfully collected data); *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 916–918 (N.D. Ill. 2022) (resolving data privacy class action with constitutional and common law

privacy claims, including intrusion on seclusion and unjust enrichment, for $92 million and agreement to refrain from collecting biometric information, geolocation data, and other user data without consent); *In re Vizio, Inc., Consumer Priv. Litig.*, 2019 WL 12966638 at *1, *2 (C. D. Cal. Jul. 31, 2019) (resolving data privacy class action with constitutional and common law privacy claims for $17 million and agreement to delete collected data and to provide opt-out forms regarding data collection).

## II. The settlement is not fair, reasonable, and adequate because the amount of future monetary relief, if any, is unknown and tied to the future success of Clearview's business model that harms the class.

In assessing the fairness of a proposed class settlement, a court must consider whether the settlement reflects a reasonable compromise in light of the prospects of further litigation. "The most important factor relevant to the fairness of a class action settlement is the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Wong*, 773 F.3d at 864 (citation omitted); *see also* Fed. R. Civ. P. 23, advisory committee's note to 2018 amendments ("The relief

that the settlement is expected to provide to class members is a central concern.").

Accordingly, a settlement should not be approved unless it provides actual relief to the class—not the possibility of relief, but relief. As this Court has explained, "[n]o class action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand." *In re Subway*, 869 F.3d at 556 (quoting *In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016)); *see also Koby v. ARS Nat'l Serves., Inc.*, 846 F.3d 1071, 1079–80 (9th Cir. 2017) ("Because the settlement gave the absent class members nothing of value, they could not reasonably be required to give up anything in return."); *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 195 (5th Cir. 2010) ("The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." (citation omitted)).

## A.    A settlement fund might never be established.

Here, the settlement offers only a possibility of future relief of unknown value. The settlement ultimately may provide no value at all,

because there is no guarantee that a triggering event to establish a settlement fund will ever occur: There is no evidence in the record to suggest that there will be an IPO, liquidation event, or sale of the settlement stake before the cash-demand option expires on September 30, 2027. And while the settling parties describe the cash-demand option as a backstop if none of the other three triggering events takes place, R. 648 at 10, and assume that the Settlement Master will exercise the cash-demand option if necessary to avoid the possibility that a Settlement Fund is never established, the Settlement Master is not required to do so. If the revenue that determines the value of the cash demand is too low to provide meaningful compensation to the class, the Settlement Administrator might elect to let the option expire in the hope that one of the other three triggering events eventually occurs. The possibility that a settlement fund will never be established should have precluded approval of the settlement, because there is no assurance that the settlement will deliver the "adequate advantage for the class" required to

justify the release of claims. *In re Katrina Canal Breaches Litig.*, 628 F.3d at 195.

## B. The value of any future settlement fund is unknown.

Before approving a class settlement, the "court should … 'insist[] that the parties present evidence that would enable [] possible outcomes to be estimated,' so that the court can at least come up with a 'ballpark valuation.'" *Synfuel*, 463 F.3d at 653 (alterations in original; quoting *Reynolds*, 288 F.3d at 285). Here, the settling parties have failed to present evidence sufficient to enable a fair estimate of the value of any potential future settlement fund.

To estimate what the class might receive, the settling parties rely exclusively on a third-party's estimate that, as of January 2024, Clearview was worth $225 million. (The settling parties have not revealed who made this estimate and for what purpose.) From that estimate, they extrapolate that the settlement stake—equal to a 23% share of the value of Clearview on September 6, 2023—might have been worth about $51.75 million in January 2024 assuming that there was no dilution by additional investment between September 2023 and January 2024. The settling parties have neither revealed what might have

changed between September 6, 2023, and January 2024, nor what has happened to the value of the settlement stake since that time. Furthermore, the value of the settlement stake at the time of any future IPO or liquidation event has not been estimated. The settling parties concede that by the time of any future IPO or liquidation event, Clearview's value may have gone up or down, and the percentage of that value that would be used to establish a settlement fund may have gone down as a result of additional investment. These unknown variables make it impossible to have any confidence in the settling parties' estimate that a settlement fund worth $51.75 million might be established in the event of an IPO or liquidation event, precluding the "ballpark valuation" required by this Court's decision in *Synfuel*, 463 F.3d at 653, and making it impossible to conclude that the class is receiving adequate value for the waiver of their claims. *See In re Katrina Canal Breaches Litig.*, 628 F.3d at 195. Indeed, in discussing the value of Clearview at the time of any future IPO or liquidation event, Clearview's counsel expressed "hope" that Clearview's value might exceed the estimate from January 2024, but ultimately admitted that "who knows" what its value might be. R. 648 at 7.

The value of a settlement fund that might be established by either of the other two triggering events—sale of the settlement stake or invocation of the cash-demand option—is even more speculative, and the settling parties do not even hazard a guess. There is no evidence in the record to show what a rational investor would pay for a stake in Clearview equal in value to a 23% share of the company on September 6, 2023, and whether an offer from such an investor reflects a "commercially reasonable price" is left to the Settlement Master's discretion. Nor is there any evidence in the record by which one could estimate the value of the cash-demand option, which is based on 17% of Clearview's revenue over some future time period. The settling parties offer no information about Clearview's expected future revenue, if any, but they suggest that the cash-demand offer would generate less value than the other triggering events. R. 648 at 10.

### C. The settlement stake is not comparable to the monetary relief provided in class settlements of other data privacy cases.

As explained above, the value of any monetary relief that the class may realize from the future establishment of a settlement fund is unknown (and may be zero). Nevertheless, the district court found that

the settlement stake—23% of Clearview's value on September 6, 2023—is "significant compared to similar BIPA settlements." App. 29. That finding was in error because the fairness inquiry does not turn on what percentage of the company's equity the settlement may be worth, but on the actual relief the class receives. Every one of the cases that the court found comparable settled for cash rather than an equity stake of unknown future value.

The district court noted that equity-based relief "is not a new idea," App. 27, citing *Uhl v. Thoroughbred Tech. & Telecomm., Inc.*, 309 F.3d 978, 987 (7th Cir. 2002). *Uhl*, however, is easily distinguished from this case. In *Uhl*, the plaintiff class brought claims for slander of title and trespass based on the defendant's installation of fiber optic cables along a railroad. *Id.* at 980. Class members whose land was used to lay the fiber optic cables received a guaranteed cash payment of "$6000 per linear mile" in addition to an equity stake. *Id.* at 982. And the equity stake in *Uhl* was an ownership interest in a new company to which the defendant was required to provide certain assets, which financially benefitted the class as shareholders. *Id.* Here, unlike in *Uhl*, the settlement offers no guaranteed cash payment. The equity stake is also fundamentally

different because the class here does not receive an ownership stake in an independent company, but in a potential (not actual) settlement fund.

## D. Clearview's financial condition does not justify a settlement tied to Clearview's success in continuing the conduct that harms the class.

The district court found that a settlement for a potential future recovery of unknown value was justified because further litigation might have driven Clearview out of business, foreclosing the possibility of meaningful monetary relief for the class. With the litigation resolved, the court hypothesized, Clearview might enjoy financial success that could benefit class members via shares of the potential settlement fund. The court's reasoning is flawed, however, because if Clearview's value increases, it will be a result of the success of Clearview's business model—which harms the class. It is fundamentally unfair to tie the class members' recovery to the continuation and expansion of the invasion of privacy that the case was brought to stop. *See* Margaret Schaack, *Injury Equity: The Rise of Future Stakes Settlements,* 92 U. Chi. L. Rev. 1125, 1171 (2025) (noting that future stakes settlements, including the one at issue here, present "special moral complexity" because they allow a

company that has caused harm to become more profitable, "all while transforming victims into shareholders").

## III. The settlement should have been rejected because the nationwide class lacked representation.

Rule 23 requires that class representatives fairly and adequately represent the interests of the class. *See* Fed. R. Civ. P. 23(a)(4), (e)(2). A class "is not fairly and adequately represented if class members have … conflicting claims." *Ret. Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) (citation omitted). Conflicts of interest within the class "can create serious problems" and thus "require the creation of separately represented subclasses." *Reynolds*, 288 F.3d at 282. Subclass representatives must share the claims and interests of the subclass they represent. *See Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 942 (7th Cir. 2013). Here, the class consists of five subgroups: the Illinois, California, New York, and Virginia subclasses, consisting of residents of those states during the relevant time period whose biometric data is in the Clearview database, and the so-called "nationwide class," consisting of all individuals who resided in the United States but outside of any of the four subclass states during the relevant time period and whose biometric data is in the Clearview database. *See* App. 11. Class

representatives Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando each belong to one of the four state-specific subclasses. The district court erred in finding that the nationwide class was adequately represented, because there was no representative for class members who resided outside of the four state-specific subclasses, despite their competing interests.

Class members outside the state-specific subclasses do not allege claims under the statutes of their states and they receive only one share of any Net Settlement Fund that may be established. In contrast, the members of the state-specific subclasses bring claims under their state's statutes and will receive either 10 shares (Illinois subclass), or 5 shares (California, New York, and Virginia subclasses) of any future Net Settlement Fund. App. 13. Class members outside the state-specific subclasses should have had their own representation because they may have found injunctive relief more meaningful than speculative monetary compensation, and they might not have agreed with the division of shares of any Net Settlement Fund.

The district court found that the distribution of shares across each subclass "was not the product of shadowy, backroom negotiations … but

reflects the strength and viability" of the claims advanced by each subgroup, App. 19, but that misses the point. Whether or not a settlement appears reasonable on its face, class members outside the state-specific subclasses "cannot be bound to a settlement except by consents given by those who ... represent solely" their interests. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 627 (1997) (citation omitted). A class representative dedicated to advocating for the rights of class members outside the state-specific subclasses was necessary to provide "structural assurance of fair and adequate representation." *Smith v. Sprint Comms. Co., L.P.*, 367 F.3d 612, 627 (7th Cir. 2004); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856–57 (1999) (holding that class members with claims of different value had "disparate interests" that required separate subclasses).

As this Court has recognized, "adversity among subgroups" is a "red flag." *Eubank*, 753 F.3d at 721. Such adversity demands "undiluted, even heightened, attention" to the requirements of Rule 23 to ensure that class representatives will adequately protect the interests of each subgroup. *Smith*, 367 F.3d at 614. And courts have found inadequate representation in cases where, as here, different sets of plaintiffs asserted different

claims. For example, in *Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340, 351 (1st Cir. 2022), plaintiffs asserted three kinds of claims against HelloFresh, a meal delivery service. The court held that apportionment of a settlement's common fund required informed, arm's-length negotiation by separate representatives for "each group of class members with materially differing interests." *Id.* at 351. That class members' claims "overlapped" did not mean their interests were the same. *Id.* at 350.

Similarly, in *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242, 245 (2d Cir. 2011), freelance authors asserted three categories of claims—A, B, and C—against a group of publishers for unauthorized publication of their works. Category A and B claims were more valuable than category C claims. *Id.* at 246. Thus, the court found that the interests of authors who held only category C claims could be protected only by the formation of a separately represented subclass, notwithstanding "intense, protracted, adversarial mediation." *Id.* at 252, 254. Further, the court explained, "[o]wning Category C claims in

addition to other claims [did] not make named plaintiffs adequate representatives for those who hold only Category C claims." *Id.* at 251.

Likewise, the settlement agreement in *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187 (3d Cir. 2012), divided the class into two groups that received different benefits—a reimbursement group with priority access to the settlement fund and a residual group. The court found the class representatives inadequate because they all belonged to the reimbursement group but noted that the "fundamental intra-class conflict between the representative plaintiffs ... and those plaintiffs in the residual group" could be resolved if the class was divided into subclasses, "each with representative plaintiffs to ensure that their interests are being accommodated." *Id.* at 189–190.

Thus, in addition to the fact that the settlement here provides no relief to the class and, moreover, wholly fails to redress the members' claims, while giving Clearview a broad release, *supra* at I & II, the lack of representation for those outside the state-specific subclasses precludes approval of the settlement.

Finally, the abrupt replacement of the eight original named plaintiffs because they "did not want to sign this settlement agreement,"

R. 648 at 12; *see* App. 18 n.7, should have alerted the district court to the unfairness of the settlement. Named plaintiffs are entrusted with protecting the distinct interests of absentee class members. *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986). As this Court has held, removal of class representatives because they oppose a settlement negotiated by class counsel is yet another "red flag" that militates against approval. *See Eubank*, 753 F.3d at 723–24 (holding that "[t]he settlement should have been disapproved on multiple grounds," one of which was the replacement of the named plaintiffs who had opposed the settlement). Here, as in *Eubank*, the need to replace the original named plaintiffs before the settlement could be finalized should have alerted the district court that this settlement is not fair.

## CONCLUSION

This Court should reverse the district court's order granting final settlement approval and remand the case for further proceedings.

July 7, 2025                    Respectfully submitted,

                               /s/ Michael T. Kirkpatrick
                               Michael T. Kirkpatrick
                               Karla Gilbride
                               Public Citizen Litigation Group
                               1600 20th Street NW
                               Washington, DC 20009
                               (202) 588-1000

                               *Counsel for Objectors-Appellants*
                               *Robert Weissman and Rick Claypool*

**CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(a)(7)(B)**

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c). As calculated by my word processing software (Microsoft Word for Office 365), the brief contains 7,700 words.

<u>/s/ Michael T. Kirkpatrick</u>
Michael T. Kirkpatrick

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rule 30(a) and (b) are included in the attached appendix.

/s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick

# APPENDIX

## TABLE OF CONTENTS

Judgment in a Civil Case (ECF No. 641, May 2, 2025)................... App. 1

Memorandum Opinion and Order (ECF No. 631, Mar. 20, 2025)... App. 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

IN RE: Clearview AI, Inc., Consumer Privacy
Litigation

Case No.  21 cv 135 (MDL 2967)
Judge Sharon Johnson Coleman

## <u>JUDGMENT IN A CIVIL CASE</u>

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

     which ☐ includes     pre–judgment interest.
           ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s) ,
and against plaintiff(s)

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other: The Court finds that the proposed settlement is fair, reasonable, and adequate pursuant to the requirements of Rule 23(e). And, with all three prerequisites class certification, notice, and fairness satisfied, the Court grants Plaintiffs' motion for final approval of the settlement [621] .

---

This action was *(check one)*:

☐ tried by a jury with Judge     presiding, and the jury has rendered a verdict.
☐ tried by Judge     without a jury and the above decision was reached.
☒ decided by Judge Sharon Johnson Coleman on motion for final approval of class action settlement.

Date:  5/2/2025                 Thomas G. Bruton, Clerk of Court

                                     Yvette Montanez, Deputy Clerk

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| In re Clearview AI, Inc., Consumer Privacy Litigation, | ) ) ) ) ) | Case No. 21-cv-00135 |
|  |  | Judge Sharon Johnson Coleman |

**MEMORANDUM OPINION AND ORDER**

After over five years of litigation, before the Court is Plaintiffs' motion for final approval of a class action settlement in the multidistrict litigation against Clearview AI, Inc. for its collection, storage, and use of biometric face images the company scraped from the internet without consent. This class action settlement agreement and release is entered into by Plaintiffs Rodell Sanders, Gerard Dache, Eric Gould and Jordan Orlando (collectively "Plaintiffs"), individually and on behalf of all others similarly situated (the "Settlement Class" or "Class Members"). The Settlement Class is further divided into a Nationwide Class, an Illinois Subclass, a California Subclass, a New York Subclass, and a Virginia Subclass. Plaintiffs and the Settlement Class are represented by Loevy & Loevy ("Lead Class Counsel").

Included as parties to the agreement are the following Defendants: Clearview AI, Inc. ("Clearview"), Clearview co-founders Hoan Ton-That and Richard Schwartz, Clearview affiliate Rocky Mountain Data Analytics LLC ("Rocky Mountain"), and Clearview General Counsel Thomas Mulcaire (collectively, the "Clearview Defendants"); and Macy's, Inc., Macy's Retail Holdings, Inc. (n/k/a Macy's Retail Holdings, LLC), and Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC) (collectively, the "Macy's Defendants" or "Macy's").

For the following reasons, the Court grants the motion for final approval of the settlement.

**Background**

*A. Biometrics and the launch of multidistrict litigation*

This litigation concerns the collection, storage, and use of biometric data. "Biometrics" refers to the automated recognition of individuals based on their biological and behavioral characteristics.[1] While the average person may not be familiar with the term, they likely are familiar with common biometric characteristics: fingerprints, DNA, voice, and, at issue here, face geometry.[2] Face biometrics use aspects of a person's face geometry, such as the eyes, nose, or mouth, to create a unique face image. Once captured, this face image can be stored and used to identify that individual through a variety of facial recognition applications, such as unlocking a smartphone, finding missing persons, and identifying criminal suspects.

The identification power of face images, combined with the ubiquity of facial capture and recognition platforms in the modern digital era, makes this biometric characteristic both incredibly powerful and highly susceptible to misuse. Seeing an opportunity in the proliferation of face images on the internet, in 2017, Hoan Ton-That and Richard Schwartz founded Clearview AI, Inc. Using a proprietary tool, the start-up assembled a massive biometric database of individuals by "scraping" their photos from publicly available websites and collecting their biometric facial geometry. With this database, Clearview customers—primarily federal and state law enforcement agencies and private retailers—seeking to identify an individual could upload an image of the person in question to Clearview's platform. Using its facial recognition software, Clearview would then compare the uploaded image to those in its database to locate other images of the individual in question, enabling the customer to identify the individual.

---

[1] "Information technology—Vocabulary—Part 37: Biometrics," THE INTERNATIONAL ORGANIZATION FOR STANDARDIZATION, https://www.iso.org/obp/ui/#iso:std:iso-iec:2382:-37:ed-3:v1:en (last accessed Mar. 18, 2025).
[2] "Types of Biometrics," BIOMETRICS INSTITUTE, https://www.biometricsinstitute.org/what-is-biometrics/types-of-biometrics/ (last accessed Mar. 18, 2025).

Through its internet scraping efforts, Clearview's database quickly grew to a staggering three billion images. In early 2020, the *New York Times* published a story titled "The Secretive Company that Might End Privacy as We Know It" describing Clearview's growing law enforcement and commercial retail clientele and the erosion of privacy signaled by the increasing use of facial recognition technology by private and government entities.[3] The article sparked a flurry of class action lawsuits in both federal and state court. The first federal court case was filed before this Court on January 22, 2020 by Lead Class Counsel. Then on May 28, 2020, the ACLU filed a complaint against Clearview in the Circuit Court of Cook County seeking injunctive relief for violation of the Illinois Biometric Information Privacy Act (BIPA). *American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cnty. Cir. Ct. No. 2020 CH 04353.

On August 18, 2020, Clearview moved to consolidate the existing actions into a multidistrict litigation (MDL) pursuant to 28 U.S.C. § 1407. *In re Clearview AI, Inc. Privacy Litigation*, MDL No. 2967. On January 8, 2021, the Judicial Panel on Multidistrict Litigation (JPML) issued a transfer order consolidating nine of the pending actions before the Court. The JPML would later order two additional cases be transferred to the MDL on June 21, 2021, bringing the total number of consolidated cases, which originated from four different districts, to eleven.

On April 9, 2021, Plaintiffs filed a consolidated class action complaint. (Dkt. 29.) That same day, Plaintiffs moved for a preliminary injunction that sought to enjoin Clearview from continuing to possess, collect, profit from, and distribute Illinois residents' biometric data. (Dkt. 31.) After a raft of briefing, on June 4, 2021, the parties entered into a joint stipulation under which Clearview would cease certain allegedly BIPA-violating practices, namely distributing, redistributing, transferring or

---

[3] Kashmir Hill, *The Secretive Company that Might End Privacy as We Know It*, N.Y. Times (Jan. 18, 2020), https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html.

otherwise disseminating to any entity or person the biometric identifiers of any Illinois plaintiff or Illinois resident. (Dkt. 97.)

## B. *Plaintiffs' claims*

On June 29, 2021, following the JPML's second and last consolidation order, Plaintiffs filed their first amended consolidated class action complaint on behalf of a nationwide class and Illinois, California, New York, and Virginia subclasses. The complaint named as defendants Clearview, its co-founders Hoan Ton-That and Richard Schwartz, Clearview's affiliate Rocky Mountain, and Clearview's general counsel, Thomas Mulcaire. The complaint also named Macy's, Inc. as a defendant, individually and on behalf of a defendant class comprised of private entities who had used Clearview for security purposes.

In their complaint, Plaintiffs: alleged violations of (1) BIPA, 740 ILCS § 14/15(b) (c) (d) and (e); (2) Viginia statutes addressing the unauthorized use of names or pictures, Va. CODE §§ 8.01-40, and the Virginia Computer Crimes Act, Va. CODE § 18.2-152.1, *et seq.*; (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, California's Commercial Misappropriation statute, Cal. Civ. Code § 3344(A), California common law protections for the right of publicity, and the California state constitution's protections against invasion of privacy; and (4) New York's civil rights protections against invasion of privacy, N.Y. CIV. RIGHTS LAW §§ 50–51; and (5) brought an unjust enrichment claim and sought judgment under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.* (Dkt. 116.)

### 1. *Illinois Subclass claims*

The first seven counts were brought by the plaintiff from Illinois on behalf of the Illinois subclass for violation by Defendants of several provisions of the Illinois Biometric Information Privacy Act. 740 ILCS § 14/1 *et seq.* BIPA was enacted in 2008 in response to the growing use of

biometrics in the business and security screening sectors and the corresponding need to ensure that biometric information is properly collected, stored, and distributed.  740 ILCS § 14/5.  To accomplish this goal, § 14/15 prescribes a range of requirements for the retention, collection, disclosure, and destruction of biometric information by private entities:

- Section 14/15(b) prohibits private entities from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining an individual's biometric information without their written consent;

- Section 14/15(c) prohibits private entities in possession of an individual's biometric information from selling, leasing, trading, or otherwise profiting from that biometric information;

- Section 14/15(d) prohibits private entities in possession of an individual's biometric information from disclosing, redisclosing, or otherwise disseminating this information unless: (1) the entity has the individual's consent; (2) the disclosure or redisclosure completes a financial transaction requested by the individual; (3) disclosure or redisclosure is required by state or federal law or municipal ordinance; or (4) the disclosure is pursuant to a valid warrant or subpoena;

- Section 14/15(e) requires a private entity to store, transmit, and protect biometric information using the reasonable standard of care and in a manner in which it stores other confidential and sensitive information.

In addition to these prohibitions, § 14/20 provides individuals with a right of action to seek the following forms of relief against entities that violate the statute's provisions: the greater of liquidated damages of $1,000 or actual damages for negligent violation; the greater of liquidated

damages of $5,000 or actual damages for intentional or reckless violation; reasonable attorneys' fees and costs; and other relief, including injunctive relief.[4]

### 2. Virginia Subclass claims

The next two counts were brought by the plaintiff from Virginia on behalf of the Virginia subclass for violation by Defendants of two statutes addressing the unauthorized use of names or pictures: Va. CODE §§ 8.01-40 and the Virginia Computer Crimes Act, Va. CODE § 18.2-152.1, *et seq.* Section 8.01-40 permits an individual to seek injunctive relief and punitive damages against a person, firm, or corporation that uses her name, portrait, or picture without her written consent. Section 18.2-152.1 permits an individual "injured by . . . any act of computer trespass" to sue for damages sustained by the trespass and the costs of the suit. Under the statute, acts of computer trespass include fraud, trespass, invasion of privacy, and gathering personal information through deception.

### 3. California Subclass claims

Four counts were brought by the plaintiff from California on behalf of the California subclass for violation of California law. The first count sought restitution and disgorgement and injunctive relief under California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200). The second sought damages under California Civil Code § 3344(a) for commercial misappropriation, which provides the greater of statutory damages for up to $750 or actual damages for the use of one's photograph or likeness without consent. The third count sought damages and injunctive relief for violation of the California common law right of publicity, which protects persons from the

---

[4] As noted by Plaintiffs in their motion for final approval, the Illinois Supreme Court has yet to resolve the question of whether statutory damages under BIPA are mandatory or discretionary. *See Cothron v. White Castle Sys., Inc.*, 2023 IL 128004, 216 N.E.3d 918, 929 as modified on denial of reh'g (July 18, 2023) (inviting the state legislature to "make clear its intent regarding the assessment of damages under [BIPA]").

unauthorized use of a person's identity by another for commercial gain. The fourth and final count sought damages and injunctive relief for intrusion of the state's constitutional right to privacy.

### 4. New York Subclass claim

One sole count was brought by the plaintiff from New York on behalf of the New York subclass for violation of New York Civil Rights Law §§ 50–51. Section 50 provides for a right of privacy and publicity and establishes the use of a person's name, portrait, picture, likeness, or voice without written consent as a misdemeanor. Section 51 enables a person to seek actual damages and injunctive relief for violation of these rights.

### 5. Nationwide Class claims

The final two counts were brought on behalf of all plaintiffs and the Settlement Class. The first sought an order compelling Defendants to disgorge into a common fund or constructive trust "proceeds that they unjustly received from the sale, lease, trade, distribution, dissemination and use of the personal information" under a theory of unjust enrichment. The second—and sixteenth total— count sought judgment under the federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, declaring that Defendants were in violation of the common law and statutory claims brought under the complaint and requesting the issuance of a nationwide injunction preventing Clearview from continuing to engage in the unlawful conduct alleged in the complaint.

### C. Settlement negotiations

The Court, with the support of Magistrate Judge Valdez, oversaw and adjudicated several motions for reconsideration, interlocutory appeal, and discovery disputes throughout the litigation. But the scale of Clearview's activities combined with the early-stage nature of the company presented a challenge for both parties. As of October 29, 2021, Clearview's database contained approximately ten billion images, creating a class that encompassed virtually any individual whose face had been

posted on the internet prior to and during the period of Clearview's operation. But as a start-up, Clearview was financially dependent on capital from investors and government contracts that had dried up during the litigation. The cost of trial and a multi-million-dollar judgment would likely lead to the company's bankruptcy, foreclosing the possibility of meaningful monetary relief for the class. Additionally, in May 2022, Clearview entered into a settlement with the ACLU in its case in Illinois state court, a development that significantly impacted the relief possible in the MDL.[5]

In light of these challenges, in mid-2022 the parties engaged the Honorable Wayne Andersen (ret.) to mediate settlement discussions. As explained by Judge Andersen in his report supporting the preliminary approval of the settlement, the parties discussed a range of issues in-depth during these discussions, including: (1) the facts surrounding Clearview's data scraping and database of facial images; (2) the size of Clearview's potential liability under BIPA and recent BIPA decisions; (3) Clearview's defenses to the Settlement Class's claims under BIPA; (4) Clearview's arguments as to the territorial limitation of BIPA as applied to non-Illinois residents; (5) the strength of and defenses to the subclass claims brought under Virginia, California, and New York law, as well as the strength of and defenses to the nationwide class claims; and (6) claims against Macy's and the vendor defendant class, including the scope and extent of any use by vendors of the information from the Clearview database. (Dkt. 578, Ex. B.) The parties also discussed Clearview's inability to pay the significant judgment expected from a loss in litigation, supported by extensive information provided by Clearview as to its financial condition. (*Id.*) Ultimately, these 2022 discussions did not lead to a settlement, as Plaintiffs insisted on receiving a substantial payment from Clearview, along with other forms of possible relief, that Clearview believed it could not provide.

---

[5] *American Civil Liberties Union, et al. v. Clearview AI, Inc.*, Cook Cnty. Cir. Ct. No. 2020 CH 04353, available at https://www.aclu.org/cases/aclu-v-clearview-ai?document=Exhibit-2-Signed-Settlement-Agreement#legal-documents (hereinafter "ACLU Settlement Agreement").

Undeterred, in February 2023, the parties once again engaged Judge Andersen to resume mediation. This time, the parties agreed from the outset that any viable class action settlement would need to include the Settlement Class receiving a meaningful equity stake in Clearview, as Clearview continued to maintain that it could not afford a payment large enough to serve as the basis for a settlement with a class of this size. (*Id.*) The need for an equity stake was further necessitated by the fact that in the event of a Clearview bankruptcy, several security interests held priority to any claim by the Settlement Class after judgment, which would leave little monetary relief for the Settlement Class to recoup. (*Id.*)

After over six months of negotiations, the parties landed on a settlement agreement providing the Settlement Class with payout from a 23% equity stake in Clearview. (*Id.*) This equity percentage represents the outcome of a delicate balancing act by the parties. Too large a percentage ran the risk of preventing Clearview from attracting the investors necessary for the start-up to grow and provide relief to the Settlement Class. But too small a percentage would not have been commensurate with the injuries of the Settlement Class and the zealous advocacy of their claims by Lead Class Counsel. This pursuit of a Goldilocks percentage was also shadowed by the numerous appellate issues that could be raised by both sides, further risking a prolonged litigation and the provision of any monetary relief for the Settlement Class.

### D. *Proposed settlement agreement*

On June 12, 2024, the parties filed a joint motion for preliminary approval of the settlement agreement. In exchange for a release of liability from the Settlement Class's claims, the settlement provides the following relief.

1. *Establishment of a nationwide settlement class and state subclasses*

The settlement establishes four state subclasses (Illinois, California, New York, and Virginia) and one nationwide class consisting of the following:

- **The Nationwide Class:** All individuals who resided in the United States of America between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The Illinois Subclass**: All individuals who resided in the state of Illinois between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The California Subclass**: All individuals who resided in the state of California between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database;

- **The New York Subclass**: All individuals who resided in the state of New York between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database; and

- **The Virginia Subclass**: All individuals who resided in the state of Virginia between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or biometric data are or were contained in the biometric database.

2.  *Monetary relief*

As monetary relief, the settlement creates a Settlement Fund for the benefit of the Nationwide Class and the subclasses based upon a Settlement Stake—a monetary amount equal to a 23% equity stake in Clearview as of September 6, 2023.  As of January 2024, Clearview's value was estimated to be approximately $225 million dollars, making the Settlement Stake worth $51.75 million dollars. (Dkt. 621.)  The Fund will be funded and paid by the triggering of one of four events:

1)  the occurrence of an IPO;

2)  the occurrence of a liquidation event, such as a merger or consolidation or sale of all or substantially all of Clearview's assets;

3)  a payment by Clearview of an amount equal to 17% of Clearview's GAAP recognized revenue for the period commencing on the date of final settlement approval and ending with the election of this option, which expires on September 30, 2027; or

4)  the amount the Settlement Class will receive if it elects to sell its right to receive the Settlement Stake payment.

The Settlement Class can pick whichever relief seems the most advantageous as events play out for Clearview in the future.  To exercise this right and to protect the interests of the Settlement Class, the settlement appoints a Settlement Master with the right: (1) to, upon reasonable notice, inspect Clearview's books and records, (2) to request and receive biannual interviews with Clearview's management team, and (3) to receive information regarding the price and terms of any secondary sales of Clearview stock.  In addition to holding the 23% stake until a triggering event, the Settlement Master also has the authority to sell the Settlement Class's rights to a third-party (immediately distributing the proceeds to the Settlement Fund) if he deems it in the Settlement Class's best interests.

Irrespective of the method of funding, the Settlement Fund serves as the source of all attorneys' fees (39.1% of the Settlement Fund) and incentive payments to Plaintiffs (equal to fifty pro rata shares of the net Settlement Fund, with a cap of $1,500). After these payments have been made, the remainder will be distributed to Settlement Class members who submit an approved claim. These shares are distributed pro rata based on each claimant's state of residence and the relative strength of each claim brought under the complaint. Approved claimants who resided in Illinois during the relevant time period will be entitled to ten shares of the Settlement Fund, while those who resided in California, New York or Virginia will be entitled to five shares. Claimants who did not reside in any of the four subclass states will be entitled to one share of the Settlement Fund.

After evaluating the fairness, adequacy, and reasonableness of the settlement agreement, the Court entered a preliminary approval of the settlement on June 21, 2024. (Dkt. 580.) The Court made three principal findings in its preliminary approval: that (1) there was good cause to believe that the settlement is fair, reasonable, and adequate; (2) the settlement had been negotiated at arm's length over several months between experienced attorneys familiar with the legal and factual issues of the case and was reached with the assistance of Magistrate Judge Valdez and mediation by Judge Andersen; and (3) the settlement provided a plan for providing notice of its material terms to the Settlement Class for their consideration and reaction. (*Id.*) The settlement also set a deadline of September 20, 2024, for the filing of any objections to the settlement or requests for exclusion.

E. *Notice plan, submission of objections, and the final approval hearing*

Following the Court's preliminary approval of the settlement, the parties proceeded with the notice plan developed by the settlement administrator, Epiq Class Action and Claims Solutions, Inc. ("Epiq"). *See generally* Dkt. 621, Ex. B. Per the Court's preliminary approval order, the notice period began on July 25, 2024, and concluded on October 25, 2024, the date by which all claims were due.

Because Clearview did not collect or know the actual identity of persons in its biometric database, individual notice to potential class members was not possible. Accordingly, on July 3, 2024, Epiq created a settlement website that contained relevant litigation documents, frequently asked questions, and instructions for opting out of, objecting to, or filing a claim under the settlement. Epiq also established an automated telephone system through a toll-free number that provided callers with information about the settlement, as well as a postal mailing address.

Epiq then employed several different forms of notice to reach class members. First, Epiq established a digital advertising campaign on select advertising networks and social media platforms designed to encourage participation by class members. This advertising campaign reached more than 372 million impressions across each platform between July 25 and September 5.

| Network/Property | Target | Language | Ad Size | Delivered Impressions |
|---|---|---|---|---|
| *Google Display Network* | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 172,657,967 |
| *Yahoo Audience Network* | Adults 18+ | English & Spanish | 728x90, 300x250, 300x600 & 970x250 | 54,923,624 |
| *Outbrain Network* | Adults 18+ | English & Spanish | Custom Feed Ads | 5,324,647 |
| *Taboola Network* | Adults 18+ | English | Custom Feed Ads | 5,274,252 |
| *Facebook* | Adults 18+ | English | Newsfeed & Right Hand Column | 71,375,097 |
| *Instagram* | Adults 18+ | English | Newsfeed | 41,063,778 |
| *X* (*Twitter*) | Adults 18+ | English | Feed Ads | 22,199,203 |
| **Total** | | | | **372,818,568** |

Next, Epiq acquired sponsored search listings that linked directly to the settlement website on the three most frequently visited internet search engines: *Google*, *Yahoo!*, and *Bing*. When search engine visitors searched selected common keyword combinations related to the settlement, the sponsored search listing was displayed at the top of the visitor's website page prior to the search results or in the upper right-hand column of the web-browser screen. These search listings were displayed 23,714

times between July 25 and September 5. Finally, a party-neutral informational release was issued nationwide over *PR Newswire's US1* and *Hispanic newslines* in English and Spanish to approximately 5,000 general media (print and broadcast) outlets, as well as approximately 4,500 websites, online databases, internet networks, and social media platforms.

By Epiq's estimation, approximately 70% of adults aged eighteen and older in the United States were reached through the notice plan, with an average frequency of 2.6 times each. (Dkt. 621.) Epiq also estimates that the final number of valid claims will be between 65,000 and 125,000, with 1,008 requests for exclusion. (*Id.*) Sixteen objections were filed by class members through this notice plan. A coalition of state attorneys general led by Vermont ("Amici States") also filed an amicus brief objecting to the settlement agreement.[6] (Dkt. 609.)

After the notice and claims submission period closed, Plaintiffs filed a motion for final approval of the settlement on January 16, 2025. On January 30, 2025, the Court held a hearing on the motion, at which time it granted Plaintiffs' motion appointing the Honorable Sidney I. Schenkier (ret.) as Settlement Master. (Dkt. 630.)

For the reasons set forth below, the Court overrules the objections and grants Plaintiffs' motion for final approval of the settlement.

**Legal Standard**

A court may approve a class action settlement if: (1) it is able to certify the settlement class; (2) the class was provided adequate notice and a public hearing; and (3) it determines that the settlement is "fair, reasonable, and adequate." *In re TikTok, Inc., Consumer Priv. Litig.*, 617 F. Supp. 3d 904, 921 (N.D. Ill. 2022) (Lee, J.) (citing Fed. R. Civ. P. 23(e)(1)–(2)).

---

[6] Amici States include: Vermont, Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Indiana, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New York, Oregon, Rhode Island, Tennessee, Washington, and the District of Columbia.

**Discussion**

    *A. Class certification*

        A plaintiff seeking class certification has the burden of showing that their proposed class meets the requirements of Rule 23(a) and the requirements for one of the three types of classes identified in Rule 23(b). *Id.* at 922 (citing *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1004 (7th Cir. 2019)). Rule 23(a) requires a plaintiff to show that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Plaintiffs also must show that "the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior over other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

        As the Court concluded in its preliminary approval order, Plaintiffs have satisfied these Rule 23(a) and (b) requirements. Accordingly, the Court certifies the class for settlement purposes.

    *1. Numerosity, commonality, and typicality*

        The numerosity, commonality, and typicality requirements of Rule 23(a) are readily satisfied here. The expected class size of 65,000–125,000 members satisfies the numerosity requirement because it is too large for joinder to be practicable. *See Anderson v. Weinert Enters., Inc.*, 986 F.3d 773, 777 (7th Cir. 2021) (noting that "a forty-member class is often regarded as sufficient to meet the numerosity requirement" by courts in the Seventh Circuit). As to commonality, there are numerous "common contention[s] . . . capable of classwide resolution" of which the "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50, 131 S. Ct. 2541, 2551, 180 L. Ed. 2d 374

(2011). Namely, Plaintiffs allege that Defendants are liable for violations of BIPA and several state statutes and common law, and for unjust enrichment, for the scraping and storing of Class Members' biometric facial images from the internet without consent or compensation, resolution of which would be the same for each Class Member. As to typicality, Plaintiffs' claims "share the same essential characteristics" with those of the Class Members because each named plaintiff suffered the same statutory privacy violation and tortious conduct as the Class Members. *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 606 (7th Cir. 2021).

### 2. Adequacy of representation

The only Rule 23(a) factor in dispute is the requirement that class representatives fairly and adequately represent the class. Fed. R. Civ. P. 23(a)(4); *see Howard*, 989 F.3d at 609. The purpose of this requirement is to protect the rights of absent class members by "uncover[ing] conflicts of interest between named parties and the class they seek to represent" and to "screen[ ] for conflicts of interest among class members." *Howard*, 989 F.3d at 609 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S. Ct. 2231, 2236, 138 L. Ed. 2d 689 (1997)). The adequacy-of-representation requirement "is composed of two parts: the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) (St. Eve, J.) (quoting *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)).

As the Court found in its preliminary approval of the settlement, Lead Class Counsel's representation of the class and that of Plaintiffs is adequate. As described further in Plaintiffs' petition for fees and later in the Court's evaluation of the opinion of competent counsel, Lead Class Counsel has shown its significant experience in class-action litigation and settlement throughout the case, with no demonstrated conflicts with the interest of the class members. (Dkt. 583.) And since being added

to the case in May 2024, each of the plaintiffs has satisfactorily participated in the litigation and represented the class. [7]

Two objectors disagree. As to representation of counsel, the Amici States protest that the 39.1% attorney's fee award is "significantly higher than normally approved in common fund cases like this." (Dkt. 609.) But this argument is in opposite to Seventh Circuit caselaw, where courts have routinely provided fee awards of 30% or greater of a common fund.[8] The fee award is also commensurate with the length and complexity of the case and the significant amount of time and effort Lead Class Counsel expended in their representation of the Settlement Class. *See Sutton v. Bernard*, 504 F.3d 688, 693 (7th Cir. 2007) (explaining that "the market price for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case") (internal quotations omitted).

Separate from the fee award, objectors Weissman and Claypool argue on behalf of the Nationwide Class that the interests of Plaintiffs, all of whom are subclass members, and the interests of the Nationwide Class are in conflict. (Dkt. 590.) First, Weissman and Claypool argue that the availability of injunctive relief is likely more significant for Nationwide class members because they, unlike the subclass members, do not allege claims for additional monetary damages under state law. Second, the objectors argue that the pro rata distribution of shares of the Settlement Fund—ten to the Illinois Subclass, five to the California, New York, and Virginia subclasses, and one to the Nationwide Class—reflects inadequate representation because there is not a named plaintiff

---

[7] Plaintiffs filed a second amended complaint on August 22, 2022. (Dkt. 428.) Plaintiffs then filed a third amended complaint on May 13, 2024—the operative complaint—substituting Plaintiffs David Mutnick, Steven Vance, Mario Calderon, Anthony Hall, Isela Carmean, Shelby Zelonis Roberson, Andrea Vestrand, and Aaron Hurvitz for Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando as class representatives. (Dkt. 573.)
[8] *See, e.g., Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (approving a fee of 38% of a $20 million-dollar common fund); *Charvat v. Valente*, 12-CV-05746, 2019 WL 5576932, at *11 (N.D. Ill. Oct. 28, 2019) (approving a fee of 33.99%); Dkt. 583 (collecting cases).

representing the Nationwide Class. Finally, the objectors argue that because Plaintiffs were named after the settlement was reached, they could not have meaningfully participated in the result to be deserving of 50 pro rata shares of the Settlement Fund and the $1,500 incentive award.

But general concerns, unsupported by evidence, do not a conflict of interest make. As the Court explains in more detail later in this opinion, the possibility of injunctive relief is not determined by the desires of the class members but by the strength and weaknesses of the bases for the relief. While some members of the Nationwide Class may have a strong interest in receiving injunctive relief under the settlement, that possibility is foreclosed by the fact that the complaint provides no basis for such relief. The same is true for the pro rata distribution of shares across each subclass, which was not the product of shadowy, backroom negotiations between Plaintiffs and Defendants but reflects the strength and viability of the respective Illinois, California, Virginia, New York, and nationwide claims. Finally, not only are incentive awards "justified when necessary to induce individuals to become named representatives" as is the case here, *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001), Weissman and Claypool do not provide any factual allegations to support their claim that Plaintiffs have not provided representation deserving of such an award.

For these reasons, the Court finds that Plaintiffs and Lead Class Counsel fairly and adequately represent the class.

### 3. *Rule 23(b)(3) factors: predominance and superiority*

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry requires the Court to "understand what the plaintiffs will need to prove and [to] evaluate the extent to which they can prove their case with common evidence." *In re Allstate Corp Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). That is, "it is the method of determining the answer

and not the answer itself that drives the predominance consideration." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 845 (7th Cir. 2022). *Bell v. PNC Bank, Nat. Assn.*, 800 F.3d 360, 378 (7th Cir. 2015) ("[A] common question predominates over individual claims if a failure of proof on the common question would end the case and the whole class will prevail or fail in unison.") (internal quotation marks omitted). Superiority is satisfied when a class action is "superior over other available methods for fairly and efficiently adjudicating" the case, keeping in mind "the class members' interests in individually controlling the prosecution . . . of separate actions" and "the extent and nature of any litigation concerning the controversy already begun." Fed. R. Civ. P. 23(b)(3).

Both predominance and superiority are satisfied here, a finding which no objector disputes. As to predominance, all class members allege injury due to Clearview's image scraping, allegations that are readily amenable to generalized proof of this conduct. And to superiority, this settlement represents the resolution of eleven consolidated class action disputes that were filed in four different districts on behalf of a class that encompasses most of the country. Given the cost and complexity of investigating and litigating the conduct at issue in this case, individual class members would likely have had little interest in prosecuting Clearview on their own. *See California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 582 U.S. 497, 513, 137 S. Ct. 2042, 2054, 198 L. Ed. 2d 584 (2017) ("The very premise of class actions is that 'small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'") (quoting *Amchem*, 521 U.S. at 617).

For these reasons, the Court finds that both predominance and superiority are satisfied as required by Rule 23(b)(3) and certifies the Settlement Class for the purposes of settlement.

B. *Rule 23's notice requirement*

To approve the settlement, the Court must next find that the notice plan provided to the class "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also* Fed. R. Civ. P.

23(e)(1)(B) (requiring the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified"). Neither Rule 23 nor due process requires that every class member actually receives notice. Instead, "notice suffices if it is reasonably calculated to reach the absent parties." 3 William B. Rubenstein, Newberg on Class Actions § 8:36 (5th ed. 2011) (updated 2024).

The Court finds that Plaintiffs have satisfied these requirements. As explained above, Epiq's notice plan was broad and comprehensive, consisting of digital advertising, sponsored search listings, and informational releases, and the establishment of a dedicated settlement website, a toll-free telephone number, and a mailing address. All told, Epiq estimates that approximately 70% of adults aged eighteen and older in the United States were reached through the notice plan, a figure that comports with the standard recommended by the Federal Judicial Center. *See* Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010), https://www.fjc.gov/sites/default/files/2012/NotCheck.pdf (last accessed March 18, 2025).

Three individuals—Kesselbrenner, Lee, and De Leon—object to the notice plan as being inadequate. Kesselbrenner argues that providing meaningful notice to such a large nationwide class is inherently impossible. (Dkt. 586.) Similarly, Lee argues that the fact that she and four members of her social circle did not see or utilize any of the options provided by the notice plan means that notice was insufficient and that notice instead "should have been mailed to every US address." (Dkt. 599.) Finally, De Leon argues that the banner advertisements were not sufficiently descriptive of the alleged harm and are generally an ineffective method of notice due to low engagement with such advertisements. (Dkt. 591.) De Leon further argues that the use of sponsored search listings inappropriately places the burden on individuals to take action to prompt the corresponding banner advertisement. (*Id.*)

None of these objections support a finding that the notice plan was insufficient. To accept the contention that it is impossible to provide meaningful notice to nationwide classes would be to foreclose class action as a method of litigation despite the increasing interconnectedness of our digital society. Nor would direct notice to every US address been practicable under the circumstances given the size of the class and the fact that Clearview did not possess address information for the face images in its database. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 665 (7th Cir. 2015) (explaining that Rule 23(c)(2)(B) "does not insist on actual notice to all class members in all cases" and in fact "recognizes it might be *impossible* to identify some class members for purposes of actual notice") (emphasis in the original). And while banner advertisements and sponsored search listings are in no way a silver bullet for ensuring notice when class members' names and address are not known or not knowable with reasonable effort, Epiq's notice plan used a variety of different methods and media to reach class members to overcome such limitations. *Id.* (noting that "courts may use alternative means such as notice through third parties, paid advertising, and/or posting in places frequented by class members" to meet the due process requirements that underpin Rule 23(c)(2)(B)).

For these reasons, the Court finds that the notice program was adequate under Rule 23.

### C. Rule 23(e) fairness inquiry

#### 1. Legal standard

The Court now turns to the fairness of the settlement itself. To evaluate the fairness of a settlement, a court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006)

(citing *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)). This analysis does not "focus on individual components of the settlement, but rather views it in its entirety in evaluating its fairness." *Isby*, 75 F.3d at 1199.

When conducting this analysis, courts consider the facts "in the light most favorable to the settlement." *Id.* At the same time, courts must be mindful that, when sizeable class action settlements are concerned, the parties may have incentives to "sell out the class" by accepting a "deal that promotes the self-interest of both class counsel and the defendant[s]" at class members' expense. *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014). As a result, the court must act akin to "a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries." *Pearson v. NBTY, Inc.*, 772 F.3d 778, 780 (7th Cir. 2014) (internal quotation marks omitted).

### 2. *Strength of Plaintiffs' case and the value of the settlement*

The first and "most important" factor in the fairness inquiry asks the Court to balance the strength of the merits of Plaintiffs' case against the value that they will receive from the settlement. *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 864 (7th Cir. 2014). In the past, this inquiry required district courts to "quantify the net expected value of continued litigation" by "estimating the range of possible outcomes and ascribing a probability to each point on the range." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 284–85 (7th Cir. 2002). But recently, the Seventh Circuit has moved away from this formulaic, quantitative analysis and endorsed an examination of "indicia of trustworthiness"—such as third-party mediation, extensive confirmatory discovery, and hard-fought, arm's-length negotiation—in making this determination. *In re TikTok, Inc.*, 617 F. Supp. 3d at 933–34 (collecting cases applying this method of scrutiny).

Indicia of trustworthiness and good faith so permeate the prior litigation and the settlement agreement before the Court that the "mechanical mathematic valuation exercise" required by *Reynolds*

is not necessary.  As described above, the settlement was the result of extensive settlement negotiations overseen by Judge Andersen, a well-respected former federal judge and experienced mediator.  These negotiations were not only characterized by zealous advocacy by both Plaintiffs and Defendants on behalf of their respective interests but also clear-eyed awareness of the structural barriers that stood in the way of injunctive and monetary relief for the Settlement Class.  The contentiousness of the motion practice and discovery prior to settlement discussions is also indicative of the entrenchment of both sides in their respective positions.

These indicia of trustworthiness do not absolve the Court of its responsibility to carefully examine the value of the settlement, particularly in light of the arguments raised by objectors.  The objections regarding the value of the settlement fall into three camps: the lack of nationwide or state-specific injunctive relief, the uncertainty of the amount of compensation provided by the Settlement Stake, and the breadth of the release.  The Court considers each objection in turn, finding that they do not impact the Court's assessment that the value of the settlement is proportionate to the strength of Plaintiffs' case.

### a.  *Lack of injunctive relief*

The most common objection brought by the individual objectors and Amici States is that the Court should not approve the settlement because it does not include injunctive relief, namely in the form of a nationwide injunction or a California-specific injunction preventing Clearview from future operations.  But the wishes of the objectors at settlement must be balanced against the realities of the case during litigation.  As the Seventh Circuit has consistently made clear, "[t]he essence of settlement is compromise."  *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).  Accordingly, a settlement should not be rejected as unfair "solely because it does not provide a complete victory to the plaintiffs," *Isby*, 75 F.3d at 1200, but instead be evaluated based on an estimate of the likely outcome of a trial.  *Eubank v. Pella Corp.*, 753 F.3d 718, 727 (7th Cir. 2014).

The sixteen counts in the amended consolidated class action complaint reflect not only the size and scope of Clearview's database but also the nascency of state biometric data privacy protections. Accordingly, and as described by Plaintiffs in their motion, the relief provided by the settlement depended on the strength and weaknesses of each of Plaintiffs' claims as measured by the extent to which the cause of action directly targeted data privacy and biometrics.

Of the causes of action brought under the statute, BIPA is the only one that directly targets data privacy and biometrics. Furthermore, the statute provides for statutory damages, actual damages, and injunctive relief. As such, the seven BIPA counts emerged as the strongest claims in the complaint. The claims brought under the other laws were more square-peg-round-hole in nature. Unlike those brought under BIPA, the California, Virginia, and New York law claims were brought under state statutory and common law theories that had yet to serve as a basis for judgment in a case involving facial recognition technology. The novel and untested nature of these claims made them comparatively weaker than those brought under BIPA. And unbound by any state's law, the unjust enrichment and declaratory judgment claims formed an even weaker basis for relief, let alone nationwide relief.

In sum, Plaintiffs complaint only provided a basis for injunction under the laws of four states, with relief under BIPA being the most certain. But even if Plaintiffs succeeded in their BIPA claim, the statute does not expressly intend to operate extraterritorially such that it could be used as the basis for nationwide or state-specific injunctive relief. *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 296 Ill.Dec. 448, 835 N.E.2d 801, 852 (Ill. 2005). As the Court explained in its prior opinion granting in part and denying in part a motion to dismiss brought by Clearview, Dkt. 279, the critical question in determining extraterritoriality is whether the circumstances relating to the violations occurred "primarily" and "substantially" in Illinois. *Avery*, 216 Ill.2d at 187. This is a fact-intensive inquiry that requires courts to look to "the residency of the plaintiff, the location of harm,

communications between parties (where sent and where received), and where a company policy is carried out." *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101 (N.D. Ill. 2017) (Chang, J.).

The resolution of the ACLU's case against Clearview further shifted the options for injunctive relief under BIPA. *See* ACLU Settlement Agreement, *supra* note 5. Among other relief, the settlement applied a permanent nationwide injunction banning Clearview from granting paid or free access to its database to any private entity or individual except in compliance with BIPA or to any individual government employee not acting in their official capacity, effectively limiting Clearview's clientele to federal and state government agencies and their contractors. The settlement also placed a five-year injunction prohibiting Clearview from granting either paid or free access to its database to Illinois state, county, local, or other government agencies or to private entities located in the state. Finally, the settlement established an opt-out program for Illinois residents, through which a resident, after uploading a photograph of themselves through an online form, could request that Clearview block any search results that include photographs of the resident and prevent future collection of photographs.

Contrary to the arguments raised by objectors, the proposed settlement does not rely on the ACLU settlement as collateral relief to justify not including injuncting relief within its own terms. Instead, given the expansive reach and scope of the ACLU settlement, the settlement recognizes that any additional injunctive relief stemming from BIPA would be a null set that would leave the Settlement Class in largely the same position as they were before the settlement. Including relief premised on such empty words would not strengthen the settlement, as the objectors argue, but instead call its fairness into question. *See In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) ("[I]f the class representatives have agreed to a settlement that provides meaningless relief to the putative class, the district court should refuse to certify or, alternatively, decertify the class."); *In re Walgreen Co. S'holder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016) ("No class

action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand."). As such, the lack of nationwide or state-specific injunctive relief does not undermine the fairness of the settlement.

      *b. Certainty of monetary relief*

The second major objection to the fairness of the settlement relates to the fact that monetary relief is provided through an equity stake with an unspecified value rather than an immediate, direct payment to the Settlement Class at the time of settlement. Objectors Wang, De Leon, Younge, and Weissman and Claypool object that the settlement relief is uncertain because it does not guarantee a specific amount of compensation for Class Members and provides "coupon" compensation that requires Class Members to do business with Clearview again to get any monetary benefit from the settlement. (Dkts. 581, 591, 593; 590.) Relatedly, Objector Lee argues that the settlement is inadequate because it does not offer a range of what the claims will be worth from a dollar amount perspective. (Dkt 599.) The Amici States raise a similar objection, arguing that the monetary relief is inadequate because Plaintiffs do not know "the true valuation of Clearview and whether there will be any monetary payment to class members at all." (Dkt. 609.)

Though novel in the context of past BIPA settlements, the concept of equity- or security-based monetary relief is not a new idea. *See Uhl v. Thoroughbred Tech. & Telecommunications, Inc.*, 309 F.3d 978, 987 (7th Cir. 2002) (affirming the district court's approval of a class-action settlement premised on the issuance of securities to class members). Just as necessity is the mother of invention, the decision to premise monetary relief on a 23% equity stake in Clearview was driven by the practical realities of the case. Judge Andersen describes Clearview's precarious financial condition in detail in his report on the settlement negotiations, saying:

      I also was convinced that even a 'victory' by the Class after a long and

      expensive trial would not necessarily lead to a meaningful recovery for the

Class. Clearview did not have the funds to pay a multi-million-dollar judgment. Indeed, there was great uncertainty as to whether Clearview would even have enough money to make it through to the end of trial, much less fund a judgment. In addition, Clearview explained, and substantiated, that certain of its convertible note holders possessed security interest in the technology being used by Clearview. This meant that, in the event of a Clearview bankruptcy – during litigation or after trial – the holders of those security interests would have priority to any claim by the Class after a judgment, leaving little to nothing with which to satisfy a judgment.

(Dkt. 578, Ex. B.) Because of Clearview's evident financial constraints, as substantiated by information on Clearview's "financial position, revenues, and capitalization," both parties agreed at the outset of settlement discussions that "any viable class action settlement would need to include the Class receiving a meaningful equity stake in Clearview." *Id.* The choice was clear: secure the Settlement Class monetary relief in the form of an equity stake in Clearview, or risk leaving litigation victorious, but empty-handed.

Nor is this 23% figure an empty, speculative gesture. As of January 2024, Clearview's value was estimated to be approximately $225 million dollars, making the Settlement Stake worth $51.75 million dollars. Granted, the nature of an equity stake is that it could shrink or grow depending on the performance of the company. But as Amici States themselves note in their objection, Clearview is bullish about the company's potential growth based on the available market of federal, state, and local agencies.[9] And even if this valuation were to remain unchanged, the 23% equity stake is

---

[9] *See* Dkt. 609. (citing Sam Blum, Clearview AI's Founder on the Company's Controversial Beginnings and Massive Growth, INC. MAGAZINE (Aug. 12, 2024), https://www.inc.com/sam-blum/clearview-ais-founder-on-companys-controversial-beginnings-massive-growth-since.html (in which Clearview co-founder Hoan Ton-That estimated that Clearview could become "a billion-plus or $2 billion annual recurring revenue company" in the next five or ten years)).

significant compared to similar BIPA settlements.[10]  Furthermore, classifying this equity stake as "coupon" relief, as argued by Weissman and Claypool in their objection, mischaracterizes the nature of the Settlement Stake, as the Settlement Class is neither receiving a coupon or voucher for discounted services with Clearview.  *See In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) (describing "coupon settlements" as those that provide recovery through "'vouchers' (good for an entire product) and 'coupons' (good for price discounts)").

Still, puffery and the vagaries of the free market are seldom enough to hang one's hat on, particularly in the context of a settlement agreement.  That is why the settlement does not leave the administration of this equity stake to chance but instead appoints Judge Schenkier as Settlement Master.  (Dkt. 625.)  As Settlement Master, Judge Schenkier will be responsible for overseeing the Settlement Stake and acting on behalf of the Settlement Class.  The Court notes that no objection has been made to the appointment of a Settlement Master or the selection of Judge Schenkier for that role, which reflects the appropriateness of the position's scope and Judge Schenkier's qualifications.

    *c.  Breadth of the release*

Weissman and Claypool object to the breadth of the release of claims provided by the settlement, arguing that the settlement releases the Macy's Defendants without any obligation for them to contribute to the Settlement Fund.  (Dkt. 590.)  But this argument runs into the now familiar buzzsaw that is the need to compare the provided relief with the strength of Plaintiffs' claims.  Here, as outlined in Plaintiffs' motion for final approval and response to objections, discovery demonstrated that though a client of Clearview, Macy's did not itself possess any biometric data or take any active

---

[10] *See, e.g.*, *In re Facebook Biometric Information Privacy Litigation*, N.D. Cal. No. 15-cv-3747-JD ($650 million settlement, representing less than %1 of Facebook's market value at the time of settlement); *Rivera v. Google, LLC*, Cook Cnty. Cir. Ct. No. 2019-CH-990 ($100 million settlement, representing 0.01% of Google's value at the time of settlement); *In re Tiktok*, N.D. Ill. No. 20-cv-04699 ($92 million settlement, representing less than %1 of TikTok's estimated valuation at the time of settlement); *Boone v. Snap Inc.*, Cir. Ct. DuPage Cnty. Ill. No. 2022-LA-708 ($35 million settlement, representing less than 1% of Snapchat's market capitalization at the time of settlement).

steps to possess or collect the biometric data in Clearview's database. (Dkt. 621.) Clearview's contract with Macy's also provided that Clearview would not include any biometric data of Illinois residents while providing services to Macy's. (*Id.*) These facts greatly weaken the strength of the claims against Macy's, rendering a requirement that they contribute to the Settlement Fund suspect at best.

Weissman and Claypool also object to the language of the release itself as being overbroad because it requires class members to release "any other claim arising under any federal law, state law, or common law, including state law privacy claims." (Dkt. 590.) But as the Seventh Circuit notes, "a court may release not only those claims alleged in the complaint but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273–74 (7th Cir. 1998); *see also id.* at 274 ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other."). As such, neither of these objections impact the Court's evaluation of the fairness of the settlement.

### 3. Other settlement factors

The remaining settlement factors also support a finding that the settlement is fair, reasonable, and adequate. *See Wong*, 773 F.3d at 863.

Given the nature of the claims and number of putative class members, the complexity, length, and expense of future litigation in this case would be enormous. The parties were in the thick of fact discovery before they began discussing settlement in earnest in 2023, with expert discovery, class certification, and summary judgment yet to occur. And as described by Judge Andersen in his report on the settlement negotiations, both sides were confident in the strength of their legal and substantive arguments, a level of entrenchment that all but guaranteed lengthy and adversarial litigation at both the trial and appellate level. Such litigation also would not have been confined to one court. Because

the eleven cases were consolidated into one MDL, once the Court completed pretrial proceedings, each individual case would have been returned to their original courts for trial preparation and trial. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 33–35, 118 S. Ct. 956, 961–62, 140 L. Ed. 2d 62 (1998) (explaining the process for returning cases under 28 U.S.C. § 1407). All the while, the risk of Clearview going bankrupt defending this litigation loomed large, an outcome that would have denied class members the possibility of any monetary relief.

The relative dearth of opposition to the settlement and the reaction of class members weighs in favor of approval as well. After 70% of adults aged eighteen and older in the United States were reached through the notice program, with an average frequency of 2.6 times each, only sixteen objections and 1,008 requests for exclusion were filed by class members. This level of opposition is remarkably low given the size of the class, the intense media scrutiny applied to Clearview and this litigation, and the breadth of the notice plan. And even taking into account the objections raised by Amici States in their brief, the substance of these objections largely concerns requests for injunctive and monetary relief that was improbable through litigation given the relative strength of the claims and Clearview's financial limitations.

Additionally, the opinion of competent class counsel supports approval of the proposed settlement. *See Isby*, 75 F.3d at 1200 (explaining that courts may "rel[y] upon affidavits that outline the qualifications of class counsel and perhaps more importantly upon its own observations over the course of the litigation as to the quality of the representation provided to the class"). Lead Class Counsel has extensive experience litigating and settling class actions of this size, scope, and complexity. This experience is further validated by the Court's own observations throughout the course of this five-year litigation and those of Judge Andersen during settlement negotiations. *See, e.g.*, Dkt. 578, Ex. B, Dkt. 583, Ex. A, Dkt. 621.

The last factor—"the stage of the proceedings and the amount of discovery completed"— asks "how fully the district court and counsel [were] able to evaluate the merits of plaintiffs' claims" before reaching the settlement. *In re AT & T*, 270 F.R.D at 350. Here, settlement was reached over four years into litigation. By the time fact discovery was stayed in June 2023 in light of the parties' ongoing settlement efforts, all parties had completed document production, Plaintiffs had retained experts to evaluate this production, and depositions of the class representatives and Defendants' witnesses had been noticed. This information gathering was then supplemented by the over a years' worth of intensive settlement negotiations, during which the relative strength of each sides' arguments and Clearview's financial condition was heavily scrutinized by the parties. As such, both the Court and the parties had ample time to evaluate the merits of Plaintiffs' claims before reaching the settlement before the Court today.

### 4. Policy objections to the settlement

Though fair, reasonable, and adequate when examined within its four corners, the settlement agreement leaves unresolved the question that motivated this multidistrict litigation: whether the collection of publicly available biometric information for use by private or government entities—even when done in accordance with the law—is reconcilable with constitutional privacy rights.

For the objectors to this settlement, the answer to this question is a resounding "no." Amici States argue that the settlement "has severe flaws that undermine consumers' fundamental right to privacy" and that the 23% Settlement Stake will not "redirect the company's moral compass." (Dkt. 609.) Objector De Leon picks up this baton, stating that "Clearview's business practices erode long-established rights of personal privacy and autonomy, supercharging governments' power to surveil marginalized groups and threatening free expression." (Dkt. 590.) And Objector Younge decries Clearview's actions and practices as "illegal and immoral" and "worr[ies] for the safety of [her]self and [her] community because it feels like companies like Clearview can pull information from anywhere

without my knowledge or consent." (Dkt. 593.) For Objector Lee, these privacy concerns outweigh the monetary relief the settlement provides to the Settlement Class. "Simply put, I don't care if Clearview goes bankrupt," Lee writes. (Dkt. 599.) "My concern is that mine and fellow residents have their privacy protected. I want the bad behavior to be stopped; not to be given a tiny fraction of the profits from it."

These concerns regarding the dangers of the use—and misuse—of biometric information are not wholly without merit. According to the ACLU, "numerous studies have shown that face recognition technology misidentifies Black people and other people of color at higher rates than white people," leading to higher incidence of wrongful arrest.[11] But on the other side, supporters of facial recognition technology point to its ability to help solve crimes, including in underserved areas, and exonerate those who have been wrongfully accused.[12]

The Court is not the first to grapple with the impact of law enforcement's use of advanced technologies such as facial recognition on the privacy rights of Americans. In determining whether the use of pole cameras by police to surveil a private residence violates the Fourth Amendment protection against unlawful search, the Seventh Circuit invited us to imagine a world of constant surveillance:

> [W]e are steadily approaching a future with a constellation of ubiquitous public and private cameras accessible to the government that catalog the movements and activities of all Americans. Foreseeable expansion in

---

[11] Nathan Freed Wessler, *Police Say a Simple Warning Will Prevent Face Recognition Wrongful Arrests. That's Just Not True*, ACLU (Apr. 30, 2024), https://www.aclu.org/news/privacy-technology/police-say-a-simple-warning-will-prevent-face-recognition-wrongful-arrests-thats-just-not-true (noting that, to date, over twenty communities across the nation have implemented bans on the use of facial recognition technology by government and/or law enforcement agencies); *see also* Robert Williams, *I Was Wrongfully Arrested Because of Facial Recognition Technology. It Shouldn't Happen to Anyone Else*, TIME MAGAZINE (June 29, 2024), https://time.com/6991818/wrongfully-arrested-facial-recognition-technology-essay/.
[12] *See, e.g.*, Thomas Brewster, *Exclusive: DHS Used Clearview AI Facial Recognition in Thousands of Child Exploitation Cold Cases*, FORBES (Aug. 7, 2023), https://www.forbes.com/sites/thomasbrewster/2023/08/07/dhs-ai-facial-recognition-solving-child-exploitation-cold-cases/; Kashmir Hill, *Clearview AI, Used by Police to Find Criminals, is Now in Public Defenders' Hands*, N.Y. TIMES (Sep. 18, 2022), https://www.nytimes.com/2022/09/18/technology/facial-recognition-clearview-ai.html.

technological capabilities and the pervasive use of ever-watching surveillance will reduce Americans' anonymity, transforming what once seemed like science fiction into fact. Constitutionally and statutorily mandated protections stand as critical bulwarks in preserving individual privacy vis-à-vis the government in this surveillance society.

*United States v. Tuggle*, 4 F.4th 505, 509–10 (7th Cir. 2021). Though ultimately finding that the use of pole cameras was consistent with current Fourth Amendment jurisprudence, the Seventh Circuit cautioned that, "barring a transformation in governing law," courts would continue to be confronted with these questions on the line between surveillance and the right to privacy:

Today's pole cameras will be tomorrow's body cameras, 'protracted location tracking using [automatic license plate readers],' drones, facial recognition, Internet-of-Things and smart devices, and so much more that we cannot even begin to envision. New technologies of this sort will not disappear, nor will the complicated Fourth Amendment problems that accompany them. If anything, we should expect technology to continue to grow exponentially. And if current technologies are any indication, that technological growth will predictably have an inverse and inimical relationship with individual privacy from government intrusion, presenting serious concerns for Fourth Amendment protections.

*Id.* at 527–28.

But unlike the court in *Tuggle*, it is not the role of this Court to address whether Clearview's past, present, or future conduct is fundamentally violative of the privacy rights provided by the federal Constitution or state constitutions. Instead, the Court is limited to determining whether the proposed

settlement is fair, reasonable, and adequate in the face of the claims brought by Plaintiffs and in its provision of relief to the Settlement Class.

Viewed through this limited aperture, the policy concerns raised by the objectors cannot stand as a basis for rejecting the settlement. While individual objectors may believe that the practice of collecting face images is illegal, they do not point to any law that Clearview's practices currently violate. Nor does the brief by Amici States—submitted on behalf of a coalition of twenty-two state attorneys general—identify any such violations. This is not an omission, but a practical result of the over five years of litigation in state and federal court seeking to ensure Clearview's compliance with the law. Absent any such violations, it would be a dereliction of the Court's duty to act as a fiduciary for the Settlement Class to reject a settlement, hard-fought and negotiated in good faith, and the relief it provides to address concerns not at issue in the present case.

Applying determinative effect to the policy concerns raised by objectors would also exceed the bounds of the Court's authority under the principles of separation of powers, namely the prohibition on issuing advisory opinions. As Chief Justice Marshall wrote in the foundational case *Marbury v. Madison*, "[i]t is emphatically the province and duty of the judicial department to say what the law is." 1 Cranch 137, 177, 5 U.S. 137, 177, 2 L. Ed. 60 (1803). So as not to "intrude into areas committed to the other branches of government," Article III of the Constitution limits the jurisdiction of federal courts to "cases" and "controversies" presented before the courts. *Flast v. Cohen*, 392 U.S. 83, 94–95, 88 S. Ct. 1942, 1949–50, 20 L. Ed. 2d 947 (1968). This same limitation prohibits courts from issuing advisory opinions on disputes that fall outside the confines of the case presently before it. *Id.*

The prohibition against advisory opinions has practical as well as theoretical merit. As noted by the Seventh Circuit, a familiar concern with advisory opinions is that they might be "ill-informed and unreliable because the factual record on which it was based was incomplete or hypothetical."

*People of State of Ill. ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 942 (7th Cir. 1983). Advisory opinions also "promote friction with the other branches of government" by "multiplying the occasions" on which federal courts would need to decide whether specific conduct is permissible under law. *Id.* Wise to these constraints on its authority, the Court will not use the policy concerns raised by the objectors to reject the settlement and issue what would in effect be an advisory opinion on whether the use of facial recognition technology impermissibly erodes constitutional privacy rights.

It is these same separation of powers principles that ensure that this settlement will not be the last word on the constraints our society should place on the use of facial recognition technology. As was the case in *Tuggle*, facial recognition is "an apt area for Congress to legislate because, as some have noted, 'Congress has significant institutional advantages over the courts in trying to regulate privacy in new technologies.'" *Tuggle*, 4 F.4th at 528 (citing Orin S. Kerr, *The Mosaic Theory of the Fourth Amendment*, 111 MICH. L. REV. 311, 313 (2012)). Notably, and to this very point, Amici States themselves are careful to explain in their objection, "for the sake of clarity," that though they object to the settlement, they "do not advocate a settlement that prohibits law enforcement accessing the Clearview database." (Dkt. 609.) That Amici States object to the settlement's terms but nevertheless endorse the use of Clearview's database by law enforcement demonstrates why it is the province of Congress and state legislatures—not the federal courts—to enact data protection laws if these bodies deem them necessary to curb the collection of face images by private entities such as Clearview and the corresponding use of facial recognition technology by law enforcement agencies.

The expansion of Clearview's opt-out program provides an example of the necessary and proper role of state legislatures in protecting the data privacy rights of their residents. As a result of its settlement with the ACLU, Clearview was required to implement an opt-out program for Illinois residents through which an individual could submit a request to be removed from Clearview's database. *See* ACLU Settlement Agreement, *supra* note 5. Today, this opt-out program has expanded

to twelve states including Illinois in response to those states enacting data protection laws concerning the collection and use of biometric information.[13]  These states have not waited for the Court's approval of this settlement to implement these programs.  Nor are they constrained by the settlement in taking further steps to protect the privacy rights of their residents.  While it may be more expedient, as suggested by several objectors, for the settlement to include a nationwide opt-out provision, expediency cannot justify overstepping the confines of judicial power.  Because such a provision both lacks a legal claim as its basis and improperly shortcuts the deliberative and representative role of legislatures in crafting responses to the proliferation of facial recognition technology, the Court will not reject the settlement on those grounds or any of the other policy concerns brought by the objectors.

**Conclusion**

For the reasons set forth in this opinion, the Court finds that the proposed settlement is fair, reasonable, and adequate pursuant to the requirements of Rule 23(e).  And, with all three prerequisites—class certification, notice, and fairness—satisfied, the Court grants Plaintiffs' motion for final approval of the settlement [621].

**IT IS SO ORDERED.**

Date: 3/20/2025

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

---

[13] These states are: California; Colorado; Connecticut; Delaware; Illinois; Iowa; Montana; Nebraska; Nevada; New Hampshire; Utah; and Virginia. *Clearview AI, Inc. Privacy Policy*, CLEARVIEW AI, INC., https://www.clearview.ai/privacy-policy (last accessed Mar. 18, 2025).