No. 25-1673

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

IN RE: CLEARVIEW AI, INC. CONSUMER PRIVACY LITIGATION.

RODELL SANDERS, *et al.*,

Plaintiffs-Appellees,

v.

CLEARVIEW AI, INC., *et al.*,

Defendants-Appellees,

APPEAL OF: ROBERT WEISSMAN and RICK CLAYPOOL,
Objectors-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:21-cv-00135
The Honorable Judge Sharon Johnson Coleman

**APPELLEES' BRIEF AND SUPPLEMENTAL APPENDIX**

September 26, 2025

Jon Loevy
Michael Kanovitz
Tom Hanson
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
312-243-5900

*Counsel for Appellees*
*Sanders, Dache, Gould,*
*and Orlando*

James L. Thompson
Daniel F. Lynch
Lynch Thompson LLP
150 S. Wacker Drive, Ste. 2550
Chicago, IL 60606
(312) 346-1600

*Counsel for Appellees*
*Clearview AI, Inc., Ton-That,*
*Schwartz, Rocky Mountain Data*
*Analytics, Inc., and Mulcaire*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1673

Short Caption: In re: Clearview AI, Inc. et al.

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Clearview AI, Inc., Hoan Ton-That, Richard Schwartz, Rocky Mountain Data Analytics, LLC, and Thomas Mulcaire

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Lynch Thompson, LLP; Jenner & Block LLP, Cahill Gordon & Reindel LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        Clearview AI, Inc.: no parent corporations. Rocky Mountain Data Analytics: parent corporation is Clearview AI

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        No publicly held company owns 10% or more of any listed party's stock.

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ James Thompson        Date: May 14, 2025

Attorney's Printed Name: James Thompson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes [✓]    No [ ]

Address: Lynch Thompson LLP, 150 South Wacker Dr., Ste 2550

Chicago, IL 60606

Phone Number: 312-346-1600        Fax Number: 312-667-9231

E-Mail Address: jthompson@lynchthompson.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1673

Short Caption: WEISSMAN et al., v. CLEARVIEW et al

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando

(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Loevy & Loevy, 311 N. Aberdeen, 3rd FL, Chicago, IL 60607

(3)      If the party, amicus or intervenor is a corporation:

   i)      Identify all its parent corporations, if any; and

   N/A

   ii)      list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

   N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   N/A

Attorney's Signature: s/ Michael Kanovitz                    Date: 5/13/2025

Attorney's Printed Name:  Michael Kanovitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes [✓]    No [ ]

Address:  311 N. Aberdeen, 3rd Fl

   Chicago, IL 60607

Phone Number:  312-243-5900                    Fax Number:  312-243-5902

E-Mail Address:  mike@loevy.com

rev. 12/19 AK

II

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-1673</u>

Short Caption: <u>WEISSMAN et al., v. CLEARVIEW et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Loevy & Loevy, 311 N. Aberdeen, 3rd FL, Chicago, IL 60607

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: <u>s/ Jon Loevy</u>    Date: <u>5/13/2025</u>

Attorney's Printed Name: <u>Jon Loevy</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: <u>311 N. Aberdeen, 3rd Fl</u>

       <u>Chicago, IL 60607</u>

Phone Number: <u>312-243-5900</u>    Fax Number: <u>312-243-5902</u>

E-Mail Address: <u>jon@loevy.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-1673

Short Caption: WEISSMAN et al., v. CLEARVIEW et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Rodell Sanders, Gerard Dache, Eric Gould, and Jordan Orlando

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Loevy & Loevy, 311 N. Aberdeen, 3rd FL, Chicago, IL 60607

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and
N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: s/ Thomas Hanson    Date: 5/13/2025

Attorney's Printed Name: Thomas Hanson

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: 311 N. Aberdeen, 3rd Fl

Chicago, IL 60607

Phone Number: 312-243-5900    Fax Number: 312-243-5902

E-Mail Address: hanson@loevy.com

rev. 12/19 AK

IV

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS ……………………………………………………..I-IV

TABLE OF AUTHORITIES ……………………………………………………VII-X

STATEMENT OF JURISDICTION ……………………………………………....1

STATEMENT OF THE ISSUE ……………………………………………………...1

STATEMENT OF THE CASE ……………………………………………………1

    Clearview's Business ……………………………………………………...1

    The Class Action Claims ……………………………………………………5

    The Litigation Before the District Court ………………………………………7

    The Class Action Settlement ……………………………………………..10

SUMMARY OF ARGUMENT …………………………………………………...16

ARGUMENT ……………………………………………………………………18

    I.      STANDARD OF REVIEW ……………………………………...18

    II.     THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION
            WHEN IT DETERMINED THAT THE SETTLEMENT WAS FAIR
            AND REASONABLE EVEN IN THE ABSENCE OF INJUNCTIVE RELIEF
            TO THE NATIONWIDE CLASS……………………………………….21

         A.  The District Court Reasonably Concluded that the Nationwide Class
            Was Unlikely to Obtain an Injunction Even if the Case Had Proceeded
            on the Merits …………………………………………………………21

             1.   The Operative Complaint Seeks Money Damages, not Injunctive
                 Relief, in its Single Claim for Unjust Enrichment on Behalf of the
                 Nationwide Class …………………………………………………...23

             2.   Objectors Weissman and Claypool Cite No Case Granting a
                 Class-Wide Injunction on an Unjust Enrichment Claim …………………27

         B.  The District Court Reasonably Declined to Enjoin Conduct that State
            Courts, State Legislatures, and Municipalities Have Not Barred ……………29

         C.  The Release Was Not Overbroad ……………………………………….32

         D.  The 2022 ACLU Settlement Constrained the Parties' Ability to Provide
            New and Meaningful Injunctive Relief …………………………………35

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN
        APPROVING THE MONETARY RELIEF CALLED FOR BY
        THE SETTLEMENT …………………………………………………37

        A.  A Settlement Fund Will Be Established ……………………………..38

        B.  Uncertainty as to the Future Value of the Settlement Fund Does Not
            Require Reversal of the District Court's Approval …………………………40

        C.  The District Court Reasonably Compared the Value of the Instant Settlement
            to the Values in Other BIPA Settlements ……………………………………42

        D.  The Settlement Does Not Connect Class Relief to Continued Conduct
            by Clearview that Harms the Class ……………………………………………43

IV.     THE NATIONWIDE CLASS WAS ADEQUATELY REPRESENTED ………...46

CONCLUSION …………………………………………………………………………53

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE
PROCEDURE 32(a)(7)(B) AND CIRCUIT RULE 32(C) …………………………...54, 55

SUPPLEMENTAL APPENDIX

Class Action Settlement Agreement and Release (ECF No. 578-1, June 12, 2024) ………..App. 1

Doe v. Highmark Complaint (ECF No. 1, February 15, 2023) ……………………………App. 59

Collins v. Conifer Class Action Complaint (ECF No. 1, October 23, 2014) ………………App. 98

*State of Vermont v. Clearview AI, Inc.* Ruling on Defendant's Motion for Summary
Judgment (ECF No. 622-1, January 16, 2025) ...............................................................App. 160

# TABLE OF AUTHORITIES

**Case(s)**                                                                        **Page(s)**

*Aland v. United States DOI,*
   2024 U.S. App. LEXIS 11203 *6 (7th Cir. May 8, 2024) …………………………………7

*Alarm Detection Sys. V. Orland Fire Prot. Dist.,*
   929 F.3d 865, 871 n.2 (7th Cir. 2019) …………………………………………………..7

*American Civil Liberties Union v. Clearview AI, Inc.,*
   Cook Cnty Cir. Ct. No. 2020 CH 4353 ………………………………………………...9

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591, 611, 625, 627 (1997) …………………………………………46, 47, 48

*Armstrong v. Board of School Directors,*
   616 F.2d 305 (7th Cir. 1980) …………………………………………………………22

*Association Benefit Servs., Inc. v. Caremark RX, Inc.,*
   493 F.3d 841, 854 (7th Cir. 2007) ……………………………………………………26

*Brown v. Google, LLC,*
   685 F. Supp. 3d 909, 921, 922 (N.D. Cal. 2023) ……………………………………27, 28

*Camp Drug Store, Inc. v. Cochran Wholesale Pharmaceutical, Inc.,*
   897 F.3d 825, 830, 831 (7th Cir. 2018) ………………………………………………18

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268, 1287 (9th Cir. 1992) ………………………………………..........32

*Collins v. Conifer Value-Based Care,*
   2025 WL 1140788 (C.D.Cal. Feb. 28, 2025) ………………………………………28

*Collins v. Conifer Value-Based Care,*
   No. 5:24-cv-2265 (C.D. Cal. Oct. 23, 2024) …………………………………………29

*Dewey v. Volkswagen Aktiengesellschaft,*
   681 F.3d 170 (3d Cir. 2012) …………………………………………………………51-52

*Doe v. Highmark, Inc.,*
   No. 2:23-cv-00250-NR , ¶ 140 (W.D. Pa. Feb. 15, 2023) …………………………28

*Donovan v. Estate of Fitzsimmons,*
   778 F.2d 298, 308 (7th Cir. 1985) ……………………………………………………19

*Dorvit v. Winemaster,*
   950 F.3d 984, 988-89 (7th Cir. 2020) …………………………………………………21

*Eubank v. Pella Corp.,*
   753 F.3d 718, 721, 723-29 (7th Cir. 2014) …………………………………19, 50, 52

*Farrell v. Bank of American Corp., N.A.,*
   827 Fed. App'x. 628, 630 (9th Cir. 2020) ……………………………………………50

*Gibson v. Warrior Met Coal Inc.,*
   *2024 WL 4399433* (N.D. Ala. Oct. 3, 2024) ………………………………………29

*In re AT&T Mobility Wireless Data Svcs. Sales Litig.,*
   270 F.R.D. 330, 345 (N.D. Ill. 2010) …………………………………………………18

*In re Facebook Internet Tracking Litig.,*
   956 F.3d 589 (9th Cir. 2020) ……………………………………………………34

*In re Facebook Internet Tracking Litig.*,
    2022 WL 16902426 (N.D. Cal. Nov. 10, 2022) ………………………………………34

*In re: Katrina Canal Breaches Litig.*,
    628 F. 3d 185 (5th Circ. 2010) …………………………………………………………...40

*In re Literary Works in Electronic Databases Copyright Litig.*,
    654 F.3d 242, 253-54 (2nd Cir. 2011) …………………………………………………51

*In re Penn Central Sec. Litig.*,
    560 F. 2d 1138 (3rd Cir. 1977) …………………………………………………………...42

*In re Southwest Airlines Voucher Litig.*,
    No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013) ………………20, 22

*In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*,
    869 F.3d 551, 556 (7th Cir. 2017) ……………………………………………………35

*In re Syngenta AG MIR 162 Corn Litig.*,
    357 F. Supp. 3d 1094, 1108 (D. Kan. 2018) ………………………………………49

*In re TikTok, Inc. Consumer Privacy Litig,*
    617 F. Supp. 3d 904 (N.D. Ill. 2022) …………………………………………………34

*In re: TSO Financial Litig.*,
    1989 U.S. Dist. LEXIS 7434, 1989 WL 73249 (E.D. Pa. June 29, 1989) ………………42

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
    895 F.3d 597, 605 (9th Cir. 2018) …………………………………………………………..50

*Isby v. Bayh*,
    75 F.3d 1191, 1196, 1198-99, 1200 (7th Cir. 1996) ……………………………...18, 19, 22

*Kaufman v. Am. Express Travel Related Servs. Co.*,
    877 F.3d 276, 283, 284, 286, 288 (7th Cir. 2017) ………………………………19, 20, 22

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483, 492 (N.D. Ill. 2015) …………………………………………………46

*Levitt v. Southwest Airlines Co.*,
    799 F.3d 701, 711 (7th Cir. 2015) ……………………………………………………18

*Martin v. Reid*,
    818 F.3d 302, 306-08 (7th Cir. 2016) …………………………………………………...18, 21

*Metro PCS v. Devor*,
    215 F. Supp. 3d 626, 635 (N.D. IL. 2016) …………………………………………………28

*Midcoast Aviation, Inc. v. General Elec. Credit Corp.*,
    907 F.2d 732, 737-38 (7th Cir. 1990) …………………………………………………27

*Murray v. Grocery Delivery E-Services USA Inc.*,
    55 F.4th 340 (1st Cir. 2022) ……………………………………………………………...51

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815, 856-57 (1999) …………………………………………………………47

*Pearson v. NBTY*,
    772 F. 3d 778, 785 (7th Cir. 2014) …………………………………………………36

*Reinhart v. Lucent Techs., Inc. (In re Lucent Techs., Inc. Sec. Litig.)*
    327 F. Supp. 2d 426, 438 (D. NJ 2004) …………………………………………....41-42

*Rodriguez v. Byte Dance, Inc.*,

2025 WL 672951(N.D. IL Mar. 3, 2025) ……………………………………………34

*Ruppert v. Alliant Energy Cash Balance Pension Plan*,
   726 F.3d 936, 942 (7th Cir. 2013) …………………………………………………47

*Salgado v. Gen. Motors Corp.*,
   150 F.3d 735, 739 (7th Cir. 1998) …………………………………………………18

*Schilling v. Rogers*,
   363 U.S. 666, 667 80 S. Ct. 1288 (1960) …………………………………………7

*Smith v. Sprint Comms. Co., L.P.*,
   387 F.3d 612, 614 (7th Cir. 2004) ……………………………………………50, 51

*State of Vermont v. Clearview AI, Inc.*
   No. 226-3-20 Cncv (Vt. Sup. Ct. Apr. 26, 2024) ………………………………31

*Synfuel Techs. Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646, 653 (7th Cir. 2006) ……………………………………………19, 20

*TBK Partners, Ltd. v. Western Union Corp.*,
   675 F.2d 456, 460 (2d Cir. 1982) …………………………………………………32

*Uhl v. Thoroughbred Tech, & Telecommunications, Inc.*,
   309 F.3d 978, 987 (7th Cir. 2002) ……………………………………………41, 43

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*,
   159 F.3d 266, 273-74 …………………………………………………………....32

*Williams v. Rohm & Haas Pension Plan*,
   658 F.3d 629, 635 (7th Cir. 2011) …………………………………………………21

*Wong v. Accretive Health, Inc.*,
   773 F.3d 859, 862, 863-64 (7th Cir. 2014) …………………………………18, 19

*Zimmerman v. Highmark, Inc.*,
   __ F.Supp.3d __; 2025 WL 1220364 (W.D. Pa. Apr. 28, 2025) …………………28

**Statutes**

740 ILCS 14/1 *et seq* ………………………………………………………………...5
Virginia Code § 8.01-40 …………………………………………………………....6
Virginia Code § 18.2-152.1 *et seq* ……………………………………………….....6
28 U.S.C. § 2201 *et seq* …………………………………………………………….6
18 U.S.C. § 1030 ……………………………………………………………………...34
18 U.S.C. § 2710 ……………………………………………………………………...34

**Rules**

Rule 12(b)(6) ……………………………………………………………………8, 28
Fed. R. Civ. P. 23(e)(2) ……………………………………………………………18

**Other Authorities**

Thomas Brewster, *Exclusive: DHS Used Clearview AI Facial Recognition In Thousands Of Child Exploitation Cold Cases*, Forbes.com (August 7, 2023) …………………………3

Stephen Mross, "*Facial recognition software leads to arrest in September home invasion,"*

The Sentinel Record, hostr.com, (October 30, 2024) …………………………………….3

Clearview AI, https://www.clearview.ai/success-stories/two-law-enforcement-agencies-solve-a-murder-and-attempted-murder .…………………………………………………………...3

Kashmir Hill, "The Secretive Company that Might End Privacy as We Know It.", New York Times (January 18, 2020), (https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html...............................................................................................5

**STATEMENT OF JURISDICTION**

Appellees do not dispute Appellants' Statement of Jurisdiction

**STATEMENT OF THE ISSUE**

Whether the district court abused its discretion when it approved a class action settlement, reached after extensive, arms-length negotiations facilitated by a neutral mediator, where that settlement (a) provided monetary relief, but not injunctive relief, to a nationwide class that had asserted no claims before the district court that would have supported injunctive relief; (b) provided a potentially lucrative future payout backstopped by a certain revenue set-aside; and (c) fully considered and protected the interests of the nationwide class.

**STATEMENT OF THE CASE**

Clearview's Business

Defendant-Appellee Clearview AI, Inc. ("Clearview") is a company that provides facial recognition services. Since 2017, Clearview has used proprietary technology to "scrape" the internet to capture literally billions of photographs from publicly available websites. (Appx. 3.) Using artificial intelligence-based computer vision and other technologies, Clearview has created a search engine, that uses a database of searchable, algorithmically-generated representations of faces ("facial vectors") from the collected, publicly available images. (Id.) A Clearview customer seeking to uncover the identity of a person captured in a photograph – a suspected

1

criminal, a missing person, a victim of human trafficking – can submit that photograph to the Clearview application, initiating a search. Clearview's technology compares the algorithmically-generated representations of the faces in the submitted image (i.e., the "facial vectors") to the vectors in its database and provides the customer with search results that contain a face that is extremely visually similar. No facial vector data is ever accessible to any user. Clearview does not collect or know the identities of persons whose facial images are stored in its database; rather, it simply supplies its customer with matching photographs that identify the website from which the photograph was collected. (R. 621 at p. 13, n.12.)

Originally, Clearview's customers included both governmental agencies and a handful of private companies. For several years prior to settlement, Clearview's customers have been exclusively federal or state government agencies and their contractors. (Appx. 26.)

The trial court recognized that advanced biometric identification technologies, like Clearview's capture and use of the facial images stored in its database, can be "both incredibly powerful and highly susceptible to misuse." (Appx. 3.) In their brief, Objectors Weissman and Claypool cite to several newspaper and other articles focusing on the risks of facial recognition technology generally, and in particular on Clearview's specific, industry-leading technology. (App. Brf. at 3-6.)

2

On the other hand, in the district court, Clearview highlighted the many positive, life-saving applications of its facial recognition technology. In its response to the filed objections and the articles they cited, Clearview noted that a joint operation led by the U.S. Department of Homeland Security and Interpol used Clearview's search engine and database to identify hundreds of victims and abusers, prompting one participating agent to state that "No single effort like this has resulted in that amount of identifications in such a short period of time." Thomas Brewster. *Exclusive: DHS Used Clearview AI Facial Recognition In Thousands Of Child Exploitation Cold Cases*, Forbes.com, August 7, 2023. (R. 622 at 2.) In another case, Clearview's technology facilitated a successful investigation of a home robbery, where police were able to use Clearview's technology to identify a man who entered and robbed the home of an elderly woman while she slept. "*Facial recognition software leads to arrest in September home invasion,*" Stephen Mross, The Sentinel Record (hostr.com) October 30, 2024. (*Id.*) The Miami Police Department used Clearview's technology to help identify an attempted murder suspect, in an investigation that ultimately led to the arrest of that suspect for a separate murder elsewhere.        https://www.clearview.ai/success-stories/two-law-enforcement-agencies-solve-a-murder-and-attempted-murder. (*Id.*) The technology has even been used to exonerate the wrongly accused.  (*Id.*)

In support of the settlement, Clearview also demonstrated to the district court that Clearview independently audits its technology infrastructure and business practices to ensure that they comply with recognized (SOC-2) standards for cybersecurity and privacy. (R. 622 at 15-16.) Clearview also submits each iteration of its facial recognition algorithm to the independent testing regime established by NIST – the National Institute of Standards and Technology. An oft-repeated criticism of facial recognition software is that it fails to accurately distinguish between photographs of people of color, but the publicly available tests show Clearview's algorithm performing exceptionally well when seeking matches among subjects of all races and skin types, as well as among photographs of varying quality. (*Id.*)

As Class Counsel and the Defendants explain below, however, and as the district court recognized and as remains true on appeal, neither the district court nor this Court need decide whether the powerful benefits of facial recognition outweigh the susceptibility for misuse. ***First***, such balancing is the province of individual states and municipalities, which can conduct their own analysis and impose whatever limitations on facial recognition technology the state or municipality deems appropriate. ***Second***, the only issues relevant to the district court, and to this Court, are the specific legal theories advanced in the class action lawsuit, and the relief sought under those laws: whether the nationwide class is receiving fair and adequate consideration for its claims in light of the strength of the actual claims asserted on

behalf of the nationwide class in the operative class action complaint. That is to say, whether the nationwide class (or any subclass) is receiving fair and adequate consideration for its claims can only be evaluated in light of the strength of the actual claim(s) asserted on behalf of the nationwide class in the class action complaint.

<u>The Class Action Claims</u>

In early 2020, New York Times reporter Kashmir Hill published a story about Clearview and its business, titled "The Secretive Company that Might End Privacy as We Know It." (https://www.nytimes.com/2020/01/18/technology/clearview-privacy-facial-recognition.html; Appx. 4.) Multiple class action lawsuits followed, with eleven lawsuits from four different districts ultimately being consolidated by the Joint Panel for Multi-District Litigation before Judge Coleman in the United States District Court for the Northern District of Illinois. (Appx. 4.)

In April 2021, Plaintiffs filed their First Consolidated Class Action Complaint. (R. 29; Appx.4.)  Several years later, in May 2024, prior to seeking court approval for the proposed class action settlement, plaintiffs filed a Third Amended Consolidated Class Action Complaint. (R. 573.) The claims and counts remained the same from April 2021 through May 2024. Those claims are:

-   Counts One through Seven, brought on behalf of an Illinois subclass, assert claims under Illinois' Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*. (Appx. 6-7.) Unique among the Class claims, the BIPA claims arise under a statute that specifically protects privacy and biometric information, and that provides for a private right of action and civil penalties for enforcement. (Id.)  The Illinois subclass

seeks monetary and injunctive relief on the BIPA claims. (e.g. R. 29 ¶¶ 85-87; 573 ¶¶ 80-82.)

- On behalf of a subclass of Virginia residents, Counts Eight and Nine assert claims under Virginia statutes, one dealing with the unauthorized use of a person's name or picture, Virginia Code § 8.01-40, and another dealing with computer crimes. Virginia Code § 18.2-152.1 *et seq.* (Appx. 7; R. 29 ¶¶ 132-147; 573 ¶¶ 127-142.)

- The operative Complaint includes four claims, Counts Ten through Thirteen, under California law on behalf of the California subclass. (R. 29 ¶¶ 148-181; 573 ¶¶ 143-176.) The Complaint asserts claims under California statutes, common law and the California constitution, and expressly seeks both monetary and injunctive relief. (R. 29 ¶¶ 159-60; 180-81; 573 ¶¶ 154-55; 175-76).

- The last state specific claim, on behalf of a New York subclass, is Count Fourteen, under New York's Civil Rights Law. (R. 29 ¶¶ 182-190; 573 ¶¶ 177-185). That claim seeks both damages in an amount to be determined at trial, and an order enjoining Defendants from violating the subclass's right to privacy and publicity under New York law.

The claims in Counts One through Fourteen are not at issue on appeal. Rather, the sole objectors who appealed from the order approving the class action settlement are members of the nationwide class, arguing that the class action settlement was not fair and adequate as to the nationwide class. So, this appeal necessarily centers on the Class Action Complaint's claims asserted on behalf of the nationwide class. As to the nationwide class, there is a single claim – Count Fifteen.[1]

---

[1] Count Sixteen, seeking a Declaratory Judgment, applies to all claims, all alleged conduct, and all subclasses, including the nationwide class. But it does not provide an independent ground for relief. Rather, Count Sixteen simply asks the court to issue a declaration describing the rights to relief described in the fifteen substantive paragraphs. If the subclass has no right to relief under the paragraph(s) relevant to it – only paragraph 15, for the nationwide class—the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.,* does not create an independent, enforceable right. This Court has recognized that "Declaratory relief

Count Fifteen asserts a claim on behalf of all the plaintiff classes – each of the state specific sub-classes and the nationwide class – for common law Unjust Enrichment. (R. 29 ¶¶ 191-98; R. 573 ¶¶ 186-193.) Count Fifteen alleges that Defendants inequitably received a benefit from collecting and using class members' photographs without compensating the class members for that benefit. As relief, the Unjust Enrichment count asserts that Defendants "should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and members of the Plaintiff Classes, proceeds that they unjustly received from the sale, lease, trade, distribution, dissemination and use of the personal information of Plaintiffs and members of the Plaintiff Classes." (*Id.*)

<u>The Litigation Before the District Court</u>

From the outset, the litigation before the trial court was fiercely contested and closely watched. As soon as the Class settled on a Consolidated Class Action Complaint (R. 29), the Clearview-affiliated defendants moved to dismiss. (R. 87.) Defendant Macy's separately moved to dismiss the claims against it. (R. 111.) Class Counsel argued forcefully in favor of the Class claims (R. 134, 152) and amici weighed in on both sides. (R. 131-33, 142.) Ultimately, the district court issued

---

'presupposes the existence of a judicially remediable right' and thus cannot be pursued without a predicate right of action." *Alarm Detection Sys. v. Orland Fire Prot. Dist.,* 929 F.3d 865, 871 n.2 (7th Cir. 2019), *quoting Schilling v. Rogers,* 363 U.S. 666, 667 80 S. Ct. 1288 (1960); *accord Aland v. United States DOI,* 2024 U.S. App. LEXIS 11203 *6 (7th Cir. May 8, 2024) (Declaratory Judgment Act is procedural only and does not create a right of action).

decisions on the motions to dismiss that upheld most, but not all, of the Class's claims, at the Rule 12(b)(6) stage, but noted several issues and disputes that remained to be resolved at summary judgment or trial. (R. 272, 279.)

Even while the motions to dismiss were pending the parties engaged in written discovery. (R. 213, 215, 237.) Once the court ruled on the Rule 12(b)(6) motions and Defendants filed their answers, the pace of discovery quickened. As the district court noted in its final approval order, Judge Coleman and Magistrate Judge Valdez "oversaw and adjudicated several motions for reconsideration, interlocutory appeal, and discovery disputes." (Appx. 8.) The record reflects that, even before the parties first moved to alter the discovery schedule in order to allow them to mediate the case (R. 522), there were more than 500 docket entries, reflecting exchanges of legal positions and the production of factual information.  By the time that the parties and mediator engaged in a second round of serious settlement talks in mid-2023, Class Counsel and the trial court had a clear understanding of Clearview's technology and database, of the strengths and weaknesses of the asserted claims, and of the financial realities confronting Clearview – a thinly capitalized start-up that faced headwinds in raising funds while the litigation persisted and that likely did not have sufficient capital to withstand class action litigation, much less pay any award that might be entered against it after a trial. (Appx. 8-9.)

During the pendency of the case before the district court, another development further affected Clearview's ability to provide one type of relief to the class. As Objectors Weissman and Claypool note, the Complaint seeks injunctive relief on some counts. (App. Brf at 21.) But not all of those claims were equally viable. In evaluating and approving the settlement, the trial court noted that "the seven BIPA counts emerged as the strongest claims in the complaint," as BIPA alone directly targets data privacy and biometrics, and provides for statutory damages, actual damages, and injunctive relief. (Appx. at 25.) To the extent that Clearview might construct a settlement package providing significant injunctive relief, rather than cash that it did not have, an injunction under BIPA was the logical, clearest path.

From mid-2022 onward, however, meaningful injunctive relief under BIPA was no longer a possibility. Shortly after the first class complaint was filed, the ACLU filed a BIPA complaint against Clearview in Illinois state court, *American Civil Liberties Union v. Clearview AI, Inc.,* Cook Cnty Cir. Ct. No. 2020 CH 4353. (Appx. 4.) In May 2022, Clearview and the ACLU entered into a settlement that resulted in a court order providing injunctive relief. The injunction entered as a result of that settlement ensured that Clearview's going forward business operations complied with the guidelines and permissible exceptions incorporated into BIPA. (Appx. 9.) As the district court observed:

> Among other relief, the settlement applied a permanent nationwide injunction banning Clearview from granting paid or free access to its

database to any private entity or individual except in compliance with
BIPA or to any individual government employee not acting in their
official capacity, effectively limiting Clearview's clientele to federal
and state government agencies and their contractors. The settlement
also placed a five-year injunction prohibiting Clearview from granting
either paid or free access to its database to Illinois state, county, local,
or other government agencies or to private entities located in the state.
Finally, the settlement established an opt-out program for Illinois
residents, through which a resident, after uploading a photograph of
themselves through an online form, could request that Clearview block
any search results that include photographs of the resident and prevent
future collection of photographs.

(Appx. 26.) Clearview later extended the opt-out program to residents of other states

that passed data privacy statutes. (R. 622 at 8.)

<u>The Class Action Settlement</u>

To facilitate settlement discussions, the parties engaged the services of the

Hon. Wayne Andersen (ret.) to mediate. In extensive but ultimately unsuccessful

negotiations in 2022, and then again in resumed negotiations over six months in

2023, Clearview and Class Counsel discussed, in detail, Clearview's business

practices; the strengths, weaknesses and defenses to the claims asserted; and the

scope of potential liability. (Appx. 9.) As Judge Andersen described (R. 578-2 ¶ 6),

"the parties and I considered the inability of Clearview, as a technology start-up with

limited funding, client-base, and revenue, to pay any judgment in the tens, never

mind the hundreds, of millions of dollars. On the issue of Clearview finances,

Clearview provided extensive information – everything that the Class requested – as

to its financial condition." In 2023, Clearview updated the information it had

provided as to its finances, revenues and capitalization. (R. 578-2 ¶ 9.) That information made clear to Class Counsel, and to Judge Andersen, that a trial "victory" for the Class would yield nothing, as the trial would be long and expensive, and Clearview would not be able to pay any judgment. (R.578-2 ¶ 13.) Indeed, Clearview would likely declare bankruptcy before any trial reached a verdict, and security interests held by Clearview note holders made it improbable that the Class would recover anything of value. (*Id.*)

Given the realities of Clearview's financial restraints, when Judge Andersen mediated resumed negotiations in early 2023, the parties and mediator quickly focused on a settlement structure that would provide the class with the equivalent of an equity stake in Clearview. (Appx. 10.) But that conceptual agreement still left the sides far from an agreed-upon path towards resolution. It took another six months of hard-fought, arms-length negotiations to settle on the size of the equity stake to be awarded to the Class and numerous other issues, including: the size and terms of the revenue set-aside; the role of a Settlement Master; the various liquidation and other events that could trigger payments to the Settlement Fund; and various complex tax and securities issues affecting the Class's interest. (R. 578-2 ¶¶ 11-14.) By September of 2023 the parties had agreed upon a settlement term sheet – a Settlement Framework Agreement – that they described to the Court and used as the basis for the final Settlement Agreement. (R. 556.) In June of 2024, Class Counsel filed a

Third Amended Consolidated Class Action Complaint (R. 573), and the parties entered a Class Action Settlement Agreement and Release (R. 578-1), which they presented in a Motion for Preliminary Approval (R. 578).[2]

The consideration at the center of the Settlement Agreement is the grant to the class of a Settlement Stake, which is a monetary amount equal to a 23% equity stake in Clearview as of September 6, 2023. (Appx. 12; SA § 5.7) According to various valuations that Clearview provided to the Class and mediator, and that were detailed in the Motion for Final Approval (R. 621 at 3), from 2021 through 2024, Clearview was valued at amounts ranging from over $130 million (2021) to $201.75 million (early 2022), to $225 million (early 2024), giving the 23% stake a range of possible values from roughly $30 million to $51.75 million. (Id; Appx. 12.) At least two of those valuations were implied company values based on actual cash investments by Clearview equity stakeholders acquiring fractional shares of Clearview.

The Class interest in Clearview, the so-called "Settlement Stake," will fund a Settlement Fund upon the occurrence of any one of three triggering events:

1. The occurrence of an IPO (Appx. 12; SA §§ 1.30, 3.3).

2. The occurrence of a Deemed Liquidation Event, such as a merger or consolidation involving Clearview or a sale or disposition of substantially all of Clearview's assets  (Appx. 12; SA §§ 1.19, 3.3).

---

[2] For the convenience of the Court, Appellees attach as Supplemental Appendix 1 is a copy of the Class Action Settlement Agreement and Release – R. 578-1 – which will be cited hereafter as "SA § __."

3. A sale of the Class's right to receive payment on its Settlement Stake to a qualified third party for a commercially reasonable price, with an independent Settlement Master (the Hon. Sidney Schenkier (ret.)) making the election to sell on behalf of the Class. (Appx. 12; SA §§ 1.49, 3.4).

In entering into the Settlement Agreement, Class Counsel recognized that, even with the litigation behind it, Clearview's still early-stage business might not be in a position to cause any of the triggering events to occur, in the short term or the long term. Thus, to ensure that there would be a source of funds to establish the Settlement Fund, Class Counsel insisted on a Cash Demand provision. (Appx. 12; SA §§ 1.8, 3.3(c).) Pursuant to the Cash Demand provision, beginning on the date of final settlement approval (which here was March 20, 2025), Clearview must set aside 17% of its GAAP recognized revenue to create an account that will fund the Settlement Fund if the Settlement Master elects to exercise the Cash Demand. (Appx. 12; SA §§ 1.8, 1.26, 1.27, 3.3(c).) Since March 20, Clearview has complied with this provision, placing 17% of its revenue into a segregated account, providing the Class and Settlement Master with statements and updates as to this set-aside.

The Settlement Agreement also outlines how the Settlement Fund will be allocated and distributed. The Agreement establishes that all payments – to Class Counsel for approved fees, to Class Representatives, and to Class Members – will be paid out of the Settlement Fund, after its funding. This is not a settlement under which Class Counsel or Class Representatives receive payments earlier, or that are

different in kind, from payments to Class Members. (Appx. 13; SA § 3.9.) The Settlement Agreement also distinguishes between members of the varying subclasses, paying: (a) ten shares per claim by members of the Illinois sub-class, since the BIPA claims were by far the strongest; (b) five shares to each member of the Virginia, California and New York sub-classes, as the Complaint included specific claims under those states' laws, even if the laws did not specifically address privacy and biometrics; and (c) one share to each nationwide class member filing a claim. (Appx. 13, 19, 25.) The Settlement Agreement releases all defendants from all claims asserted in the litigation and all claims relating to the same underlying conduct, including "federal statutory, constitutional, and common law claims that were, or could have been, advanced regarding the images held in [Clearview's] Biometric Database. (SA § 1.46.)

The district court granted preliminary approval of the settlement agreement (R. 580). Per the Settlement Agreement terms, Clearview provided notice to the Class, by way of a multi-pronged, extensive internet notice campaign, undertaken because Clearview does not have the names and contact information associated with any of the images in its database. (Appx. 14-15.) The settlement administrator estimates that the notice plan reached more than 70% of adults in the United States and resulted in more than 65,000 successfully filed claims. (*Id.*)

14

During the period for objections, the district court received sixteen objections from Class Members, including an objection from current Appellants, Weissman and Claypool. (Appx. 15; R. 581, 585-86, 590-602.) A group of state attorneys general, led by the Vermont AG's office, sought and were granted leave to file an amicus brief that objected to the settlement. (Appx. 15; R. 609.) Among other arguments, the objectors and amici made the same arguments on behalf of the nationwide class that Objectors Weissman and Claypool raise in this appeal – that the settlement should have included injunctive relief; that the compensation provided for in the settlement is not fair and reasonable because the amount of monetary relief is unknown and hinges upon Clearview's future success; and that the nationwide class was not adequately represented. (R. 590, 609.)

The district court convened a final approval hearing addressing the settlement on January 30, 2025. (Appx. 15; R. 627-30.)  At that hearing, the Court heard argument from the parties, and from each objector who elected to appear, including Appellants Weissman and Claypool, who appeared through counsel. On March 20, 2025, the Court issued its Memorandum and Opinion overruling the Objections and granting final approval to the Class Action Settlement. (Appx.)

Objectors Weissman and Claypool timely filed this appeal.

## SUMMARY OF ARGUMENT

This Court reviews a district court's final approval of a class action settlement under an abuse of discretion standard. Under this highly deferential standard, the court of appeals will affirm a trial court's decision to approve a class action settlement if there is any basis for that decision, even if the appellate court believes that it might have made a different decision.

Under the several factors that this Court evaluates in reviewing a class action settlement approval, the most important factor is whether the district court considered the strength of the plaintiffs' case on the merits, balanced against the extent of the relief offered by the settlement. At issue in this appeal are the claims of only the nationwide subclass. The record reveals that the district court judge, Judge Coleman, carefully evaluated the strength of the nationwide class claims and balanced them against the relief provided by the settlement. Specifically, the district court opinion confirming the settlement considered the nationwide class claims and recognized that those claims were particularly weak, based exclusively on a single common law theory (Unjust Enrichment) that is not designed to address privacy-related claims like those raised in the Complaint. Where the nationwide class's right to injunctive relief under the pleaded state laws is so novel and uncertain, class members should ask the courts in their state, or petition their state or municipal legislatures, to validate those uncertain rights, not petition a single federal district

16

court to impose injunctive relief under an Unjust Enrichment theory under the common laws of 46 states and territories.

The district court also noted that the nationwide class claim for injunctive relief is especially weak, because the class presents no legal theory to support that claim or relief and because a previous class action settlement between Clearview and the ACLU already provided the most meaningful injunctive relief.

Finally, the district court, like the mediator whose affidavit the court cited, considered the perilous financial condition of defendant Clearview. The court concluded that ongoing litigation was highly likely to propel Clearview into bankruptcy, where the Classes, including the nationwide class, were unlikely to emerge with any meaningful recovery. The court balanced that negative result against the conditional, but possibly lucrative, recovery created by the class action settlement and reasonably concluded that the recovery possible under the settlement is superior to the probable lack of any recovery had litigation proceeded. The fact that the final amount ultimately used to create the Settlement Fund is uncertain is no objection, where an ongoing set-aside of 17% of Clearview revenue is already accruing to provide at least some source of settlement payment, and where the alternative was likely, if not certain, to be no recovery for the class.

# ARGUMENT

## I.     STANDARD OF REVIEW

Objectors Weissman and Claypool acknowledge (App. Brf. at 19) that this Court reviews a district court's approval of a class-action settlement for abuse of discretion. *Levitt v. Southwest Airlines Co. (In re Southwest Airlines Voucher Litigation)*, 799 F.3d 701, 711 (7th Cir. 2015) (no abuse of discretion in approval of a class-action settlement providing drink voucher as compensation); *Martin v. Reid*, 818 F.3d 302, 306 (7th Cir. 2016). But Appellants fail to come to grips with the deference accorded to the district court under the abuse of discretion standard. There is no abuse of discretion where "the district court chose an option that was among those from which we might expect a district court reasonably to choose." *Camp Drug Store, Inc. v. Cochran Wholesale Pharmaceutical, Inc.*, 897 F.3d 825, 831 (7th Cir. 2018) (citing *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 739 (7th Cir. 1998).

Under Fed. R. Civ. P. 23(e)(2), the district court will approve a class-action settlement that it finds to be fair, reasonable, and adequate. *Camp Drug Store, Inc. v. Cochran Wholesale Pharm., Inc.*, 897 F.3d 825, 830 (7th Cir. 2018); *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014). "Federal courts naturally favor the settlement of class action litigation," *In re AT&T Mobility Wireless Data Svcs. Sales Litig.*, 270 F.R.D. 330, 345 (N.D. Ill. 2010) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)).

This Court has identified five factors that district courts are to consider when evaluating whether to approve a class action settlement: (i) the strength of a plaintiff's case compared to the amount of the defendant's settlement offer; (ii) an assessment of the likely complexity, length and expense of the litigation; (iii) an evaluation of the amount of opposition to the settlement among affected parties; (iv) the opinion of competent counsel; and (v) the stage of the proceedings and amount of discovery completed at the time of settlement. *Isby*, 75 F.3d at 1198-99; *Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 308 (7th Cir. 1985). Courts should also consider whether the settlement is the product of collusion, or whether there are any "red flags" present in the settlement that would suggest it is unfair to the class. *Eubank v. Pella Corp.*, 753 F.3d 718, 723-29 (7th Cir. 2014). Here, each of the factors supports approval of the settlement, and no red flags are present.

Of the five factors to be considered, the "most important factor relevant to the fairness of a class action settlement is the first one listed: the strength of plaintiffs' case on the merits balanced against the amount offered in the settlement." *Wong, 773 F.3d at 863-64* (internal quotations omitted)*; Synfuel Techs., Inc v. DHL Express (USA), Inc.,* 463 F.3d 646, 653 (7th Cir. 2006). The strength of a plaintiff's case can be quantified by examining "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 284 (7th Cir. 2017) (citation and internal quotations

omitted). This Court also recognizes, however, "that [a] high degree of precision cannot be expected in valuing litigation" so the parties present evidence to allow the court to come up with a ballpark valuation. *Synfuel,* 463 F. 3d at 653. "In considering the strength of plaintiffs' case, legal uncertainties at the time of settlement favor approval." *In re Southwest Airlines Voucher Litig.*, No. 11-cv-8176, 2013 WL 4510197, at *7 (N.D. Ill. Aug. 26, 2013), citing *Synfuel,* 463 F. 3d at 653. Finally, because the essence of any settlement is compromise, the trial court need not reject a settlement just because it does not provide plaintiffs with a complete victory. *Isby*, 75 F.3d at 1200.

In multiple cases, this Court has applied the deferential standard of review to affirm district court approval of class-action settlements that may be less than perfect. For example, in *Kaufman v. Am. Express Travel Related Servs. Co.*, 877 F.3d 276, 288 (7th Cir. 2017), this Court held that the district court did not abuse its discretion in approving a class-action settlement in which the individual class members received very little. *Id.* In *Kaufman,* certain intervenors argued, like Objectors Weissman and Claypool here, that the release was overbroad because it released claims for which the settlement provided no compensation, *Kaufman,* 877 F.3d at 283, 286 (App. Brf. at 25.) The district court in *Kaufman* acknowledged the breadth of the release but found that this issue did not justify rejecting the settlement altogether. *Id.* at 286. This Court affirmed, noting that no party provided admissible

evidence showing that any of the uncompensated claims existed. *Id. Accord, Martin v. Reid*, 818 F.3d at 306-08; *Dorvit v. Winemaster*, 950 F.3d 984, 988-89 (7th Cir. 2020) (no abuse of discretion where district court considered the probabilities of success on the merits and reasonably balanced the strength of the case against the settlement amount); *Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629, 635 (7th Cir. 2011).

## II. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION WHEN IT DETERMINED THAT THE SETTLEMENT WAS FAIR AND REASONABLE EVEN IN THE ABSENCE OF INJUNCTIVE RELIEF TO THE NATIONWIDE CLASS.

### A. The District Court Reasonably Concluded that the Nationwide Class Was Unlikely to Obtain an Injunction Even if the Case Had Proceeded on the Merits.

Appellant's first argument is that the District Court abused its discretion by approving a settlement that did not provide injunctive relief to members of the nationwide class. (App. Brf. at 21-27.)  This argument does not persuade.

On multiple occasions this Court has affirmed class action settlements in the face of complaints from objecting class members who argued that the settlement failed to include injunctive relief, or failed to provide the type of injunctive relief they preferred. For example, in *Martin v. Reid*, 818 F.3d 302, 306-08 (7th Cir. 2016), the objecting class member argued that the settlement should have included permanent injunctive relief. This Court found no abuse of discretion since the district court acted within its discretion in considering and ultimately rejecting the need for

any injunctive relief. The Court in *Kaufman* reached the same conclusion. *Kaufman,* 877 F.3d at 286. In both *Isby,* 75 F.3d 1191 and *Armstrong v. Board of School Directors,* 616 F.2d 305 (7th Cir. 1980), the Court found no abuse of discretion where the district court properly evaluated the class action settlements and approved them even though they did not include the more far-reaching forms of injunctive relief demanded by some objecting class members.

Here, the district court's opinion approving the settlement expressly evaluated the Objectors' arguments regarding the nationwide class's entitlement to injunctive relief. Judge Coleman considered and rejected the argument that fairness required injunctive relief to the nationwide class. (Appx. at 23-27.) The court balanced the strength of the case on the merits against the value of the settlement. (*Id*. at 23.) In this balancing, the district court identified substantial indicia of trustworthiness, including: skilled and experienced Class Counsel; hard-fought, contentious litigation over several years; extensive, arms-length settlement negotiations overseen by a well-respected, former district court judge (Hon. Wayne Andersen); and a "clear-eyed awareness" of the structural and financial realities that made it challenging to provide the class members with injunctive and monetary relief. (*Id*. 23-24, 31-32.)

The district court specifically addressed the lack of injunctive relief for the nationwide class, focusing on the weakness of the nationwide class claim. The court noted that the relief under the settlement varies by the strength of each subclass's

claims, based on the extent to which the relevant cause(s) of action "directly targeted data privacy and biometrics." (*Id*. at 25.) The only substantive claim on behalf of the nationwide class is Count Fifteen, asserting a state common law claim for Unjust Enrichment, a claim that has no connection to data privacy or biometrics. (R. 116; R. 573.) Judge Coleman contrasted that claim with the far stronger claims, Counts One through Seven, under Illinois' BIPA statute on behalf of an Illinois subclass. Unlike the common law claims of Unjust Enrichment, BIPA specifically addresses privacy and biometrics, creates a private right of action, and expressly provides for statutory damages, actual damages, and injunctive relief. (Appx. at 25.) The claims under Virginia, New York and California law, on behalf of state specific subclasses, were far less viable than the BIPA claims, as they arose under state-specific statutory or common law theories that had never yet served as the basis for judgment in a case involving privacy claims relating to facial recognition technology. (*Id*.) As the district court found, the claims on behalf of the nationwide class, unbounded by any state's law, "formed an even weaker basis for relief, let alone nationwide relief." (*Id*.) This reasoned conclusion, reached after careful consideration of the objectors' arguments, cannot be characterized as an abuse of the trial court's discretion.

1.  The Operative Complaint Seeks Money Damages, not Injunctive Relief, in its Single Claim for Unjust Enrichment on Behalf of the Nationwide Class

To try to escape the district court's conclusion, Objectors Weissman and Claypool suggest that the nationwide class actually had a strong entitlement to

injunctive relief, contrary to Judge Coleman's analysis. First, they note that the operative complaint alleges that the class has no adequate remedy at law, asserts that monetary damages alone are insufficient, and demands injunctive relief. (App. Brf. at 21.) To support this argument, however, Appellants rely on complaint paragraphs (¶¶ 81, 89,  96, 103, 110, 117, 125, 155, 176, and 185) that allege claims under Illinois, California, and New York law that are irrelevant to the nationwide class. Indeed, the contrast between those claims, and the single nationwide class claim, highlights the weakness of the nationwide class claim for injunctive relief.

It is true, as Objectors Weissman and Claypool suggest, that paragraph 125 of the Complaint alleges that Defendants' conduct violates BIPA and, "Unless and until enjoined and restrained by order of th[e] court," that conduct will continue to cause irreparable injury to "members of the Illinois subclass."(R. 573 ¶ 125.) But allegations seeking injunctive relief under BIPA, on behalf of an Illinois subclass, do not help Objectors Weissman and Claypool or apply to the nationwide class.

Similarly, Objectors Weissman and Claypool cite and rely on Complaint paragraphs 155 and 176. (App. Brf. at 21-2.) Those paragraphs also assert that the alleged misconduct, unless enjoined and restrained, will continue to cause irreparable injury. Paragraph 155, under a California statute, alleges that "Plaintiff Gould and the California subclass are entitled to injunctive relief." (R. 573 ¶ 155.) Complaint paragraph 185, cited and relied upon by the Appellants, is similarly

unavailing. Asserting a claim under Section 51 of the N.Y Civil Rights Act, it alleges that Plaintiff Orlando and members of the New York subclass are entitled to a permanent injunction. (R. 573 ¶ 185.) Even if the New York and California subclasses had strong claims to injunctive relief under those states' laws – and the district court explained why those laws are an imperfect fit when applied to privacy issues and facial recognition technology – they provide no help to members of the nationwide class.

The only claim that the Complaint asserts on behalf of the nationwide class is for common law Unjust Enrichment, and the Complaint does not demand injunctive relief on that claim. In stark contrast to the allegations in Paragraphs 125, 155, and 185 discussed above, the allegations in the Unjust Enrichment count, Paragraphs 186-193, do not request an order permanently enjoining the alleged misconduct. Paragraphs 186-193 fail to allege that the alleged wrongful conduct will continue to cause great and irreparable injury if not enjoined and do not specifically claim entitlement to injunctive relief. Rather, Paragraph 191 alleges that it would be unfair for Defendants to "retain any of the benefits obtained" from the plaintiffs, and Paragraph 193 concludes the count by seeking *monetary relief* -- an order compelling Defendants to "disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and members of the Plaintiff Classes, proceeds that they

unjustly received from the sale, lease, trade, distribution, dissemination, and use" of the plaintiffs' personal information. (R. 573 ¶¶ 191-93.)

This request for disgorgement of ill-gotten gains is not surprising, as this is the precise relief that a party asserting an unjust enrichment claim typically seeks. Objectors Weissman and Claypool rely on Chapter 7 of the Restatement (Third) of Restitution and Unjust Enrichment (A.L.I. 2011) to argue that equitable relief can be flexible. (App. Brf. at 23.) But they ignore that Topic 1 of that Restatement describes the typical unjust enrichment case, in which plaintiff seeks to prove "the unjust enrichment of the defendant at the claimant's expense," entitling claimant to a monetary judgment equal to the amount of the enrichment. Liability typically is measured "by the benefit conferred, or (somewhat more precisely) by the extent to which the recipient has been unjustly enriched at the expense of the claimant."

Courts in this Circuit thus describe Unjust Enrichment as a claim for monetary relief, using terminology like that in the Restatement. In *Assoc. Benefit Servs., Inc. v. Caremark RX, Inc.,* 493 F.3d 841, 854 (7th Cir. 2007), this Court explained that an unjust enrichment claim lies where defendant has unjustly retained a benefit, to plaintiff's detriment, such that defendant should be required to compensate plaintiff for the value of that retained benefit. Elsewhere, this Court has noted, where a benefit is unjustly retained, "principles of quasi-contract mandate the imposition of an obligation upon the benefit receiver to avoid the unjust enrichment. The obligation

imposed is an obligation to pay money to the benefit provider, an obligation closely akin to a duty to make restitution." *Midcoast Aviation, Inc. v. Gen. Elec. Credit Corp.,* 907 F.2d 732, 737-38 (7th Cir. 1990) (citations omitted). That is precisely the type of Unjust Enrichment claim here asserted on behalf of the nationwide class. It seeks monetary relief – disgorgement of Defendants' "unjustly received" benefits "into a common fund or constructive trust" for the benefit of the nationwide class. The district court did not abuse its discretion in finding that Count Fifteen provides an exceedingly weak claim to injunctive relief.

> 2. Objectors Weissman and Claypool Cite No Case Granting a Class-Wide Injunction on an Unjust Enrichment Claim.

In their second argument to try to undermine the district court's discretionary finding that common law Unjust Enrichment claims form a weak basis for injunctive relief, Objectors Weissman and Claypool cite five cases as support for their argument that "courts have confirmed the availability of injunctive relief in cases with unjust enrichment claims." (App. Brf. at 23-24.) But, critically, none of these cases involves a court actually granting injunctive relief on an Unjust Enrichment count, and all of them highlight the weakness of Appellants' claim here.

Strangest of the cases Objectors Weissman and Claypool cite and rely on is *Brown v. Google, LLC,* 685 F. Supp. 3d 909 (N.D. Cal. 2023). (App. Brf. at 25.) That privacy case, focusing on Google's "incognito" browsing feature, includes seven counts, but none are for unjust enrichment. *Id.* at 921. The court discusses unjust

enrichment, but only as a remedy seeking money damages, in contrast to the remedy of injunctive relief: Plaintiffs "seek two types of remedy: unjust enrichment and injunctive relief." *Id.* at 922.

Nor do any of the other four cited cases cited support Appellants.

● In *Metro PCS v. Devor,* 215 F. Supp. 3d 626, 635 (N.D. IL. 2016), the district court granted default judgment to plaintiff on thirteen counts but made clear that the Illinois law Unjust Enrichment claim sought money damages: "Defendants retained substantial financial gain and caused significant financial harm to Plaintiff . . . and it is unjust and inequitable for Defendants to retain them without paying Plaintiff the value of the benefits acquired." It based the injunction on the Lanham Act and computer fraud statutory claims.

● In *Zimmerman v. Highmark, Inc.*, __ F.Supp.3d __; 2025 WL 1220364 (W.D. Pa. Apr. 28, 2025), the court allowed multiple claims, including an Unjust Enrichment claim, to survive a Rule 12(b)(6) motion. The court never ruled on, or even considered, whether the class could recover injunctive relief on its Unjust Enrichment claim. Such a ruling is unlikely, since the Unjust Enrichment claim in the *Zimmerman* class action complaint, like the claim here, seeks only monetary relief: "an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct." *Doe v. Highmark, Inc.*, No. 2:23-cv-00250-NR, ¶ 140 (W.D. Pa. Feb. 15, 2023) (Plaintiff Zimmerman later replaced the original John Doe plaintiff) (attached as Supp. Appx 2).

● *Collins v.. Conifer Value-Based Care*, 2025 WL 1140788 (C.D. Cal. Feb. 28, 2025) merely allowed Unjust Enrichment and other claims to survive a 12(b)(6) motion; it enters no judgment on any theory. It analyzes Unjust Enrichment under California law, irrelevant to Objectors Weissman and Claypool here. The opinion describes the Unjust Enrichment claim as one seeking relief because the defendants

"enriched themselves" at plaintiffs' expense, reflecting that the complaint there, as here, seeks to compel defendants "to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them." *Collins v.. Conifer Value-Based Care*, No. 5:24-cv-2265 (C.D. Cal. Oct. 23, 2024) (attached as Supp. Appx 3).

● The decision in *Gibson v. Warrior Met Coal Inc., 2024 WL 4399433* (N.D. Ala. Oct. 3, 2024) is of no help to Objectors Weissman and Claypool, as the court there, ruling on a motion to dismiss, ***denies*** almost all injunctive relief on all counts. Like the other cited cases, it describes the Unjust Enrichment count as one seeking a financial recovery: the money defendant saved by skimping on data protection security measures.

The relief on a successful Unjust Enrichment claim typically is money damages in the form of disgorgement of ill-gotten gains -- the precise relief the nationwide class sought here -- and Objectors Weissman and Claypool cite to no case in which a court has granted injunctive relief on such a claim. The district correctly found that the nationwide class had little chance of recovering such relief.

B.    <u>The District Court Reasonably Declined to Enjoin Conduct that State Courts, State Legislatures, and Municipalities Have Not Barred.</u>

Given the weak grounds for injunctive relief under the only common law theory advanced in the Complaint, the district court would have far overstepped its bounds had it granted the injunctive relief Objectors Weissman and Claypool demand. Its failure to grant such relief is not an abuse of discretion.

In their response to the Objections and amicus brief filed with the district court, Class Counsel and Defendants explained that the proper bodies to regulate

29

facial recognition technologies like Clearview's are state legislatures, municipalities, and state courts evaluating the applicability of general state law legal theories to new technologies implicating privacy. (R. 622 at 8-9.) Several municipalities have enacted regulations governing the use of facial recognition technology, as the district court noted in remanding a California case (*Renderos*) back to federal court in California (R. 322.) Similarly, states can enact statutes governing facial recognition technology.  Clearview noted that "several states have enacted such statutes (see e.g., Colorado, Connecticut, Delaware, Indiana, Iowa, Minnesota, Nebraska, New Jersey, Oregon, Rhode Island, Tennessee,) and Clearview has revised its activities in those states" to ensure compliance with those state laws. (R. 622 at 9; App. at 36-37.) Finally, to the extent that members of the nationwide class, like Objectors Claypool and Weissman, believe that the Unjust Enrichment law in their state of residence bars Clearview's activities, they may sue Clearview in state court. Objectors Weissman and Claypool cite no state law actions asserting such claims and applying common law Unjust Enrichment to bar facial recognition technology.

In this Court, the Vermont Attorney General's office has drafted and filed an amicus brief, on behalf of itself and several other state AGs. The Vermont experience, however, reinforces that it would have been improper for the district court to insist that the settlement include injunctive relief for the nationwide class, including Vermont residents. As Defendants and Class Counsel explained, the

legislature in Vermont proposed a new law to regulate facial recognition technology, but that law ultimately was not enacted. (R. 622 at 9.) The Vermont AG sued Clearview in state court under state law theories, but that claim did not succeed. (*Id.*; *State of Vermont v. Clearview AI, Inc.* No. 226-3-20 Cncv (Vt. Sup. Ct. Apr. 26, 2024) (attached as Supp. Appx. 4).

It thus was correct, and not an abuse of discretion, for the district court to recognize both the delicate balancing inherent in considering whether and how to regulate facial recognition technology, and the impropriety of a federal district court making the determination. Given that the nationwide class cites no law that Clearview currently violates, the court noted that "it would be a dereliction of the Court's duty to act as a fiduciary for the Settlement Class to reject a settlement, hard-fought and negotiated in good faith, and the relief it provides to address concerns not at issue in the present case." (Appx. at 34.) Likewise, the Court correctly recognized that granting the relief sought by the objectors on behalf of the nationwide class "would also exceed the bounds of the Court's authority under the principles of separation of powers." (*Id.)*

Appellants' brief nowhere deals with the limitations of federalism, and the impropriety of the district court granting first-of-its kind injunctive relief, on a state law Unjust Enrichment theory, to bar conduct not made improper by any applicable

state law or municipal regulation. The district court did not abuse its discretion by electing not to reject the settlement for failing to include such injunctive relief.

C.    The Release Was Not Overbroad.

Failing to show that the nationwide class had any right to injunctive relief, Appellants make a fallback argument: Even if the district court did not err in rejecting the settlement for failing to include injunctive relief, it must have erred by approving a release that was impermissibly overbroad. This argument fares no better.

Courts routinely approve class action settlements that release all claims based on the same or similar conduct, and this Court has recognized the propriety of such releases. In *Williams v. Gen. Elec. Capital Auto Lease, Inc.,* 159 F.3d at 273-74, this Court reviewed a decision enforcing a class action settlement from a different circuit, and the Court found that the scope of the release – covering claims that may not have been asserted – was proper. The Court referenced the Ninth Circuit's careful analysis of this issue in *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992):

> the weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim "based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."

955 F.2d at 1287, quoting *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982). The district court referenced these principles in approving the scope of the settlement's release. (Appx. at 30.)

32

Equally problematic for Objectors Weissman and Claypool is their failure to support their supposition that the nationwide class had a right to relief under some federal or state law theory covered by the "overbroad" release. As the district court recognized, in examining the complaint's sixteen counts (Appx. 5-7, 25-26) the court's analysis "is limited to determining whether the proposed settlement is fair, reasonable, and adequate *in the face of the claims brought by Plaintiffs*." (Appx. at 35 (emphasis added).) This is significant because at no time did any class member or counsel assert any of the unspecified "constitutional and common law privacy claims" that Objectors Weissman and Claypool reference, even though: (1) this MDL action consolidated eleven cases by differing plaintiffs under differing theories in differing jurisdictions (Appx. at 4); (2) at all times the classes were represented by skilled, experienced counsel (*id.* at 17, 31); (3) class counsel filed and repeatedly revised a consolidated class action complaint, identifying and refining the best legal claims (R. 29, 573); (4) the case was litigated aggressively during more than four years before a settlement was presented to the court, with Class Counsel gaining a detailed understanding of Clearview's data scraping and database of facial vectors (Appx. at 9; R. 578-2); and (5) multiple objectors, including Objectors Weissman and Claypool, attacked the proposed settlement without identifying any specific, viable legal claims that could have been, but were not, asserted in the litigation. As Judge Coleman noted: the objectors (including Weissman and Claypool), "do not

33

point to any law that Clearview's practices currently violate." (Appx. at 35.) If there were other, viable federal or state law claims available to the classes here, they would have been raised.

The cases cited by Objectors Weissman and Claypool do nothing to bolster their argument. (App. Brf. at 25-27.) None of these cases involved Clearview or its business practices. None of these cases was ever decided on the merits; the defendants simply settled all pending claims in a blanket settlement. Several of the cases, including *Rodriguez v. Byte Dance, Inc.,* 2025 WL 672951 (N.D. IL Mar. 3, 2025), *In re Facebook Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020); and *In re Facebook Internet Tracking Litig.*, 2022 WL 16902426 (N.D. Cal. Nov. 10, 2022), include extensive common law and statutory claims under California law, which could never have been asserted on behalf of the nationwide class in the instant case.

The decision approving a class settlement in *In re TikTok, Inc. Consumer Privacy Litig,* 617 F. Supp. 3d 904 (N.D. Ill. 2022), is instructive. As applied to the nationwide class, the settlement included only: (a) federal statutory claims not available here – Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710; (b) California statutory and law claims not available to the nationwide class in this case; and (c) unjust enrichment. The *TikTok* court did not issue a final decision enforcing any claims and did not approve a class action settlement with any additional claims that

the nationwide class could have asserted here. A release properly may encompass all claims based on the same underlying facts as the settled claims, and Appellants fail to show that the release caused nationwide class members to forfeit any viable "constitutional and common law privacy claims."

     D.    <u>The 2022 ACLU Settlement Constrained the Parties' Ability to Provide New and Meaningful Injunctive Relief</u>

Finally, the district court did not abuse its discretion by holding that Clearview's settlement of separate litigation brought by the ACLU severely limited the options for injunctive relief available to all of the subclasses. (Appx. at n.5, 26-27.) In the ACLU settlement, Clearview agreed to change its business practices in ways that preclude Clearview from offering database access "to any private entity or individual except in compliance with BIPA." (*Id.*) The complaint here, filed before the ACLU settlement, attacked Defendants for granting access to the Clearview database to private entities (like Macy's) and sought to bar such access. Following the ACLU settlement, the district court accurately recognized that if the proposed settlement had included an injunction addressing the same conduct barred by the ACLU settlement, such an inclusion would have been illusory and would thus have undermined, not strengthened, the settlement. Indeed, several of the cases that Objectors Weissman and Claypool cite involve improperly-approved settlements providing just such meaningless, empty injunctions. *In re Subway Footlong Sandwich Mktg. & Sales Pracs. Litig.*, 869 F.3d 551, 556 (7th Cir. 2017) (App. Brf.

35

at 20); *Pearson v. NBTY*, 772 F. 3d 778, 785 (7th Cir. 2014) (injunction criticized as "superfluous").

Objectors Weissman and Claypool attempt to escape this limitation by arguing, first, that the complaint here asserts claims on behalf of the nationwide class that provide a basis for injunctive relief "under legal theories other than BIPA," and second that the court could have insisted that the opt-out option made available to Illinois residents, under the ACLU settlement, be extended to nationwide class members. (App. Brf. at 22-23.) The first argument has been thoroughly addressed above: the only claim asserted on behalf of the nationwide class is for Unjust Enrichment, and it provides no basis for providing injunctive relief to Appellants.

The district court squarely addressed the second argument, regarding opt out rights to the Clearview database. The court noted that Clearview has extended the opt out right to persons beyond the Illinois subclass, but it also recognized that Clearview has done so to respond to state data protection laws concerning the collection and use of biometric information." (Appx. at 37.) Where a state enacts legislation governing facial recognition technology, it is up to Clearview to respond and make sure that its practices comply with the new, legal guidelines. In the absence of such law, and merely on the strength of a common law Unjust Enrichment theory, the district court would be "overstepping the confines of judicial power" if it imposed injunctive relief to regulate Clearview conduct that the states themselves

had not sought to address. (Appx. at 37.) In short, the nationwide class had no right to injunctive relief, and the district court did not abuse its discretion in approving the settlement despite the parties' decision not to include such relief in the settlement.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN APPROVING THE MONETARY RELIEF CALLED FOR BY THE SETTLEMENT.

In approving the settlement, the district court recognized that the form of relief being provided – the monetary equivalent of a 23% interest in Clearview, backstopped by a revenue set-aside – was "novel in the context of past BIPA settlements." (Appx. at 12-13, 27.) As the court explained, however, the concept of providing a class with an equity interest in a settling corporate defendant is not a new idea. *Id*. The court also noted that a settlement providing an interest in the future value of Clearview was the only structure that could provide meaningful monetary relief to the class. The district court referenced the analysis of Judge Andersen, the mediator who oversaw the negotiations and who had access to Clearview's financial information. He concluded both that the Settlement Stake had the potential to provide a lucrative payment to the Class, and that the alternative to that Settlement Stake was likely to be no recovery at all. (R. 578-2.)  The court exercised its discretion to conclude that this relief was sufficient, in light of the claims asserted and the reality that continued litigation would almost certainly have resulted in no monetary recovery to the class.

Objectors Weissman and Claypool make four arguments to try to demonstrate that the district court abused its discretion by allowing the settlement to move forward with its agreed-to financial terms. Their arguments downplay (or misapprehend) the protections built into the settlement structure and demand a level of certainty that is neither required nor necessary to protect class members. None of Appellants' arguments overcomes the deference afforded a trial court evaluating an arms-length compromise – a class action settlement – reached after extensive litigation and discovery, with a focus on the alternatives to the relief being offered.

A.    A Settlement Fund Will Be Established.

Objectors Weissman and Claypool first argue that the trial court abused its discretion by approving the settlement because the Settlement Fund called for by the Settlement Agreement might never be created, leaving the class with no recovery. (App. Brf. at 28-29.)  This alleged, hypothetical concern is unfounded and requires this Court to ignore the protections for the class that are built into the settlement.

The settlement approved by the district court includes several levels of protection designed to prevent such a result. The Class will receive its largest payout if one of the designated Liquidation Events occurs – an IPO, a merger or sale of Clearview' assets, or a sale of the Class's right to receive such a payout to an investor. (SA § 3.3, 3.4.) Because such a transaction is not guaranteed – a feature of the settlement, not a bug, as Objectors Weissman and Claypool suggest – the settlement

creates a 17% revenue set-aside. (SA § 3.3(c).) Thus, since March 20, 2025, the date of final settlement approval by the district court, Clearview has been setting aside 17% of its revenue each month. (*Id.*) Those reserved funds are available for a single purpose – to fund the Settlement Stake if the Settlement Master determines that a liquidation event is too speculative, or remote in time, to be worth waiting for.

The Settlement Master provides another critical layer of protection for the Class, ensuring that a Settlement Fund will be established. The district court emphasized the importance of this position, filled in the present case by retired U.S District Court Magistrate Judge Sidney Schenkier. (Appx. 28-29.) As the court noted: "the settlement agreement does not leave the administration of this equity stake to chance but instead appoints Judge Schenkier as Settlement Master." (Appx. at 29.) In that role, Judge Schenkier owes fiduciary duties to the class. (SA § 3.5.)

In addition, as Settlement Master, Judge Schenkier is entitled to demand and receive information from Clearview, and the Settlement Master (along with Class Counsel) is provided with quarterly updates on Clearview's business and the amount accumulating in the revenue set-aside fund. (Id.) At any time, the Settlement Master may elect to receive, as a Cash Demand, the amount accumulating in the 17% revenue set-aside fund. Indeed, the only conceivable scenario in which the Class could receive nothing is if the Settlement Master, despite being fully informed, ignores his fiduciary duties to the Class and declines to accept the Cash Demand in

favor of a wholly speculative future liquidation event.[3] The district court did not abuse its discretion by failing to credit this imaginary concern.

B.     Uncertainty as to the Future Value of the Settlement Fund Does Not Require Reversal of the District Court's Approval.

Objectors Weissman and Claypool next argue that a court reviewing a proposed class action settlement must attempt to estimate possible outcomes, leading to a ballpark valuation. The appellants argue that there is too much uncertainty about future events to make such a ballpark valuation possible here. (App. Brf. at 30-32.) Objectors Weissman and Claypool are wrong – the district court conducted the proper analysis and the uncertainty as to the final amount going to the Settlement Fund does not render the district court's approval improper.

Appellees agree that a court evaluating a potential class action settlement should attempt to come up with a ball park valuation of the possible outcomes but disagree that the district court here failed to make such estimates. At pages 25-26 of the Court's opinion approving the settlement (Appx. 26-27), the court referenced a recent (January 2024) valuation of Clearview and estimated the value of the Class's 23% Settlement Stake if an IPO or asset sale occurred at such a valuation ($51.75 million). The district court here made an appropriate ball park valuation.

---

[3] This string of protected-against improbabilities is wholly dissimilar to the settlement agreement in *In re: Katrina Canal Breaches Litig.,* 628 F. 3d 185 (5th Circ. 2010) (App. Brf. at 28-29). There, the only certain payments were to class counsel; here, in contrast, class counsel receives the same payment, at the same time, as class members. Future costs and enhanced counsel fees could have consumed the entire Katrina settlement fund for the class, a flaw with that settlement, among many others, not present here.

In addition, the district court had other available data points. In its Motion and Memorandum in Support of Final Approval, Class Counsel presented the court and public with three different valuations of Clearview from the years prior to the settlement, based on actual investors infusing money into Clearview in exchange for equity stakes in the company, with the valuations ranging from $130 million to $225 million. (R 621 at 3). By simply multiplying those valuations by 23%, the court and Class members can obtain a reliable, fact-based range of possible outcomes.

It is also not true, as Objectors Weissman and Claypool suggest, that there is no evidence as to the value of the Cash Demand option. (App. Brf. at 32.) As Class Counsel notes in its memo in support of final approval, Clearview provided extensive financial information to Judge Andersen as part of the settlement negotiations (including its revenues), which Judge Andersen kept confidential but made available to the district court. (R. 621 at n. 3.) The settlement agreement also obligates Clearview to provide ongoing, up-to-date financial information to the Settlement Master, including information as to the revenue set aside. (SA § 3.5.)

Finally, the district court correctly noted that "the concept of equity – or security – based monetary relief is not a new idea, citing *Uhl v. Thoroughbred Tech, & Telecommunications, Inc.,* 309 F.3d 978, 987 (7th Cir. 2002). (Appx. at 27.) This is correct, as *Uhl* and other cases have approved of the use of equity interests as a form of class settlement compensation. *See  Reinhart v. Lucent Techs., Inc. (In re*

41

*Lucent Techs., Inc. Sec. Litig.)* 327 F. Supp. 2d 426, 438 (D. NJ 2004); *In re: TSO Financial Litig.,* 1989 U.S. Dist. LEXIS 7434, 1989 WL 73249 (E.D. Pa. June 29, 1989); *see also In re Penn Central Sec. Litig.*, 560 F. 2d 1138 (3rd Cir. 1977) (settlement includes cash payment by some defendants and certain defendants surrendering common and preferred stock). The lack of certainty as to the value of the settlement is a necessary feature of any settlement involving an equity interest in a defendant, especially where, as here, the defendant is a privately held, start-up entity. Given the present settlement structure – which the district court and mediator agreed was the only structure likely to provide money to the Class – the district court made appropriate estimates of the settlement's likely valuation and did not abuse its discretion by electing not to reject the settlement for lack of absolute precision.

> C.    The District Court Reasonably Compared the Value of the Instant Settlement to the Values in Other BIPA Settlements.

In a single sentence in the opinion granting final approval to the Clearview settlement, the district court observed that the Class receipt of a 23% interest in Clearview gives the Class a much larger recovery, measured in terms of market value, than in other BIPA settlements. (Appx. at 28-29.) Objectors Weissman and Claypool quibble with this single sentence, arguing (without citation) that "the fairness inquiry does not turn on what percentage of the company's equity the settlement may be worth, but on the actual relief the class receives. (App. Brf. at 33.) This argument in no way demonstrates an abuse of discretion by the trial court.

*First*, the district court's comparison of percentages of market value between settlements came *after* the court discussed the estimated size of the actual relief the Class is to receive – a Settlement Stake estimated to be $51.75 million at the most recent, $225 million valuation of Clearview. (Appx. at 28.) ***Second***, any comparisons between the current settlement and settlements in prior BIPA privacy class actions are going to be imperfect, simply because Clearview is nothing like the other cited, settling defendants – Facebook, Google and Snapchat – in terms of size, reach, and market capitalization. Tiny startup Clearview could never hope to fund a $650 million settlement, like Facebook; behemoth Facebook could never hope to fund a class action settlement with the economic equivalent of 23% of its equity value. ***Third,*** Appellants' critique of the equity stake granted to the class here, and the supposed lack of cash payment as in *Uhl*, 309 F.3d 978, disregards the Cash Demand feature of the current settlement as well as the protections provided by the Settlement Master. The settlement includes features to ensure that the class does, ultimately, receive a meaningful recovery. The district court's one line comparison of settlements, based on the size of the equity stake, was not an abuse of discretion.

### D.    The Settlement Does Not Connect Class Relief to Continued Conduct by Clearview that Harms the Class.

In its opinion approving the settlement, the district court noted that many objectors simply oppose the very business that Clearview is in, and object to any class relief short of an injunction that puts Clearview out of business. Objectors

argued that only such relief can "redirect the company's moral compass," address its "illegal and immoral" practices, and stop the "bad behavior." (Appx. at 32-33.) Objectors Weissman and Claypool sound this same theme in their final argument based on the value of the relief to the class, asserting that a settlement built around an equity interest in Clearview merely continues the conduct that harms the class. (App. Brf. at 34-35.)

There are two problems with this suggestion. First, the district court has a duty to consider the interests of all Class members, not simply the small but vocal minority who object to the settlement and would prefer to see Clearview put out of business. So as to provide a meaningful financial recovery to all Class members, the Defendants and Class Counsel and the mediator designed the equity-based settlement, with key protections, that was presented to the district court for preliminary approval, and thereafter for final approval. The district court permissibly exercised its discretion to "secure the Settlement Class monetary relief in the form of an equity stake in Clearview, or risk leaving litigation victorious, but empty-handed." (Appx. at 28.) A result that left the class empty-handed, but that put Clearview in bankruptcy might have been preferable to Objectors Weissman and Claypool and other objectors who disfavor Clearview's business and practices. But the district court did not abuse its discretion by approving the settlement that provides for a monetary recovery for all Class members.

Second, the fact that Objectors Weissman and Claypool say that Clearview's continued existence "harms the class" does not make it so. Rather, such an assertion can only be measured against the legal claim advanced by the nationwide class -- state common law Unjust Enrichment. Do Clearview's business practices, as modified over time and adjusted to conform to the terms of the ACLU settlement, harm the nationwide class by creating a right to recover under the theory alleged? The answer is "no." There is no such harm. As Judge Coleman held:

> While individual objectors may believe that the practice of collecting face images is illegal, they do not point to any law that Clearview's practices currently violate. Nor does the brief by Amici States— submitted on behalf of a coalition of twenty-two state attorneys general—identify any such violations. This is not an omission, but a practical result of the over five years of litigation in state and federal court seeking to ensure Clearview's compliance with the law. Absent any such violations, it would be a dereliction of the Court's duty to act as a fiduciary for the Settlement Class to reject a settlement, hard-fought and negotiated in good faith, and the relief it provides to address concerns not at issue in the present case.

(Appx. at 35.)  The district court was acting well within its discretion when it elected to approve a settlement that provides a meaningful recovery for the class, over the objections of a handful of nationwide class members who simply believe – without reference to a viable legal theory – that Clearview's ongoing business somehow harms them.

## IV.    THE NATIONWIDE CLASS WAS ADEQUATELY REPRESENTED.

Objectors Weissman & Claypool object on behalf of the nationwide subclass, arguing that it lacks adequate representation because all class representatives are part of subclasses. (App. Brf. at 35-37.) The purpose of the adequacy of representation requirement, however, is to "uncover conflicts of interest between the named parties and the class they seek to represent." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 492 (N.D. Ill. 2015), quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (overruling FRCP 23(a) objections to adequacy of representation). Like in *Kolinek*, "[n]o objectors have argued, and there is no evidence on the record to suggest, that [class representatives'] interests are adverse to those of the [nationwide] class." *Id.* Indeed, the district court specifically considered, and properly rejected, the very "lack of representation" argument here asserted:

> General concerns, unsupported by evidence, do not a conflict make. As the court explains in more detail later in this opinion [and as Appellees demonstrated previously in this brief], the possibility of injunctive relief is not determined by the desires of the class members but by the strength and weakness of the bases for the relief. While some members of the Nationwide Class may have a strong interest in receiving injunctive relief under the settlement, that possibility is foreclosed by the fact that the complaint provides no basis for such relief.

(App. at 19). The district court did not abuse its discretion in finding that there was neither a legitimate right to injunctive relief for the nationwide class, nor a conflict between its interests and those of the other classes.

46

The cases Objectors Claypool and Weissman cite to attack the district court's exercise of discretion on this point do not help their argument. In *Ruppert v. Alliant Energy Cash Balance Pension Plan*, 726 F.3d 936, 942 (7th Cir. 2013), this Court merely noted that, in light of its merits-based ruling reversing summary judgment in favor of a class of pension plan beneficiaries, the two named plaintiffs no longer had valid claims under the theory of relief asserted on behalf of one subclass. Although the named plaintiffs had been adequate representatives before appeal, a new representative would be needed for the subclass of which they were no longer members. Thus, the case stands for the anodyne proposition that each class or subclass must have a representative. Here, of course, the named plaintiffs (and their predecessors) were each a member of the nationwide class at all times, as well as members of the state-specific Subclasses they represent.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) is similarly inapposite.[4] *Amchem* was an asbestos case in which the district court certified a single settlement class that included not only class members already afflicted with an asbestos-related disease, but also those without manifest injury who had been exposed to the defendants' asbestos products ("exposure-only plaintiffs"). These two groups, the Court ruled, had competing interests in that the exposure-only plaintiffs

---

[4] Appellants also cite *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856-57 (1999), another asbestos case reiterating *Amchem's* holding; the *Amchem* discussion applies equally to both cases.

would want protection against inflation for future recoveries, as well as back-end opt-out rights and causation provisions that would keep pace with scientific and medical advancement, whereas the already injured plaintiffs "would care little about such provisions and would rationally trade them for higher current payouts." *Id.* at 611. The settlement included "no adjustment for inflation; only a few claimants per year can opt out at the back end; and loss-of-consortium claims are extinguished with no compensation." *Id.* at 627. Because of these patent, demonstrable conflicts the court found that the adequacy of representation element was not met.

In sharp contrast, every class member in the present case suffered the same injury – Clearview's alleged collection of their biometric information without consent. And every class member desired the same result – the largest monetary recovery possible, as well as the most protection from future violations that could be afforded. While Objectors Weissman and Claypool say that the nationwide class members "*may* have found injunctive relief more meaningful than speculative monetary compensation," (App. Brf. at 36 (emphasis added)), they offer no support for this *ipse dixit*, because no such support exists. More fundamentally, as the district court found and as discussed above, this hypothesized preference for injunctive relief cannot create a conflict where there was "no basis for such relief." (App. at 19.)

Objectors Weissman and Claypool also argue without basis that the nationwide class members outside the state-specific subclasses "*might* not have

agreed with the division of shares of any Net Settlement Fund." (App. Brf. at 36 (emphasis added).) Again, no support is offered for this speculative argument; notably, Objectors Weissman and Claypool themselves do not assert that *they* disagree with the allocation, or that the allocation is unfair given the relative strength of claims. And in any event, Appellants' conjecture does not establish a conflict between the state-specific subclass members and those only in the nationwide class.

Under the settlement, members of the state specific subclasses will receive larger shares than the nationwide class members. Rightfully so. (App. at 19.) As discussed above, this MDL consolidated cases filed in some of the subclass states, and alleged claims under the state laws of Illinois, Virginia, California and New York. Additionally, as the district court explained, Illinois' BIPA was the driving cause of action, as it addresses biometrics and includes a private right of action allowing for statutory damages in the absence of actual damages, which are difficult to prove and hard to certify on a class basis. The claims charging Clearview with BIPA violations are the strongest, while claims under California, New York and Virginia law are weaker. (App. at 25.) Recovery solely for nationwide class members was even more remote. It is eminently fair and reasonable to provide greater recovery to a subclass if it has a greater chance of winning than do other subclasses. *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1108 (D. Kan. 2018) (reasonable for class action settlement to provide lesser recovery for

class members with weaker claims); *Farrell v. Bank of American Corp., N.A.*, 827 Fed. App'x. 628, 630 (9th Cir. 2020) (affirming approval of class action settlement structure that "appropriately protected 'higher-value claims … from class members with much weaker ones'"), quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 605 (9th Cir. 2018). The rights of these subclass members were adequately considered and protected.

*Eubanks v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), does not help Appellants' argument. In that case, this Court rejected a settlement not because state-specific subclasses wrongly received more than a nationwide class, but because the settlement *ignored* the certified state-specific subclasses, and instead sought to settle only a nationwide class, in a settlement that, among other glaring problems, awarded more than half the recovery (including a $2 million advance before notice was sent out) to lead class counsel who was the son-in-law of the lead class representative and who was facing Illinois Attorney Registration and Disciplinary Commission proceedings at the time of negotiating the settlement (culminating in a recommendation of a 30 month suspension by the time of the appeal). *Id.* at 722-24. Needless to say, these facts have no relevance to Judge Coleman's careful exercise of discretion in this case.

Appellants' remaining cited cases fare no better. In *Smith v. Sprint Comms. Co., L.P.*, 387 F.3d 612 (7th Cir. 2004), plaintiffs who had already won class

certification in their respective state courts objected to a nationwide settlement on behalf of a class that this Court already had deemed uncertifiable in an earlier case. *Id.* at 614. Under those unique facts, which have no relevance to this case, the court unsurprisingly found that certification of a nationwide settlement class would not adequately protect the interests of the state-specific objectors. The court in *Murray v. Grocery Delivery E-Services USA Inc.*, 55 F.4th 340 (1st Cir. 2022), undertook a similar analysis, rejecting a proposed settlement precisely because, unlike in this case, the settlement placed claimants with stronger claims on equal footing with other groups whose claims were virtually worthless.

*In re Literary Works in Electronic Databases Copyright Litig.*, 654 F.3d 242 (2nd Cir. 2011) involved a settlement that – like this one – offered lower compensation for demonstrably weaker claims. But that was not the reason the court rejected the settlement; in fact, the court *rejected* the objectors' argument that the "inferior recovery [w]as determinative evidence of inadequate representation." *Id.* at 253. Rather, the Court found that the possibility of a further reduction for the inferior claims if a certain total settlement amount was reached – a reduction that applied only to the inferior claims – could eliminate the recovery for those claimants entirely. *Id.* at 253-54. No such concerns exist here, because the settlement does not call for reductions of any kind, let alone reductions specific to any subclass. The same result occurred *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170 (3d Cir.

51

2012), in which a "residual group" of claimants were at risk of receiving no compensation depending on the number of claims made by the "reimbursement group." Again, here there is no such risk, and thus the court's analysis is inapplicable.

Finally, Objectors Weissman and Claypool's contention that the replacement of the named plaintiffs prior to settlement raises a "red flag" is without merit. The only case cited is *Eubank*, in which the soon-to-be-suspended class counsel – who was also facing financial hardship – effectively sold out the already-certified state law subclasses by seeking a settlement that provided nothing on those claims, in favor of a nationwide settlement that paid him more than half the recovery and awarded a hefty incentive award to the sole remaining named plaintiff, his father-in-law. Not surprisingly, Judge Posner described these facts as not only raising "red flags," but "scandalous." 753 F.3d at 721. Here, in contrast, while the original named plaintiffs declined to sign off on the settlement, only three out of the seven of them opted out, and none (in contrast to *Eubank*) filed an objection. (R. 621 at 34, fn. 38.)

# CONCLUSION

For all of the reasons stated above, and as fully explained in the carefully reasoned district court opinion granting final approval, this Court should affirm the decision of the district court to grant final approval to the class action settlement in this case.

September 26, 2025                    Respectfully submitted,

                                              By: */s/ James Thompson*
                                              James Thompson
                                              Daniel Lynch
                                              LYNCH THOMPSON LLP
                                              150 South Wacker, Suite 2550
                                              Chicago, Illinois 60606
                                              Phone: (312) 346-1600
                                              *Counsel for the Clearview Defendants*

                                              By:*/s/ Thomas M. Hanson*
                                              Thomas M. Hanson
                                              Jon Loevy
                                              Michael Kanovitz
                                              Thomas M. Hanson
                                              LOEVY & LOEVY
                                              311 N. Aberdeen St.
                                              Chicago, Illinois
                                              312.243.5900
                                              *Lead Class Counsel*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c). As calculated by my word processing software (Microsoft Word for Office 365), the brief contains 13,287 words.

*/s/ James Thompson*
James Thompson

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I electronically field the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the Seventh Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ James Thompson*
James Thompson

# SUPPLEMENTAL APPENDIX

# TABLE OF CONTENTS

Class Action Settlement Agreement and Release (ECF No. 578-1, June 12, 2024) ………........App. 1

Doe v. Highmark Complaint (ECF No. 1, February 15, 2023) …………………………......App. 59

Collins v. Conifer Class Action Complaint (ECF No. 1, October 23, 2014) ……………....App. 98

*State of Vermont v. Clearview AI, Inc.* Ruling on Defendant's Motion for Summary Judgment (ECF No. 622-1, January 16, 2025) .................................................................App. 160

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| *In re: Clearview AI, Inc. Consumer Privacy Litigation* | Civil Action File No.: 1:21-cv-00135 |
|  | Judge Sharon Johnson Coleman |
|  | Magistrate Judge Maria Valdez |

## CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This class action settlement agreement and release (the or this "Agreement" or the or this "Settlement Agreement") is entered into as of June 12, 2024, by and among Plaintiffs Rodell Sanders, Gerard Dache, Eric Gould and Jordan Orlando (collectively, "Plaintiffs"), individually and on behalf of the class of persons they seek to represent (the "Settlement Class" defined in paragraph 2.3, below, that includes the Nationwide Class, the Illinois Subclass, the California Subclass, the New York Subclass, and the Virginia Subclass), and Defendants Clearview AI, Inc. ("Clearview"), Hoan Ton-That, Richard Schwartz, Rocky Mountain Data Analytics LLC, and Thomas Mulcaire (collectively, the "Clearview Defendants"); and Defendants Macy's, Inc., Macy's Retail Holdings, Inc. (n/k/a Macy's Retail Holdings, LLC), and Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC) (collectively, the "Macy's Defendants") (Plaintiffs, the Clearview Defendants, and the Macy's Defendants are collectively referred to as the "Parties"). This Agreement is intended by the Parties to fully, finally, and forever resolve, discharge, and settle the Released Claims (defined below), upon and subject to the terms and conditions of the Agreement, and subject to the final approval of the Court.

## <u>RECITALS</u>

A.      Plaintiffs are residents of the fifty United States, including sub-class members in
Illinois, California, New York, and Virigina, who allege in this Action that Defendants violated
various state laws in their collection, storage and use of Plaintiffs' biometric information in
Defendant Clearview's Biometric Database.

B.      In January 2021, the Judicial Panel on Multidistrict Litigation transferred various
filed lawsuits against some or all of the Defendants to the Honorable Sharon Johnson Coleman of
the Northern District of Illinois, Eastern Division, creating this Action.

C.      On June 29, 2021, Plaintiffs filed their First Amended Consolidated Class Action
Complaint, alleging violations of: (1) Illinois' Biometric Information Privacy Act ("BIPA"), 740
ILCS 14/15(b) (c) (d) and (e); (2) Viginia statutes addressing the unauthorized use of names or
pictures, Va. CODE §§ 8.01-40, and the Virginia Computer Crimes Act, Va. CODE § 18.2-152.1,
*et seq.*; (3) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*,
California's statute against Commercial Misappropriation, Cal. Civ. Code § 3344(A), California
common law protections for right of publicity, and the California state Constitution's protections
against invasion of privacy; (4) New York civil rights protections against invasion of privacy, N.Y.
CIV. RIGHTS LAW §§ 50-51; (5) for unjust enrichment; and (6) for a judgment under the federal
Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

D.      After the Court denied most of the arguments in defense motions to dismiss the
First Amended Consolidated Class Action Complaint, in March 2022, Defendants filed their
respective answers, affirmative defenses, and counterclaims in the Action, denying all allegations
of wrongdoing and liability.

E.      After engaging in extensive written discovery and document productions over
several months, in early 2023, the Clearview Defendants and Plaintiffs jointly agreed to participate

in a mediation to try to resolve this Action. Over a period of several months from March through August of 2023, the Clearview Defendants and Plaintiffs worked with a neutral Mediator, the Honorable Wayne Andersen (Ret.) of JAMS, to try to resolve the entire Action. In September 2023, the Clearview Defendants and Plaintiffs reached an agreement in principle on the key terms of a class settlement.

F.      Plaintiffs and Class Counsel strongly believe that the claims asserted in the Action have merit. Nonetheless, Plaintiffs and Class Counsel recognize and acknowledge the expense, time, and risk associated with continued prosecution of the Action against Defendants through dispositive motions, class certification, trial, any subsequent appeals and, ultimately, collectability of a judgment. Plaintiffs and Class Counsel also have taken into account the uncertainty, difficulties, and delays inherent in litigation, especially in complex actions like this Action. Of particular relevance, Class Counsel has carefully evaluated the current financial condition of Clearview and considered the likelihood that Clearview would not be able to survive as a going concern through the remaining discovery and trial. Therefore, Plaintiffs and Class Counsel believe that it is desirable that Class Members receive the consideration called for by this Agreement and that the Released Claims be fully and finally compromised, settled, dismissed with prejudice, and barred pursuant to the terms set forth herein. Based on their evaluation, Plaintiffs and Class Counsel have concluded that the terms and conditions of this Settlement Agreement are fair, reasonable, and adequate for the Settlement Class, and that it is in the best interests of the Settlement Class to settle the Released Claims pursuant to the terms and provisions of this Agreement without delay.

G.      Defendants consistently have denied, and continue to deny, all allegations of wrongdoing and liability and all material allegations in the Action. Defendants strongly believe

they would prevail in any trial on the merits.  They have concluded, however, that this Settlement Agreement is desirable to avoid the time, risk, and expense of defending protracted litigation, to permit Clearview to focus on its business opportunities (rather than litigation), and to avoid the risk posed by the Settlement Class's claims for substantial damages. Defendants thus desire to resolve finally and completely the pending claims of Plaintiffs and the Settlement Class.

H.    The Parties agree that the Action was resolved in good faith, following arm's-length bargaining presided over by a retired federal judge acting as a neutral Mediator.

I.    Subject to approval by the Court, Defendants conditionally agree and consent to certification of the Settlement Class (the Nationwide Class, and the Illinois, California, New York, and Viriginia Subclasses, as defined below) for settlement purposes only and within the context of this Agreement only, as described in paragraph 2 below.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and among the Parties, by and through their respective counsel, subject to final approval by the Court after a hearing or hearings as provided for in this Settlement Agreement, and in consideration of the benefits flowing from the Settlement Agreement set forth herein, that the Action and the Released Claims shall be finally and fully compromised, settled, and released, and the Action shall be dismissed with prejudice, upon and subject to the terms and conditions of this Agreement.

## <u>AGREEMENT</u>

## 1.    DEFINITIONS

As used herein, in addition to any definitions set forth elsewhere in this Settlement Agreement, the following terms shall have the meanings set forth below:

1.1    "Action" means the consolidated case captioned *In re: Clearview AI, Inc. Consumer Privacy Litigation*, No.: 1:21-cv-00135 (N.D.Ill.).

1.2 "Agreement" or "Settlement Agreement" means this Class Action Settlement Agreement and Release.

1.3 "Approved Claim" means a Claim Form submitted by a Class Member that is timely and submitted in accordance with the directions on the Claim Form and the terms of this Agreement, or that is otherwise accepted by the Court and satisfies the conditions of eligibility for a Settlement Payment as set forth in this Agreement.

1.4 "Biometric Data" means biometric information and biometric identifiers as defined in the Illinois Biometric Privacy Act, 740 ILCS 14/1, *et seq.*

1.5 "Biometric Database" means the databases created and maintained by Clearview containing facial images, facial vector data, and/or Biometric Data.

1.6 "California Subclass" means all individuals who resided in the state of California between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data were or are contained in the Biometric Database.

1.7 "California Subclass Notice Plan" means the plan, as set forth in paragraph 5.7 and as executed and administered by the Settlement Administrator, for disseminating notice of the Settlement Agreement and of the Final Approval Hearing to members of the California Subclass.

1.8 "Cash Demand" means a demand by the Settlement Master, in the Settlement Master's independent judgment, that Clearview make a cash payment in an amount representing seventeen per cent (17%) of Clearview's Generally Accepted Accounting Principles (GAAP) recognized revenue, as reviewed and confirmed by an independent Certified Public Accountant, for the period commencing on the date of Final Judgment and ending on the date of the Settlement Master's demand.

1.9     All Class Members, including Subclass Members, who wish to file a claim for a
Settlement Payment must submit a Claim Form which will be available for electronic completion
and submission, as provided in the electronically provided Notice to the Nationwide Class, to the
Illinois, California, New York, and Virginia Subclasses, and also available on the Settlement
Website. The Claim Form will require a claiming Class Member to provide the following
information: (i) full name; (ii) current U.S. Mail address or an e-mail address; (iii) a certification
that one or more photographs depicting the claiming Class Member's face was posted to a publicly
accessible webpage on the internet (such as, by way of example, e.g. Facebook, Instagram, TikTok,
Snapfish, Shutterfly, Flickr, Pinterest, Imgur, Smugmug, Photobucket, or Tumblr ; (iv) a
certification that the Class member is over the age of 18; and (v) affirm whether the Class Member
resided in Illinois, California, New York, or Virginia between July 1, 2017 and the date of
Preliminary Approval. The electronic Claim Form will provide Class Members with instructions
for receiving their Settlement Payment digitally.

1.10    "Claims Deadline" means the date by which all Claim Forms must be postmarked
or submitted electronically to be considered timely, and shall be set as a date no later than ninety
(90) calendar days following the Notice Date, subject to Court approval. The Claims Deadline
shall be clearly set forth in the order preliminarily approving the Settlement, as well as in the
Notice and the Claim Form.

1.11    "Class Counsel" means the law firms of Loevy & Loevy; Bursor & Fisher, P.A;
Hedin Hall LLP; Neighborhood Legal LLC; Community Lawyers LLC; Webster Book LLP; and
Drury Legal, LLP.

1.12    "Class Member" means a person who falls within the definition of the Settlement
Class and who does not submit a valid request for exclusion.

1.13    "Class Representative" means Plaintiffs Rodell Sanders, Gerard Dache, Eric Gould and Jordan Orlando.

1.14    "Clearview" means Defendant Clearview AI, Inc.

1.15    "Clearview Defendants" means Defendants Clearview AI, Inc.; Hoan Ton-That; Richard Schwartz; Rocky Mountain Data Analytics LLC; and Thomas Mulcaire.

1.16    "Clearview Defendants' Counsel" means the law firm of Lynch Thompson LLP.

1.17    "Court" means the United States District Court for the Northern District of Illinois, Eastern Division, the Honorable Sharon Johnson Coleman presiding, or any judge who shall succeed her as the judge assigned to the Action.

1.18    "Current Shareholder Sale" means any sale of one or more shares of Clearview common stock by any person or entity who is a current holder of Clearview common shares as of the date of this Settlement Agreement.

1.19    "Deemed Liquidation Event" means:  (a) a merger or consolidation in which (i) Clearview is a constituent party or (ii) a subsidiary of Clearview is a constituent party and Clearview issues shares of its capital stock pursuant to such merger or consolidation, except any such merger or consolidation involving Clearview or a subsidiary in which the shares of capital stock of Clearview outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital stock that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital stock of (1) the surviving or resulting entity; or (2) if the surviving or resulting entity is a wholly owned subsidiary of another entity immediately following such merger or consolidation, the parent corporation of such surviving or resulting entity; or (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by Clearview or any

- 7 -

subsidiary of Clearview of all or substantially all the assets of Clearview and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise, and whether in a single transaction or a series of related transactions) of one or more subsidiaries of Clearview if substantially all of the assets of Clearview and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of Clearview.

1.20    "Defendants" means the Clearview Defendants and the Macy's Defendants, collectively.

1.21    "Defendants' Counsel" means Clearview Defendants' Counsel and Macy's Defendants' Counsel, collectively.

1.22    "Effective Date" means the date one (1) business day after which all of the events and conditions specified in paragraph 10.1 have occurred and have been met.

1.23    "Escrow Account" means the separate, interest-bearing escrow account to be established by the Settlement Administrator under the terms described herein, at a bank to be determined by Epiq, which shall be the "Escrow Agent." The Settlement Stake Payment or the proceeds from the exercise of the Sale Option shall be deposited into the Escrow Account and the money shall be invested in the following types of accounts and/or instruments and no other: (a) demand deposit accounts; (b) time deposit accounts and certificates of deposit; (c) United States Treasury bills; or (d) other instruments backed by the full faith and credit of the United States Government. The costs of establishing and maintaining the Escrow Account shall be paid by the Settlement Administrator.

1.24    "Fee Award" means the consideration, representing attorneys' fees and expenses, awarded by the Court to Class Counsel.

- 8 -

1.25    "Final" means one business day after the latest of the following events: (i) the date upon which the time expires for filing or noticing any appeal of the Court's Final Judgment approving the Settlement Agreement; (ii) if there is an appeal or appeals, other than an appeal or appeals solely with respect to the Fee Award, the date of completion, in a manner that finally affirms and leaves in place the Final Judgment without any material modification, of all proceedings arising out of the appeal or appeals (including, but not limited to, the expiration of all deadlines for motions for reconsideration or petitions for review and/or certiorari, all proceedings ordered on remand, and all proceedings arising out of any subsequent appeal or appeals following decisions on remand); or (iii) the date of final dismissal of any appeal or the final dismissal of any proceeding on certiorari.

1.26    "Final Approval Hearing" means the hearing before the Court where the Parties will request that the Final Judgment be entered by the Court finally approving the Settlement as fair, reasonable, and adequate, and approving the Fee Award and the incentive awards to the Class Representatives.

1.27    "Final Judgment" means the final judgment to be entered by the Court approving the settlement of the Action in accordance with this Settlement Agreement after the Final Approval Hearing.

1.28    "Illinois Subclass" means all individuals who resided in the state of Illinois between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database.

1.29    "Illinois Subclass Notice Plan" means the plan, as set forth in paragraph 5.5 and as executed and administered by the Settlement Administrator, for disseminating notice of the Settlement Agreement and of the Final Approval Hearing to members of the Illinois Subclass.

1.30    "IPO" means the consummation of Clearview's first underwritten public offering of its common stock under the Securities Act of 1933, as amended.

1.31    Lead Class Counsel shall mean the law firm of Loevy & Loevy.

1.32    "Macy's Defendants" means Defendants Macy's, Inc., Macy's Retail Holdings, Inc. (n/k/a Macy's Retail Holdings, LLC), and Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC), collectively.

1.33    "Macy's Defendants' Counsel" means the law firm Blank Rome LLP.

1.34    "Mediator" means the Honorable Wayne R. Andersen (Ret.) of JAMS.

1.35    "Nationwide Class" means all individuals who resided in the United States of America between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database.

1.36    "Notice Plan" means the plan, as set forth in Section 5 and as executed and administered by the Settlement Administrator, for disseminating notice of the Settlement Agreement and of the Final Approval Hearing to members of the Nationwide Class and the California, Illinois, New York, and Virginia Subclasses.

1.37    "New York Subclass" means all individuals who resided in the state of New York between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database.

1.38    "New York Subclass Notice Plan" means the plan, as set forth in paragraph 5.9 and as executed and administered by the Settlement Administrator, for disseminating notice of the Settlement Agreement and of the Final Approval Hearing to members of the New York Subclass.

1.39    "Net Settlement Fund" means the Settlement Fund, plus any interest or investment income earned on the Settlement Fund, less any Fee Award, incentive awards to the Class Representatives, and less any Taxes and Tax Expenses.

1.40    "Notice" means the notice of this proposed Settlement and Final Approval Hearing, which is to be disseminated to the Settlement Class substantially in the manner set forth in this Settlement Agreement and approved by the Court, fulfilling the requirements of Due Process and Rule 23, and is substantially in the form of Exhibit 1 attached hereto.

1.41    "Notice Date" means the date by which the Notice is disseminated to the Settlement Class, which shall be a date no later than thirty-five (35) calendar days after entry of Preliminary Approval.

1.42    "Objection/Exclusion Deadline" means the date by which a written objection to the Settlement or a request for exclusion by a person within the Settlement Class must be made, which shall be designated as a date no later than sixty (60) calendar days after the Notice Date and no sooner than fourteen (14) calendar days after the request for the Fee Award is filed with the Court and posted to the Settlement Website, or such other date as ordered by the Court.

1.43    "Parties" means all Plaintiffs and Defendants, collectively.

1.44    "Plaintiffs" means the individuals Rodell Sanders, Gerard Dache, Eric Gould and Jordan Orlando, or any other individual plaintiff which the Court may appoint.

1.45    "Preliminary Approval" means that an order has been issued by the Court ("Preliminary Approval Order") making each of the following rulings: (i) preliminarily approving the Agreement and finding that the Settlement is within the range of potential final approval as fair, reasonable, and adequate; (ii) confirming certification of the Nationwide Class, California Subclass, Illinois Subclass, New York Subclass, and Virginia Subclass, for settlement purposes;

and (iii) approving the form and manner of the Notice and directing that Notice be sent to the Settlement Class.

1.46    "Released Claims" means any and all claims, theories, or causes of action, whether known or unknown (including "Unknown Claims" as defined below), arising from or related to Defendants' alleged collection, capture, purchase, storage, possession, receipt through trade, obtainment, sale, lease, trade, profiting from and/or dissemination, disclosure or redisclosure of images and/or facial vectors and/or Biometric Data using the Clearview Biometric Database or other Clearview technology, including, without limitation, Clearview's algorithms, facial vectors, or other proprietary technology, to make use of those images and/or biometric data, including all claims and issues that were litigated in the Action or that could have been brought in the Action and claims for any violation of the Illinois Biometric Information Privacy Act ("BIPA") or other Illinois statutory or common law related to facial recognition, as well as any and all state law claims (including, but not limited to claims under the laws of Illinois, California, New York, and Virigina) and federal statutory, constitutional, and common law claims that were, or could have been, advanced regarding the images held in the Biometric Database in any of the cases assigned by the Judicial Panel on Multidistrict Litigation to the Action.

1.47    "Released Parties" means all Defendants, including all Clearview Defendants, and all Macy's Defendants, and all Defendants' respective present or former administrators, predecessors, successors, assigns, parents, subsidiaries, holding companies, affiliates, investors, divisions, associates, employees, agents, representatives, consultants, independent contractors, directors, managing directors, officers, partners, principals, members, attorneys, vendors, accountants, fiduciaries, financial and other advisors, investment bankers, insurers, reinsurers,

employee benefit plans, underwriters, shareholders lenders, auditors, investment advisors, and former companies

1.48    "Releasing Parties" means Plaintiffs and the Class Members and their respective present or past heirs, executors, estates, administrators, trustees, assigns, agents, consultants, independent contractors, insurers, attorneys, accountants, financial and other advisors, investment bankers, underwriters, lenders, and any other representatives of any of these persons and entities.

1.49    "Sale Option" means the Settlement Master's option under the terms set forth in paragraph 3.4, acting in accordance with the Settlement Master's duties as a fiduciary, to elect to sell the right to receive the Settlement Stake Payment to a single third party for a commercially reasonable price; provided that such third party must be a United States Person (as defined in the Securities Act of 1933), an accredited investor (as defined in Regulation D), and not a competitor of Clearview or then in active litigation with Clearview.

1.50    "Settlement" means the settlement contemplated by this Settlement Agreement.

1.51    "Settlement Administration Expenses," all of which are to be borne exclusively by Clearview, separate from and not taken from the Settlement Fund, means all reasonable expenses incurred by the Settlement Administrator, including the expenses incurred in providing Notice, processing claims, responding to inquiries from members of the Settlement Class, providing Settlement Payments, and related services. Based on assumptions provided by the parties, including an assumed four-year administration period, the Settlement Administrator anticipates the total cost of Settlement Administration to be approximately $338,320 ("Estimated Settlement Administration Expenses"). Settlement Administration Expenses shall also include the fees charged by the Settlement Master, at the Settlement Master's reasonable hourly rate, which fees also are to be borne by Clearview, separate from and not taken from the Settlement Fund. The fees

charged by the Settlement Master are in addition to the Estimated Settlement Administration Expenses outlined above. Settlement Administration Expenses shall not include Taxes incurred on the Settlement Fund, as addressed separately in paragraph 1.61.

     1.52   "Settlement Administrator" means Epiq Class Action & Claims Solutions, Inc., subject to approval by the Court, which will administer the aspects of this Settlement, including sending Notice, maintaining the Settlement Website, processing Approved Claims as Settlement Payments to Class Members, overseeing the Escrow Account, and preparing and submitting certain Class tax filings, as set forth in this Agreement.

     1.53   "Settlement Class" means each member of the Settlement Class, as defined in paragraph 2.3 of this Settlement Agreement (pending Court approval), including Plaintiffs, the Nationwide Class, the California Subclass, the Illinois Subclass, the New York Subclass, and the Virginia Subclass.

     1.54   "Settlement Fund" means the non-reversionary fund that shall be funded exclusively by the total amount of the Settlement Stake Payment OR the proceeds from the exercise of the Sale Option, to be deposited into the Escrow Account, plus all interest earned thereon. The following shall be paid from the Settlement Fund: All Settlement Payments as a result of Approved Claims submitted by Class Members; all Taxes and Tax Expenses on amounts in the Settlement Fund; any incentive awards approved by the Court and payable to the Class Representatives; and any Fee Award to Class Counsel. The Settlement Fund shall be held in the Escrow Account until such times as the above-listed payments are made. The Settlement Fund includes all interest that shall accrue on the sums deposited in the Escrow Account. The Settlement Fund, comprised of the Settlement Stake Payment or the proceeds from the exercise of the Sale Option, along with Settlement Administration Expenses under Section 1.51, represent the

exclusive and total extent of Defendants' monetary obligations under this Agreement. For the avoidance of doubt, the Macy Defendants have no obligation to contribute any amount to the Settlement Fund.  In no event shall Defendants' total monetary obligation with respect to this Agreement exceed or be less than the amount of the Settlement Fund and Settlement Administration Expenses (as stated in Section 1.51). The Parties, the Escrow Agent, and the Settlement Administrator agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. §1.468B-1. In addition, the Settlement Administrator shall timely make such elections as necessary or advisable to carry out this provision, including the "relation-back election" (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Settlement Administrator and/or Clearview's Counsel to timely and properly prepare and deliver the necessary documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

1.55    "Settlement Master" means Hon. Sidney I. Schenkier (ret.), the individual selected by Lead Class Counsel, and approved by Defendants (approval not to be unreasonably withheld), and appointed by the Court, to oversee the funding of the Settlement Fund by causing Class Members to receive the Settlement Stake Payment, pursuant to paragraph 3.3 below, or by causing the Class Members to receive the proceeds of a Settlement Stake Payment Sale, pursuant to paragraph 3.4 below. The Settlement Master's required qualifications and duties are set out in paragraph 3.5 below.

1.56    "Settlement Payment" means a payment to be made to a claiming Class Member in response to an Approved Claim. Each Class member who submits an Approved Claim will receive

a pro rata portion of the Net Settlement Fund. The pro rata portion will be weighted by settlement class as follows: (a) Each Nationwide Class Member who submits an Approved Claim and who is not a member of any subclass will receive one (1) share of the Net Settlement Fund; (b) Each Nationwide Class Member who submits an Approved Claim who is also a member of the California, New York or Virginia Subclass will receive five (5) shares of the Net Settlement Fund; (c) Each Nationwide Class Member who submits an Approved Claim who is also a member of the Illinois Subclass will receive ten (10) shares of the Net Settlement Fund.

1.57    "Settlement Stake" means a monetary amount equal to the value of the number of shares of Clearview common stock equal to twenty-three percent (23%) of the capitalization of Clearview as of September 6, 2023, calculated on a fully-diluted basis (meaning after all outstanding warrants, employee options, convertible notes and all other outstanding securities are converted to common stock).

1.58    "Settlement Stake Payment" means the cash generated by Clearview via one of the means described in paragraph 3.3, to fund the Settlement Fund, and in so doing pay the Settlement amounts. The Settlement Stake Payment shall be realized under the supervision of the Settlement Master, and, once made, transferred to the Escrow Account and administered by the Settlement Administrator as the Settlement Fund.

1.59    "Settlement Stake Payment Sale" means the proceeds from a sale by the Settlement Master of the right to receive the Settlement Stake Payment to a single third party for a commercially reasonable price, in accord with paragraph 3.4, provided that such third party must be a United States Person (as defined in the Securities Act of 1933), an accredited investor (as defined in Regulation D), and not a competitor of Clearview or then in active litigation with Clearview.

1.60    "Settlement Website" means the website to be created, launched, and maintained by the Settlement Administrator, which will provide access to relevant case documents including the Notice, Claim Form, and other relevant documents.

1.61    "Taxes" means all federal, state, or local taxes of any kind on any income earned by the Settlement Fund and the expenses and costs incurred in connection with the taxation of the Settlement Fund (including, without limitation, interest, penalties and the reasonable expenses of tax attorneys and accountants). All (i) Taxes (including any estimated Taxes, interest or penalties) arising with respect to the income earned by the Settlement Fund, including any Taxes or tax detriments that may be imposed upon the Released Parties or their counsel with respect to any income earned by the Settlement Fund for any period during which the Settlement Fund does not qualify as a "qualified settlement fund" for federal or state income tax purposes, and (ii) tax-related expenses and costs incurred in connection with the operation and implementation of this Settlement Agreement (including, without limitation, expenses of tax attorneys and/or accountants and the costs of mailing and distribution and filing (or failing to file) the returns described in this Settlement Agreement) (together, "Tax Expenses"), shall be paid out of the Settlement Fund. In no event shall the Released Parties or their counsel bear any liability or responsibility for the Taxes or the Tax Expenses. Further, Taxes and Tax Expenses shall be treated as, and considered to be, a cost of administration of the Settlement Fund, but one not to be borne by Clearview, but instead shall be timely paid by the Escrow Agent, as instructed by the Settlement Administrator, out of the Settlement Fund without prior order from the Court and the Settlement Administrator shall be authorized (notwithstanding anything herein to the contrary) to withhold from distribution to Class Members with Approved Claims any funds necessary to pay such amounts, including the establishment of adequate reserves for any Taxes and Tax Expenses (as well as any amounts that

may be required to be withheld under Treas. Reg. §1.468B-2(l)(2)). The Parties hereto agree to cooperate with the Settlement Administrator, the Escrow Agent, each other, and their tax attorneys and accountants to the extent reasonably necessary to carry out the provisions of this Agreement. For the purpose of §1.468B of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, the Settlement Administrator shall be the "administrator." The Settlement Administrator shall timely and properly file all informational and other tax returns necessary or advisable with respect to the Settlement Fund and Escrow Account (including, without limitation, the returns described in Treas. Reg. §1.468B-2(k)). Such returns (as well as the election described in this Agreement) shall be consistent with this section and in all events shall reflect that all Taxes (including any estimated Taxes, interest or penalties) on the income earned by the Settlement Fund shall be paid out of the Settlement Fund as provided in this Agreement.

1.62    "Unknown Claims" means claims that could have been raised in the Action and that any or all of the Releasing Parties do not know or suspect to exist, which, if known by him or her, might affect his or her agreement to release the Released Parties or the Released Claims or might affect his or her decision to agree, object or not to object to the Settlement, or seek exclusion from the Settlement Class. Upon the Effective Date, the Releasing Parties shall be deemed to have, and shall have, expressly waived and relinquished, to the fullest extent permitted by law, the provisions, rights and benefits of § 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Upon the Effective Date, the Releasing Parties also shall be deemed to have, and shall have, waived any and all provisions, rights and benefits conferred by any law of any state or territory of the

United States, or principle of common law, or the law of any jurisdiction outside of the United States, which is similar, comparable or equivalent to § 1542 of the California Civil Code. The Releasing Parties acknowledge that they may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention to finally and forever settle and release the Released Claims, notwithstanding any Unknown Claims they may have, as that term is defined in this paragraph.

1.63    "Virginia Subclass" means all individuals who resided in the state of Virginia between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database.

1.64    "Virginia Subclass Notice Plan" means the plan, as set forth in paragraph 5.11 and as executed and administered by the Settlement Administrator, for disseminating notice of the Settlement Agreement and of the Final Approval Hearing to members of the Virginia Subclass.

## 2.    SETTLEMENT CLASS CERTIFICATION

2.1    For the purposes of the Settlement only, the Parties stipulate and agree that: (i) the Settlement Class shall be certified in accordance with the definitions contained in paragraph 2.3 below; (ii) Plaintiffs shall represent the Settlement Class for settlement purposes and shall be the Class Representatives; and (iii) the firm of Loevy & Loevy will be appointed Lead Class Counsel, and the other firms identified in Paragraph 1.10 shall be appointed as additional Class Counsel.

2.2    Defendants do not consent to certification of the Settlement Class or the included Nationwide Class or Settlement Subclasses for any purpose other than to effectuate the Settlement. If the Court does not enter Final Judgment, or if for any other reason Final Judgment does not occur, is successfully objected to, or challenged on appeal, any certification of any Settlement Class will be vacated, and the Parties will be returned to their positions with respect to the Action

as if no Settlement Class had ever been certified and as if the Settlement Agreement had not been entered.

2.3     Subject to Court approval, the Settlement Class shall be comprised of the members of all Classes and Subclasses defined below -- the Nationwide Class; the Illinois Subclass, the California Subclass, the New York Subclass, and the Virginia Subclass --and shall be certified for settlement purposes. The Settlement Class is made up of:

(a)     The Nationwide Class: All individuals who resided in the United States of America between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database;

(b)     The Illinois Subclass: All individuals who resided in the state of Illinois between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database;

(c)     The California Subclass: All individuals who resided in the state of California between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data were or are contained in the Biometric Database;

(d)     The New York Subclass: All individuals who resided in the state of New York between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database; and

     (e)     The Virginia Subclass: All individuals who resided in the state of Virginia between July 1, 2017, and the date of Preliminary Approval, and whose facial images, facial vector data, and/or Biometric Data are or were contained in the Biometric Database.

     2.4    **Exclusions from Class. The following are excluded from the Settlement Class and all Settlement Subclasses:**

     (a)     any Judge, Magistrate, or Mediator presiding over this Action, members of their immediate families, members of their staff, and members of their staff's immediate families;

     (b)     all Defendants;

     (c)     any family member, parent, subsidiary, successor, predecessor, or affiliate of any Defendant, or any entity in which any Defendant has a controlling interest;

     (d)     the officers, directors, agents, servants, or employees of any Defendant, including of any parent, subsidiary, successor, predecessor, or affiliate of any Defendant;

     (e)     persons who properly execute and file a timely request for exclusion from the Settlement Class;

     (f)     Class Counsel;

     (g)     the Settlement Administrator;

     (h)     the Settlement Master; and

     (i)     the legal representatives, successors or assigns of any such excluded persons.

     2.5    If for any reason the Settlement is not approved, the Court does not enter a Preliminary Approval Order and/or a Final Judgment, or final settlement and resolution of the Action as provided for in this Settlement Agreement is not reached, Defendants' consent to

proceeding in court for the limited purpose of approval of the Settlement and agreement to the certification of the Settlement Class shall not be used or cited for any purpose in the Action, including but not limited to any request for class certification in the Action or any other proceeding. Should this Settlement fail to be finalized in a Final Judgment for any reason, the Parties will return to their pre-settlement litigation positions, and all claims will proceed in court.

**3.    SETTLEMENT RELIEF**

3.1    **Security Interests in IP held by Current Investors**. At the time that the Clearview Defendants and the Settlement Class negotiated this Settlement, certain existing Clearview investors held security interests in Clearview IP with a convertible note.  By the time of Final Judgment, all security interests in Clearview IP held by existing investors will have been released. The 23% stake in Clearview as of September 6, 2023, identified as the Settlement Stake, already was calculated on a fully diluted basis, so that any consideration for the release(s) of the IP security interests in the convertible note will not produce any additional dilution of the Settlement Stake.

3.2    **Payment to Class Members.**  In exchange for the releases and other obligations contained herein, on the Effective Date, the Clearview Defendants agree to provide Class Members with the right to obtain the Settlement Stake pursuant to the terms set out below. On the Effective Date, neither the Class Members nor Class Counsel shall receive, or have the right to receive, any shares of Clearview stock, but shall be entitled to receive payments in exchange for the Settlement Stake in accordance with Paragraphs 3.3 and 3.4 below.

3.3    **Settlement Stake Payment.** Upon the earlier of (1) the consummation of Clearview's first underwritten public offering of its Common Stock under the Securities Act of 1933, as amended (an "**IPO**"), (2) any **Deemed Liquidation Event**, or (3) a **Cash Demand** by

the **Settlement Master**, Clearview will make a payment (the **Settlement Stake Payment**) to the

Settlement Class as follows:

(a)    **Settlement Stake Payment: Deemed Liquidation Event:**  In the case of a

Deemed Liquidation Event, the Settlement Stake Payment shall be a cash payment equal

to what the Settlement Class would have received had it been issued the Settlement Stake

immediately prior to the consummation of the Deemed Liquidation Event.  The treatment

of the Settlement Stake in connection with a Deemed Liquidation Event shall be no less

favorable than the treatment of the shares then owned by Hoan Ton-That and Richard

Schwartz.

(b)    **Settlement Stake Payment: IPO:**  In the case of an IPO, the Settlement

Stake Payment shall be a cash payment equal to the Settlement Stake multiplied by the

public offering price set forth on the front cover of the final prospectus for the IPO, as filed

with the U.S. Securities and Exchange Commission.

(c)    **Settlement Stake Payment: Cash Demand:**  At any point on or before

September 30, 2027, provided that no Settlement Stake Payment event has been triggered,

in exercising the Settlement Master's independent judgment, the Settlement Master may

elect to require Clearview to pay a Cash Demand payment in an amount representing

seventeen (17%) of Clearview's GAAP recognized revenue, as reviewed and confirmed by

an independent Certified Public Accountant, for the period commencing on the date of final

settlement approval and ending on the date of the Settlement Master's Cash Demand.  For

the avoidance of doubt, in the event the Settlement Master elects the Cash Demand, neither

the Settlement Class nor Class Counsel shall be entitled to receive Clearview stock, the

value of Clearview stock, or any other form of Settlement Stake Payment.

3.4     **The Settlement Stake Payment Sale: An Option to Sell the Right to Receive Settlement Stake Payment.**     At any time after Final Judgment by the Court, provided that no Settlement Stake Payment event has been triggered, the Settlement Master shall have the right to elect to sell the right to receive the Settlement Stake Payment to a single third party for a commercially reasonable price; provided that such third party must be a U.S. Person (as defined in the Securities Act of 1933), an accredited investor (as defined in Regulation D), and not a competitor of Clearview or then in active litigation with Clearview. In connection with the exercise of the Sale Option to generate a Settlement Stake Payment Sale, the Settlement Master may elect to cause Clearview to issue the Settlement Stake, in lieu of the right to receive the Settlement Stake Payment, to the purchasing third party, the proceeds of such sale to constitute the Settlement Fund, in the same manner as a Settlement Stake Payment would fund the Settlement Fund.     For the avoidance of doubt, in the event the Settlement Master consummates a Settlement Stake Payment Sale, neither the Settlement Class nor Class Counsel shall be entitled to receive Clearview stock, the value of Clearview stock, or any other form of Settlement Stake Payment.

3.5     **Appointment of Settlement Master**. Upon the execution of this Settlement Agreement, Lead Class Counsel shall select a candidate for the position of Settlement Master. The Settlement Master candidate must have the following qualifications:

(a)     a minimum of ten (10) years of relevant industry experience in or advising the venture capital or private equity industries; or a minimum of ten (10) years of relevant judicial experience, including experience with class actions;

(b)     experience with private and public company valuations and/or prior experience with class actions is preferred;  and

- 24 -

(c)    no conflicts of interest, including cannot be Class Counsel or an affiliate or family member of Class Counsel or a claiming Class Member.

The selection of the Settlement Master candidate is subject to the approval of the Clearview Defendants, which approval shall not be unreasonably withheld, and the Court. Upon receiving Clearview Defendants' approval of the Settlement Master candidate, Lead Class Counsel shall file a motion with the Court to have the candidate appointed Settlement Master. Upon the Court's granting of this motion, the approved candidate shall be retained as Settlement Master. Upon retention, the Settlement Master will acknowledge a fiduciary duty to the Settlement Class and Class Counsel. The Clearview Defendants shall bear the cost of the Settlement Master's reasonable hourly rate and costs.

To the fullest extent permitted by law, the Settlement Master shall not be liable to the Settlement Class for any loss, damage, or claim incurred by reason of any act or omission performed or omitted by the Settlement Master in good faith on behalf of the Settlement Class and in a manner reasonably believed to be within the scope of the authority conferred on the Settlement Master by this Settlement Agreement or any order of the Court.

Until the Settlement Class is paid the Settlement Stake Payment (whether by Deemed Liquidation Event, IPO, or Cash Demand), or until the Settlement Master has received payment on behalf of the Settlement Class upon a Settlement Stake Payment Sale (following exercise of the Sale Option), the Settlement Master will have the right, (i) upon reasonable notice, to inspect the books and records of Clearview, (ii) to request and receive bi-annual interviews with the Clearview management team, and (iii) to receive information regarding the price and terms of any secondary sales of Clearview stock.

3.6     **Restrictions on Payment of Dividends**. Upon the execution of this Settlement Agreement, Clearview shall not pay dividends to Clearview shareholders prior to the Settlement Stake Payment or the completion of a Settlement Stake Payment Sale.

3.7     **Current Shareholder Sale**. Upon the execution of this Settlement Agreement, any contemplated sale of shares by any Clearview shareholder (a "Current Shareholder Sale") as of the date of this Settlement Agreement must be submitted to the Settlement Master for review prior to consummation of that Current Shareholder Sale. In the event Clearview chooses not to exercise its right of first refusal to purchase the shares to be sold pursuant to a Current Shareholder Sale, Clearview shall provide to the Settlement Master an explanation as to why Clearview chooses not to exercise its right of first refusal, and the Settlement Master shall have the right to review any information, data or records necessary to assess the explanation provided by Clearview.

3.8     **Transfer of Proceeds to Escrow Account.** Within fourteen (14) days after receipt of payment pursuant to a Settlement Stake Payment OR a Settlement Stake Payment Sale, the proceeds from such transaction representing the Settlement Fund, the Settlement Master will transfer or cause to be transferred the received funds into the separate, interest-bearing Settlement Fund Escrow Account, to be established by the Settlement Administrator under terms acceptable to Lead Class Counsel. The Settlement Fund deposited into the Escrow Account shall be invested in the following types of accounts and/or instruments and no other: (a) demand deposit accounts; (b) time deposit accounts and certificates of deposit; (c) United States Treasury bills; or (d) other instruments backed by the full faith and credit of the United States Government. The Escrow

Account will be administered as the Settlement Fund by the Settlement Administrator. The costs of establishing and maintaining the Escrow Account shall be paid by the Settlement Administrator.

3.9    **Use of the Settlement Fund.** The following shall be paid from the Settlement Fund: All Settlement Payments as a result of Approved Claims made by Class Members; Taxes and Tax Expenses; any incentive awards to the Class Representatives; and any Fee Award to Class Counsel. The Settlement Fund shall be kept in the Escrow Account until such time as the above-listed payments are made. The Settlement Fund includes all interest that shall accrue on the sums deposited in the Escrow Account. The Settlement Administrator shall be responsible for all tax filings with respect to any earnings on the Settlement Fund and causing the payment of all Taxes that may be due on such earnings. The Settlement Fund, comprised of the Settlement Stake Payment by Clearview alone, along with the Settlement Administration Expenses, represents the total extent of Defendants' monetary obligations under this Agreement. In no event shall Defendants' total monetary obligation with respect to this Agreement exceed or be less than the Settlement Stake Payment and Settlement Administration Expenses. The Parties, the Escrow Agent, the Settlement Master, and the Settlement Administrator agree to treat the Settlement Fund as being at all times a "qualified settlement fund" within the meaning of Treas. Reg. §1.468B-1. In addition, the Settlement Administrator shall timely make such elections as necessary or advisable to carry out this provision, including the "relation-back election" (as defined in Treas. Reg. §1.468B-1) back to the earliest permitted date. Such elections shall be made in compliance with the procedures and requirements contained in such regulations. It shall be the responsibility of the Settlement Administrator to timely and properly prepare and deliver the necessary

documentation for signature by all necessary parties, and thereafter to cause the appropriate filing to occur.

3.10    **Settlement Payments to Class Members.** Within sixty (60) calendar days after the Settlement Fund has been created in the Escrow Account, from the proceeds from a Settlement Stake Payment or a Settlement Stake Payment Sale, or such other date as the Court may set, the Settlement Administrator shall send Settlement Payments from the Settlement Fund by digital payment to each Class Member who has submitted an Approved Claim.

3.11    In the event that a digital payment to a Class Member is unable to be processed, the Settlement Administrator shall attempt to contact the Class Member within forty-five (45) calendar days to correct the problem.

3.12    To the extent that a digital payment is unable to be processed within ninety (90) calendar days of the first attempt, after efforts to contact the Class Member have been made under paragraph 3.11 above, all funds represented by unprocessed digital payments shall remain in the Settlement Fund and shall be apportioned pro rata to participating Class Members in a second distribution, if practicable. To the extent that any second distribution is impracticable, or second-distribution funds remain in the Settlement Fund after 180 calendar days after the first issuance or attempt, such funds shall revert to a privacy-related non-profit to be agreed to by Lead Class Counsel, Clearview, and Macy's, or failing agreement, as ordered by the Court.

3.13    No amount contributed or paid by Clearview via the Settlement Stake, then paid into the Settlement Fund via the Settlement Stake Payment or Settlement Stake Payment Sale, shall revert to Clearview unless the Settlement is terminated in accordance with paragraphs 8.1 or 5.6.

In no event shall any such amount be paid to any Class Counsel except for the amount of an approved Fee and Costs Award as described in paragraphs 9.1-9.2.

4.    **RELEASES**

4.1    The obligations incurred pursuant to this Settlement Agreement shall be a full and final disposition of the Action and any and all Released Claims, as against all Released Parties.

4.2    Upon the Effective Date, the Releasing Parties, and each of them, shall be deemed to have, and by operation of the Final Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims against the Released Parties, and each of them.

4.3    Upon the Effective Date, the Releasing Parties, and each of them, will be forever barred and permanently enjoined from directly, indirectly, representatively or in any other capacity, filing, commencing, prosecuting, continuing, litigating, intervening in, participating in as class members or otherwise, or receiving any benefits or other relief from any lawsuit, any arbitration, or any administrative, regulatory, or other proceeding (including by seeking to amend a pending complaint to include class allegations or by seeking class certification in a pending action in any jurisdiction) against any of the Released Parties in any jurisdiction based on or relating in any way to the Released Claims, except for claims to enforce the terms of the Settlement.

4.4    Upon the Effective Date, the Released Parties shall by operation of the Final Judgment have, fully, finally, and forever released, relinquished, and discharged all claims, known or unknown, asserted or unasserted, against Plaintiffs, the Settlement Class, and Class Counsel that arise out of or relate in any way to the commencement, prosecution, settlement or resolution of the Action, except for claims to enforce the terms of the Settlement.

5.    **NOTICE TO THE SETTLEMENT CLASS**

5.1    Upon entry of the Preliminary Approval Order, the Settlement Administrator shall cause the Notice to be disseminated to the Settlement Class. Such Notice shall comport with Rule 23 of the Federal Rules of Civil Procedure, and be effectuated pursuant to the Nationwide Class Notice Plan, Illinois Notice Plan, California Notice Plan, New York Notice Plan, and Virginia Notice Plan, the costs of which shall be Settlement Administration Expenses borne by the Clearview Defendants, and not to be paid out of the proceeds of a Settlement Stake Payment or Settlement Stake Payment Sale.

5.2    **Identification of Class Members: Nationwide Class.** Clearview estimates that its Biometric Database contains several billion captured images. Within fourteen (14) calendar days of the Preliminary Approval Order, Clearview will provide to the Settlement Administrator a list (if any) of the names and addresses (residential addresses and/or email addresses) of all members of the Settlement Class who, based on Clearview's data, (1) appear in facial images held within the Clearview Biometric Database, (2) had a home location reasonably believed to be in the United States of America, for one hundred eighty-three (183) or more consecutive days between July 1, 2017 and the date of the Preliminary Approval Order, and (3) provided information indicating that the Settlement Class Member in the facial image was eighteen years of age or over when their facial image was posted to a publicly accessible webpage (the "Nationwide Class Notice List"). Clearview will conduct a good faith search of the Clearview Biometric Database, but believes that it will have few, if any records, which are sufficient to identify the name, home location, duration of residence, and age of person(s) captured in facial images held within the Clearview Biometric Database. The Settlement Administrator shall keep the Nationwide Class Notice List and all personal information obtained therefrom, including the identity of all Persons, strictly confidential.

The Nationwide Class Notice List may not be used by the Settlement Administrator for any purpose other than advising specific individual Class Members of their rights, transmitting Settlement Payments, and otherwise effectuating the terms of the Settlement Agreement or the duties arising thereunder, including the provision of Notice of the Settlement.

     5.3    **Notice to the Nationwide Class**. Notice to the Nationwide Class shall be disseminated according to the Nationwide Class Notice Plan. The Nationwide Class Notice Plan includes:

     (a)    Email Notice by Settlement Administrator. For each name on the Nationwide Class Notice List for which an email addresses can be identified, no later than the Notice Date, the Settlement Administrator shall send Notice via email, with a link to a Spanish language version, to each email address on the Nationwide Class Notice List.

     (b)    Reminder Notice. No later than date fourteen days before the Claims Deadline the Settlement Administrator shall send reminder notice via email to each email address on the Nationwide Class Notice List with a link to a Spanish language version.

     (c)    Settlement Website. Expeditiously after preliminary approval of the Settlement and the Nationwide Notice Plan, the Settlement Administrator shall cause the Notice to be placed and made available to visitors on a website, which shall be administered and maintained by the Settlement Administrator, and shall include the ability to file Claim Forms online. The Notice provided on the Settlement Website will be in English and Spanish. The content of the Settlement Website and any materials posted on the Settlement Website shall be subject to approval of Lead Class Counsel and Defendants' Counsel.

     (d)    Digital Notice/Social Media Notice: No later than three days after the Notice date, the Settlement Administrator shall disseminate Digital Notices containing

information regarding the Settlement, including the ability to access Notice and Claim Forms, via targeted digital advertising on the following advertising networks: *Google Display Network, Yahoo Audience Network*, *Outbrain Network,* and *Taboola Network,* which together represent thousands of digital properties across all major content categories. The Digital Notices also will be placed on the social media platforms Facebook, Instagram, and X (Twitter). The Digital Notices will also run on photo-sharing sites, such as Flickr, Imgur, Tumblr, and others.

(e)     CAFA Notice. Clearview will coordinate updated compliance with 28 U.S.C. § 1715 at its own cost.

The Settlement Administrator shall, in support of the Motion for Preliminary Approval, provide attestation that the methods of notice set forth herein are valid and effective means of providing notice pursuant to the requirements of Federal Rule of Civil Procedure 23.

5.4     **Identification of Class Members: Illinois Subclass.** Within fourteen (14) days Clearview will provide to the Settlement Administrator a list (if any) of the names and addresses (residential addresses and/or email addresses), of the names of all members of the Settlement Class who, based on Clearview's data, (1) appear in facial images held within the Clearview Biometric Database, (2) had a home location reasonably believed to be in Illinois for one hundred eighty-three (183) or more consecutive days between July 1, 2017 and the date of the Preliminary Approval Order, and (3) provided information to indicated that the Settlement Class Member in the facial image was eighteen years of age or over when their facial image was posted to a publicly accessible webpage (the Illinois Subclass Notice List). Clearview will conduct a good faith search of the Clearview Biometric Database, but believes that it will have few, if any records, which are sufficient to identify the name, home location, duration of residence, and age of Illinois residents,

or the email addresses of Illinois residents, captured in facial images held within the Clearview Biometric Database. In all instances in which Clearview is able to locate a residential and/or email address for an Illinois Subclass Member, Clearview will include all such residential and email addresses on the Illinois Subclass Notice List. The Settlement Administrator shall keep the Illinois Subclass Notice List and all personal information obtained therefrom, including the identity of all Persons, and any email addresses, strictly confidential. The Illinois Subclass Notice List may not be used by the Settlement Administrator for any purpose other than advising specific individual Class Members of their rights, mailing Settlement Payments, and otherwise effectuating the terms of the Settlement Agreement or the duties arising thereunder, including the provision of Notice of the Settlement.

5.5    **Notice to the Illinois Subclass:** Notice to the Illinois Subclass shall be disseminated according to the Illinois Subclass Notice Plan. The Illinois Subclass Notice Plan includes:

(a)    Email Notice by Settlement Administrator. For each name on the Illinois Subclass Notice List for which an email addresses can be identified, no later than the Notice Date, the Settlement Administrator shall send Notice via email, with a link to a Spanish language version, to each email address on the Illinois Subclass Notice List.

(b)    Reminder Notice. No later than date fourteen days before the Claims Deadline the Settlement Administrator shall send reminder notice via email to each email address on the Illinois Subclass Notice List with a link to a Spanish language version.

(c)    Publication Notice. CAFA Notice. Clearview will coordinate updated compliance with 28 U.S.C. § 1715 at its own cost.

5.6     **Identification of Class Members: California Subclass.** Within fourteen (14) days Clearview will provide to the Settlement Administrator a list (if any) of the names and addresses (residential addresses and/or email addresses) of the names of all members of the Settlement Class who, based on Clearview's data, (1) appear in facial images held within the Clearview Biometric Database, (2) had a home location reasonably believed to be in California for one hundred eighty-three (183) or more consecutive days between July 1, 2017, and the date of the Preliminary Approval Order, and (3) provided information to indicated that the Settlement Class Member in the facial image was eighteen years of age or over when their facial image was posted to a publicly accessible webpage (the California Subclass Notice List). Clearview will conduct a good faith search of the Clearview Biometric Database, but believes that it will have few, if any records, which are sufficient to identify the name, home location, duration of residence, and age of California residents, or the email addresses of California residents, captured in facial images held within the Clearview Biometric Database. In all instances in which Clearview is able to locate a residential and/or email address for a California Subclass Member, Clearview will include all such residential and email addresses on the California Subclass Notice List. The Settlement Administrator shall keep the California Subclass Notice List and all personal information obtained therefrom, including the identity of all Persons, and any email addresses, strictly confidential. The California Subclass Notice List may not be used by the Settlement Administrator for any purpose other than advising specific individual Class Members of their rights, mailing Settlement Payments, and otherwise effectuating the terms of the Settlement Agreement or the duties arising thereunder, including the provision of Notice of the Settlement.

5.7    **Notice to the California Subclass:** Notice to the California Subclass shall be disseminated according to the California Subclass Notice Plan. The California Subclass Notice Plan includes:

(a)    Email Notice by Settlement Administrator. To the extent the California Subclass Notice List contains email addresses, no later than the Notice Date, the Settlement Administrator shall send Notice via email, with a link to a Spanish language version, to each email address on the California Subclass Notice List

(b)    Reminder Notice. No later than date fourteen days before the Claims Deadline the Settlement Administrator shall send reminder notice to each email address on the California Subclass Notice List, with a link to a Spanish language version.

(c)    CAFA Notice. Clearview will coordinate updated compliance with 28 U.S.C. § 1715 at its own cost.

5.8    **Identification of Class Members: New York Subclass.** Within fourteen (14) days Clearview will provide to the Settlement Administrator a list (if any) of the names and addresses (residential addresses and/or email addresses) of the names of all members of the Settlement Class who, based on Clearview's data, (1) appear in facial images held within the Clearview Biometric Database, (2) had a home location reasonably believed to be in New York for one hundred eighty-three (183) or more consecutive days between July 1, 2017, and the date of the Preliminary Approval Order, and (3) provided information to indicated that the Settlement Class Member in the facial image was eighteen years of age or over when their facial image was posted to a publicly accessible webpage (the New York Subclass Notice List). Clearview will conduct a good faith search of the Clearview Biometric Database, but believes that it will have few, if any records, which are sufficient to identify the name, home location, duration of residence, and age of New

York residents, or the email addresses of New York residents, captured in facial images held within the Clearview Biometric Database. In all instances in which Clearview is able to locate a residential and/or email address for a New York Subclass Member, Clearview will include all such residential and email addresses on the New York Subclass Notice List. The Settlement Administrator shall keep the New York Subclass Notice List and all personal information obtained therefrom, including the identity of all Persons, and any email addresses, strictly confidential. The New York Subclass Notice List may not be used by the Settlement Administrator for any purpose other than advising specific individual Class Members of their rights, mailing Settlement Payments, and otherwise effectuating the terms of the Settlement Agreement or the duties arising thereunder, including the provision of Notice of the Settlement.

5.9    **Notice to the New York Subclass:** Notice to the New York Subclass shall be disseminated according to the New York Subclass Notice Plan. The New York Subclass Notice Plan includes:

(a)    Email Notice by Settlement Administrator. To the extent the New York Subclass Notice List contains email addresses, no later than the Notice Date, the Settlement Administrator shall send Notice via email, with a link to a Spanish language version, to each email address on the New York Subclass Notice List.

(b)    Reminder Notice. No later than date fourteen days before the Claims Deadline the Settlement Administrator shall send reminder notice via email to each email address on the New York Subclass Notice List with a link to a Spanish language version.

(c)    CAFA Notice. Clearview will coordinate updated compliance with 28 U.S.C. § 1715 at its own cost.

5.10    **Identification of Class Members: Virginia Subclass.** Within fourteen (14) days Clearview will provide to the Settlement Administrator a list (if any) of the names and addresses (residential addresses and/or email addresses) of the names of all members of the Settlement Class who, based on Clearview's data, (1) appear in facial images held within the Clearview Biometric Database, (2) had a home location reasonably believed to be in Virginia for one hundred eighty-three (183) or more consecutive days between July 1, 2017, and the date of the Preliminary Approval Order, and (3) provided information to indicated that the Settlement Class Member in the facial image was eighteen years of age or over when their facial image was posted to a publicly accessible webpage (the Virginia Subclass Notice List). Clearview will conduct a good faith search of the Clearview Biometric Database, but believes that it will have few, if any records, which are sufficient to identify the name, home location, duration of residence, and age of Virginia residents, or the email addresses of Virginia residents, captured in facial images held within the Clearview Biometric Database. In all instances in which Clearview is able to locate a residential and/or email address for a Virginia Subclass Member, Clearview will include all such residential and email addresses on the Virginia Subclass Notice List. The Settlement Administrator shall keep the Viriginia Subclass Notice List and all personal information obtained therefrom, including the identity of all Persons, and any email addresses, strictly confidential. The Virginia Subclass Notice List may not be used by the Settlement Administrator for any purpose other than advising specific individual Class Members of their rights, mailing Settlement Payments, and otherwise effectuating the terms of the Settlement Agreement or the duties arising thereunder, including the provision of Notice of the Settlement.

5.11    **Notice to the Virginia Subclass:** Notice to the Virginia Subclass shall be disseminated according to the Virginia Subclass Notice Plan. The Virginia Subclass Notice Plan includes:

(a)    Email Notice by Settlement Administrator. To the extent the Virigina Subclass Notice List contains email addresses, no later than the Notice Date, the Settlement Administrator shall send Notice via email, with a link to a Spanish language version, to all Virginia Subclass Members to each email address on the Virginia Subclass Notice List.

(b)    Reminder Notice. No later than date fourteen days before the Claims Deadline the Settlement Administrator shall send reminder notice via email to all Virginia Subclass Members to each email address on the Virginia Subclass Notice List, with a link to a Spanish language version.

(c)    CAFA Notice. Clearview will coordinate updated compliance with 28 U.S.C. § 1715 at its own cost.

5.12    The Notice to the Nationwide Class and the Illinois, California, New York, and Virigina Subclasses shall advise the Settlement Class and/or relevant Settlement Subclass of their rights, including the right to be excluded from the Settlement Class or Settlement Subclass, to comment upon, and/or object to the Settlement Agreement, any of its terms, or the request for the Fee Award. The Notice shall specify that any objection to the Settlement Agreement and/or the request for the Fee Award, and any papers submitted in support of said objection, shall be considered by the Court at the Final Approval Hearing only if properly filed with the Court, and contain directions for such filing.

5.13    Each Settlement Class Member who wishes to file a claim for a Settlement Payment must submit a Claim Form which will be available for electronic completion and submission, as

provided in the electronically provided Notice to the Nationwide Class or Illinois, California, New York or Virginia Subclass Notice, and also available on the Settlement Website. The Claim Form will require a claiming Class Member to provide the following information: (i) full name; (ii) current U.S. Mail address or an e-mail address; (iii) a certification that one or more photographs depicting the claiming Class Member's face was posted to a publicly accessible webpage on internet (such as, by way of example, e.g. Facebook; Instagram; Flickr; Snapfish etc.); (iv) a certification that the Class Member is over the age of 18; and (v) affirm whether the Class Member was a resident of Illinois, California, New York, or Viriginia at the time(s) when the photograph(s) depicting the claiming Class Member was posted to a publicly available webpage. The electronic Claim Form will provide Class Members with instructions for receiving their Settlement Payment digitally.

5.14    Any member of the Settlement Class who intends to object to this Agreement and/or the request for a Fee Award, must present the objection in writing only to the Court, which must be personally signed by the objector, and must include: (1) the objector's name, address, and email; (2) an explanation of the basis upon which the objector claims to be a Class Member; (3) whether the objection applies only to the objector, a subset of the Settlement Class, or the entire Settlement Class; (4) all grounds for the objection, including all citations to legal authority and evidence supporting the objection; (5) the name and contact information of any and all attorneys representing, advising, or in any way assisting the objector in connection with the preparation or submission of the objection or who may profit from the pursuit of the objection, who must enter an appearance with the Court in accordance with the Local Rules; and (6) a statement indicating whether the objector intends to appear at the Final Approval Hearing (either personally or through counsel). Any objection to the Settlement Agreement and/or the request for a Fee Award, and any

papers submitted in support of said objection, shall be considered by the Court at the Final

Approval Hearing only if the Class Member making the objection files copies of such papers with

the Clerk of the Court, or alternatively, if the objection is from a Class Member represented by

counsel, files any objection and supporting papers through the Court's CM/ECF system.

   5.15 A member of the Settlement Class may request to be excluded from the Settlement

Class by sending a written request that is received on or before the Objection/Exclusion Deadline

approved by the Court and specified in the Notice. To exercise the right to be excluded, a

Settlement Class member must timely send a written request for exclusion to the Settlement

Administrator providing his/her name, home or email address, a signature, the name and number

of the Action, and a statement that he or she wishes to be excluded from the Settlement Class for

purposes of this Settlement. The Settlement Administrator shall create a dedicated e-mail address

to receive exclusion requests electronically. A request to be excluded that does not include all of

this information, or that is sent to an address other than that designated in the Notice, or that is not

postmarked within the time specified, shall be invalid, and the person serving such a request remain

a member of the Settlement Class and shall be bound as a Class Member by this Agreement, if

approved. Any member of the Settlement Class who validly elects to be excluded from this

Agreement shall not: (i) be bound by any orders or the Final Judgment; (ii) be entitled to relief

under this Settlement Agreement; (iii) gain any rights by virtue of this Agreement; or (iv) be

entitled to object to any aspect of this Agreement. The request for exclusion must be personally

signed by the person requesting exclusion. So-called "mass" or "class" opt-outs shall not be

allowed. To be valid, a request for exclusion must be postmarked or received by the date specified

in the Notice.

5.16    The Final Approval Hearing shall be no earlier than one hundred twenty (120) calendar days after the Notice described in paragraphs 5.2 through 5.11 is provided.

## 6.    SETTLEMENT ADMINISTRATION

6.1    The Settlement Administrator shall, under the supervision of the Court, administer the relief provided by this Settlement Agreement by providing Notice and processing Claim Forms in a reasonable, cost effective, and timely manner. The Settlement Administrator shall maintain reasonably detailed records of its activities under this Agreement. The Settlement Administrator shall maintain all such records as are required by applicable law in accordance with its normal business practices and such records will be made available to Lead Class Counsel upon request. The Settlement Administrator shall also provide reports and other information to the Court as the Court may require. Without limiting the foregoing, the Settlement Administrator shall:

(a)    Receive requests to be excluded from the Settlement Class and promptly provide Lead Class Counsel and Defendants' Counsel copies thereof. If the Settlement Administrator receives any exclusion forms after the deadline for the submission of such forms, the Settlement Administrator shall promptly provide copies thereof to Lead Class Counsel and Defendants' Counsel;

(b)    Provide weekly reports to Lead Class Counsel regarding the number of Claim Forms received and the categorization and description of Claim Forms rejected, in whole or in part, by the Settlement Administrator;

(c)    Make available for inspection by Lead Class Counsel the Claim Forms received by the Settlement Administrator at any time upon reasonable notice.

6.2    The Settlement Administrator shall be obligated to employ reasonable procedures to screen claims for abuse or fraud and deny Claim Forms where there is evidence of abuse or

fraud. The Settlement Administrator shall determine whether a Claim Form submitted by a Class Member is an Approved Claim and shall reject Claim Forms that fail to (a) comply with the instructions on the Claim Form or the terms of this Agreement, (b) provide full and complete information as requested on the Claim Form or (c) are submitted by a Class member who already has submitted an accepted Claim Form. In the event a person submits a timely Claim Form by the Claims Deadline, but the Claim Form is not otherwise complete, then the Settlement Administrator shall give such person reasonable opportunity to provide any requested missing information, which information must be received by the Settlement Administrator no later than twenty-eight (28) calendar days after the Claims Deadline. In the event the Settlement Administrator receives such information more than twenty-eight (28) calendar days after the Claims Deadline, then any such claim shall be denied. The Settlement Administrator may contact any person who has submitted a Claim Form to obtain additional information necessary to verify the Claim Form. Lead Class Counsel and Defendants' Counsel shall both have the right to challenge the acceptance or rejection of a Claim Form submitted by a Class Member by the Settlement Administrator. The Settlement Administrator shall follow any joint decisions of Lead Class Counsel and Defendants' Counsel as to the validity of any disputed submitted Claim Form. Where Lead Class Counsel and Defendants' Counsel disagree as to the validity of a submitted Claim Form, the Settlement Administrator will resolve the dispute and the Claim Form will be treated in the manner designated by the Settlement Administrator.

6.3    Clearview shall bear all costs of settlement administration separate and apart from the Settlement Fund, except for Taxes and Tax Expenses, which shall be funded from the Settlement Fund.

**7.      PRELIMINARY APPROVAL AND FINAL APPROVAL**

7.1      Promptly after the execution of this Settlement Agreement, Lead Class Counsel shall submit this Agreement together with its Exhibits to the Court and shall move the Court for entry of Preliminary Approval of the settlement set forth in this Agreement, which order shall set a Final Approval Hearing date and approve the Notice and Claim Form for dissemination. The order granting Preliminary Approval shall also authorize the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications and expansions of the Settlement Agreement and its implementing documents (including all exhibits to this Agreement) so long as they are consistent in all material respects with the terms of the Final Judgment set forth below and do not limit or impair the rights of the Settlement Class.

7.2      After Notice is given, the Parties shall request and seek to obtain from the Court a Final Judgment, which will (among other things):

(a)      find that the Court has personal jurisdiction over all Class Members and that the Court has subject matter jurisdiction to approve the Agreement, including all exhibits thereto;

(b)      approve the Settlement Agreement and the proposed settlement as fair, reasonable and adequate as to, and in the best interests of, the Class Members; direct the Parties and their counsel to implement and consummate the Agreement according to its terms and provisions; and declare the Agreement to be binding on, and have res judicata and preclusive effect in all pending and future lawsuits or other proceedings maintained by or on behalf of Plaintiffs and the Releasing Parties with respect to the Released Claims;

(c)      find that the Notice implemented pursuant to the Agreement (i) constitutes the best practicable notice under the circumstances; (ii) constitutes notice that is reasonably

calculated, under the circumstances, to apprise Class Members of the pendency of the Action, their right to object to the Settlement or exclude themselves from the Settlement Class, and to appear at the Final Approval Hearing; (iii) is reasonable and constitutes due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) meets all applicable requirements of the Federal Rules of Civil Procedure, the Due Process Clause of the United States Constitution, and the rules of the Court;

(d)    find that the Class Representatives and Lead Class Counsel adequately represent the Settlement Class for purposes of entering into and implementing the Agreement;

(e)    award Class Counsel fees and costs as determined by the Court;

(f)    dismiss the Action (including all individual claims and Class claims presented thereby) on the merits and with prejudice, without fees or costs to any party except as provided in the Settlement Agreement;

(g)    incorporate the Releases set forth above, make the Releases effective as of the Effective Date, and forever discharge the Released Parties from the Released Claims as set forth herein;

(h)    permanently bar and enjoin all Class Members who have not properly sought exclusion from the Settlement Class from filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in, any lawsuit or other action in any jurisdiction based on the Released Claims;

(i)    without affecting the finality of the Final Judgment for purposes of appeal, retain jurisdiction as to all matters relating to administration, consummation, enforcement,

and interpretation of the Settlement Agreement and the Final Judgment, and for any other necessary purpose; and

> (j)    incorporate any other provisions, as the Court deems necessary and just.

7.3    The Parties shall, in good faith, cooperate, assist and undertake all reasonable actions and steps in order to accomplish these required events on the schedule set by the Court, subject to the terms of this Settlement Agreement.

## 8.    TERMINATION OF SETTLEMENT

8.1    **Termination Notice**. Subject to paragraphs 10.1-10.4 below, each Defendant and each Class Representative on behalf of the Settlement Class, shall have the right to terminate this Agreement by providing written notice of the election to do so ("Termination Notice") to all other Parties hereto within twenty-one (21) calendar days of any of the following events: (i) the Court's refusal to grant Preliminary Approval of this Agreement in any material respect or a ruling conditionally approving this Agreement subject to proposed changes to, or additions of, material terms (including, but not limited to, changes or additions to the Payment to Class Members set forth in paragraph 3.2, the Notice provisions of paragraphs 5.2-5.11, and the definition of "Released Claims"); (ii) the Court's refusal to grant final approval of this Agreement in any material respect; (iii) the Court's refusal to enter the Final Judgment in this Action in any material respect; (iv) the date upon which the Court of Appeals or the Supreme Court reverses or modifies the Final Judgment in any material respect; or (v) the date upon which the Court of Appeals or the Supreme Court reverses or modifies in any material respect an Alternative Judgment, as defined in paragraph 10.1(d) of this Agreement.

8.2    **Exclusion Requests.** If, prior to the Final Approval Hearing, the number of members of the Settlement Class who have timely requested exclusion from the Settlement Class

in accordance with the provisions of the Preliminary Approval Order and the Notice given pursuant

thereto exceeds 50,000 Defendants shall have, in their sole and absolute discretion, the option to

terminate this Agreement. Defendants may terminate the Agreement by filing a Termination

Notice with the Court and serving such Termination Notice on Lead Class Counsel by hand

delivery or overnight courier within ten (10) business days after being informed in writing by the

Settlement Administrator that more than 50,001 or more such requests for exclusion have been

timely filed.

9. **INCENTIVE AWARD AND CLASS COUNSEL'S ATTORNEYS' FEES AND PAYMENT OF EXPENSES**

9.1    Subject to the Court's approval, the Parties have agreed that the Settlement Fund

(comprised of the Settlement Stake Payment or Settlement Stake Payment Sale plus any accrued

interest) can be used to pay the Fee and Costs Award to Class Counsel. The Fee and Costs Award

is the consideration, representing both attorneys' fees and litigation expenses, awarded by the

Court to Class Counsel. Subject to the Court's approval, the Parties have agreed that up to 39.1%

of the Settlement Fund may be allocated to the Fee and Costs Award, with the remainder of the

Settlement Fund for distribution to the Settlement Class by the Settlement Administrator.  Class

Counsel shall not seek or accept more than this amount from the Court.

9.2    Plaintiff's counsel agrees that the Fee and Costs Award shall be paid solely out of

the Settlement Fund and shall not increase Defendants' total financial liability with respect to this

Settlement Agreement.

9.3    In lieu of any payments on claims to which they may be entitled as a Settlement

Class Member under the Settlement Agreement, and in recognition of their efforts on behalf of the

Settlement Class, each Class Representatives shall, subject to the approval of the Court, be

awarded an incentive award to be paid from the Settlement Fund in an amount equal to the lesser

of 50 shares in the Net Settlement Fund or $1,500.00 [One Thousand Five Hundred Dollars]. This sum shall be paid in recognition of the Class Representatives' time and effort serving as Class Representatives. The Class Representatives reserve all rights with respect to any incentive payments.

9.4    The Parties agree that Defendants' payment of any incentive award approved by the Court shall be paid solely out of the Settlement Fund and shall not increase Defendants' total financial liability with respect to this Agreement.

## 10.    CONDITIONS OF SETTLEMENT, EFFECT OF DISAPPROVAL, CANCELLATION OR TERMINATION.

10.1    The Effective Date of this Settlement Agreement shall not occur unless and until each of the following events occurs and shall be the date upon which the last (in time) of the following events occurs:

(a)    The Parties and their counsel have executed this Settlement Agreement;

(b)    The Court has granted Preliminary Approval;

(c)    The Court has entered an order finally approving the Agreement, following Notice to the Settlement Class and a Final Approval Hearing, as provided in the Federal Rules of Civil Procedure, and has entered the Final Judgment, or a judgment consistent with this Agreement in all material respects; and

(d)    The Final Judgment has become Final, as defined by this Agreement, or, in the event that the Court enters an order and final judgment in a form other than that provided above ("Alternative Judgment"), and that has the approval of the Parties, such Alternative Judgment becomes final and unappealable.

10.2    If some or all of the conditions specified in paragraph 10.1 are not met, or in the event that this Settlement Agreement is not approved by the Court, or the settlement set forth in

this Settlement Agreement is terminated or fails to become effective in accordance with its terms, then this Settlement Agreement shall be canceled and terminated subject to paragraph 8.1 unless Lead Class Counsel and Defendants' Counsel mutually agree in writing to proceed with this Agreement. If any Party is in material breach of the terms hereof, any other Party, provided that it is in substantial compliance with the terms of this Settlement Agreement, may terminate this Settlement Agreement on notice to all of the Parties. Notwithstanding anything herein, the Parties agree that the Court's failure to approve, in whole or in part, the attorneys' fees payment to Class Counsel and/or the awards to Plaintiffs set forth in paragraph 9 above shall not prevent the Settlement Agreement from becoming effective, nor shall it be grounds for termination.

10.3    If this Agreement is terminated or fails to become effective for the reasons set forth in paragraphs 8.1 and 10.1-10.2 above, the Parties shall be restored to their respective positions as of the date of the signing of this Settlement Agreement. In such event, any Final Judgment or other order entered by the Court in accordance with the terms of this Agreement shall be treated as vacated, *nunc pro tunc*, and the Parties shall be returned to the *status quo ante* as if this Settlement Agreement had never been entered into.

10.4    In the event the Settlement is terminated or fails to become effective for any reason after the Settlement Fund has been funded, the Settlement Fund, together with any earnings thereon at the same rate as earned by the Settlement Fund, less any Taxes paid or due, shall be returned to Clearview within thirty (30) calendar days after written notification of such event in accordance with instructions provided by Clearview Defendants' Counsel to Lead Class Counsel. At the request of Clearview Defendants' Counsel, Lead Class Counsel or their designees shall apply for any tax refund owed on the amounts in the Settlement Fund and pay the

proceeds, after any deduction of any fees or expenses incurred in connection with such application(s), of such refund to Clearview or as otherwise directed.

## 11.    MISCELLANEOUS PROVISIONS

11.1    The Parties (a) acknowledge that it is their intent to consummate this Settlement Agreement; and (b) agree, subject to their fiduciary and other legal obligations, to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Agreement, to exercise their reasonable best efforts to accomplish the foregoing terms and conditions of this Agreement, to secure final approval, and to defend the Final Judgment through any and all appeals. Lead Class Counsel and Defendants' Counsel agree to cooperate with one another in seeking Preliminary Approval, and entry of the Final Judgment, and promptly to agree upon and execute all such other documentation as may be reasonably required to obtain final approval of the Agreement.

11.2    The Parties intend this Settlement Agreement to be a final and complete resolution of all disputes between them with respect to the Released Claims by Plaintiffs, the Settlement Class and each or any of them, on the one hand, against the Released Parties, and each or any of the Released Parties, on the other hand. Accordingly, the Parties agree not to assert in any forum that the Action was brought by Plaintiffs or defended by Defendants, or each or any of them, in bad faith or without a reasonable basis.

11.3    Each signatory to this Agreement and warrants (a) that he, she, or it has all requisite power and authority to execute, deliver and perform this Settlement Agreement and to consummate the transactions contemplated herein, (b) that the execution, delivery and performance of this Settlement Agreement and the consummation by it of the actions contemplated herein have been duly authorized by all necessary corporate action on the part of each signatory, and (c) that this

Settlement Agreement has been duly and validly executed and delivered by each signatory and constitutes its legal, valid and binding obligation.

11.4     The Parties have relied upon the advice and representation of counsel, selected by them, concerning the claims hereby released. The Parties have read and understand fully this Settlement Agreement and have been fully advised as to the legal effect hereof by counsel of their own selection and intend to be legally bound by the same.

11.5     Whether or not the Effective Date occurs or the Settlement Agreement is terminated, neither this Agreement nor the settlement contained herein, nor any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement:

(a)     is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission, concession or evidence of, the validity of any Released Claims, the truth of any fact alleged by the Plaintiffs, the deficiency of any defense that has been or could have been asserted in the Action, the violation of any law or statute, the reasonableness of the settlement amount or the Fee Award, or of any alleged wrongdoing, liability, negligence, or fault of the Released Parties, or any of them;

(b)     is, may be deemed, or shall be used, offered or received against Defendant, as an admission, concession or evidence of any fault, misrepresentation or omission with respect to any statement or written document approved or made by the Released Parties, or any of them;

(c)     is, may be deemed, or shall be used, offered or received against the Released Parties, or each or any of them, as an admission or concession with respect to any liability, negligence, fault or wrongdoing as against any Released Parties, in any civil,

criminal or administrative proceeding in any court, administrative agency or other tribunal. However, the settlement, this Agreement, and any acts performed and/or documents executed in furtherance of or pursuant to this Agreement and/or Settlement may be used in any proceedings as may be necessary to effectuate the provisions of this Agreement. Further, if this Settlement Agreement is approved by the Court, any Party or any of the Released Parties may file this Agreement and/or the Final Judgment in any action that may be brought against such Party or Parties in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim;

(d)       is, may be deemed, or shall be construed against Plaintiffs, the Settlement Class, the Releasing Parties, or each or any of them, or against the Released Parties, or each or any of them, as an admission or concession that the consideration to be given hereunder represents an amount equal to, less than or greater than that amount that could have or would have been recovered after trial; and

(e)       is, may be deemed, or shall be construed as or received in evidence as an admission or concession against Plaintiffs, the Settlement Class, the Releasing Parties, or each and any of them, or against the Released Parties, or each or any of them, that any of Plaintiffs' claims are with or without merit or that damages recoverable in the Action would have exceeded or would have been less than any particular amount.

11.6    The headings used herein are used for the purpose of convenience only and are not meant to have legal effect.

161593.00001/135800788v.1

11.7    The waiver by one Party of any breach of this Settlement Agreement by any other Party shall not be deemed as a waiver of any other prior or subsequent breaches of this Settlement Agreement.

11.8    All of the Exhibits to this Settlement Agreement are material and integral parts thereof and are fully incorporated herein by this reference.

11.9    This Settlement Agreement and its Exhibits set forth the entire agreement and understanding of the Parties with respect to the matters set forth herein, and supersede all prior negotiations, agreements, arrangements and undertakings with respect to the matters set forth herein. No representations, warranties or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits other than the representations, warranties and covenants contained and memorialized in such documents. This Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all Parties or their respective successors-in-interest.

11.10   Except as otherwise provided herein, each Party shall bear its own costs and attorneys' fees incurred in any way related to the Action.

11.11   Plaintiffs represent and warrant that they have not assigned any claim or right or interest relating to any of the Released Claims against the Release Parties to any other person or party and that they are fully entitled to release the same.

11.12   Each counsel or other Person executing this Settlement Agreement, any of its Exhibits, or any related settlement documents on behalf of any Party hereto, hereby warrants and represents that such person has the full authority to do so and has the authority to take appropriate action required or permitted to be taken pursuant to the Settlement Agreement to effectuate its terms.

11.13   This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument. Signature by digital, facsimile, or in PDF format will constitute sufficient execution of this Settlement Agreement. A complete set of original executed counterparts shall be filed with the Court if the Court so requests.

11.14   This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and the Released Parties.

11.15   The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of this Settlement Agreement, and all Parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this Settlement Agreement.

11.16   This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without reference to the conflict of laws provisions thereof.

11.17   This Settlement Agreement is deemed to have been prepared by counsel for all Parties as a result of arms' length negotiations among the Parties with the aid of a neutral Mediator. Whereas all Parties have contributed substantially and materially to the preparation of this Agreement, it shall not be construed more strictly against one Party than another.

11.18   Where this Settlement Agreement requires notice to the Parties, such notice shall be sent to the following counsel. For Plaintiffs: Michael Kanovitz/Tom Hanson, 311 N. Aberdeen St., Third Floor, Chicago, IL 60607. For Clearview Defendants: Daniel Lynch/James L. Thompson, Lynch Thompson LLP, 150 S. Wacker Drive, Suite 2600 Chicago, IL 60606. For Macy's Defendants:  Rachel Schaller/Daniel Saeedi, Blank Rome LLP, 444 W. Lake St., Suite 1650, Chicago, IL 60606.

11.19   Under no circumstances will Defendants have any liability for Taxes or Tax Expenses under the Settlement. Plaintiffs, Class Counsel, and Class Members, and the recipients of cy pres funds are responsible for any taxes on their respective portions of the recoveries or awards. Nothing in this Agreement, or statements made during the negotiation of its terms, shall constitute tax advice by Defendants or Defendants' counsel.

11.20   All time periods and dates described in this Settlement Agreement are subject to the Court's approval. These time periods and dates may be changed by the Court or by the Parties' written agreement without notice to the Settlement Class. The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any provision of this Settlement Agreement

[THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK.  SIGNATURE PAGE FOLLOWS.]

161593.00001/135800788v.1

IN WITNESS WHEREOF, the Parties hereto have caused this Settlement Agreement to be executed.

**For Plaintiffs and the Settlement Class**:

_Rondell Sanders (Jun 10, 2024 16:16 CDT)_

Rodell Sanders, Class Representative

Date: 10/06/24

_Gerard R. Dache_
_Gerard R. Dache (Jun 11, 2024 22:30 EDT)_

Gerard Dache, Class Representative

Date: 06/11/24

_Eric Gould (Jun 11, 2024 21:21 EDT)_

Eric Gould, Class Representative

Date: 06/11/24

_Jordan Orlando_
_Jordan Orlando (Jun 11, 2024 10:49 EDT)_

Jordan Orlando, Class Representative

Date: 06/11/24

_Thomas Hanson_
_Thomas Hanson (Jun 12, 2024 21:53 CDT)_

Tom Hanson, Lead Class Counsel
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607

Date: 06/12/24

**For Clearview AI, Inc.:**

Date: _____

NAME, POSITION
CLEARVIEW AI, INC.

Date: _____

NAME
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654

Date: _____

NAME

- 55 -

For Clearview AI, Inc.:

_Hoan_
Hoan Ton-That (Jun 12, 2024 14:44 PDT)                    Date: 06/12/2024
Hoan Ton-That, CEO
CLEARVIEW AI, INC.

_[signature]_                                             Date: June 12, 2024
James Thompson
LYNCH THOMPSON LLP
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606

For Hoan Ton-That:

_Hoan_
Hoan Ton-That (Jun 12, 2024 14:44 PDT)                    Date: 06/12/2024
Hoan Ton-That

_[signature]_                                             Date: June 12, 2024
James Thompson
LYNCH THOMPSON LLP
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606

For Richard Schwartz:

_Richard Schwartz_
Richard Schwartz (Jun 12, 2024 17:40 EDT)                 Date: 06/12/2024
Richard Schwartz

_[signature]_                                             Date: June 12, 2024
James Thompson
LYNCH THOMPSON LLP
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606

For Rocky Mountain Data Analytics LLC:

_Hoan_
Hoan Ton-That (Jun 12, 2024 14:44 PDT)                    Date: 06/12/2024
Hoan Ton-That
ROCKY MOUNTAIN DATA ANALYTICS LLC

161593.00001/135800788v.1

App. 56

_____                    Date: June 12, 2024
James Thompson
LYNCH THOMPSON LLP
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606

**For Thomas Mulcaire:**

*Thomas Mulcaire*
_____    Date: _____06/12/202_____
Thomas Mulcaire

_____                    Date: June 12, 2024
James Thompson
LYNCH THOMPSON LLP
150 S. Wacker Drive, Suite 2600
Chicago, Illinois 60606

161593.00001/135800788v.1                - 57 -

**For Macy's, Inc.:**

_____     Date: 6/12/2024
Rachel L. Schaller
BLANK ROME LLP
444 W. Lake St., Suite 1650
Chicago, Illinois 60606


**For Macy's Retail holdings, Inc. (n/k/a Macy's Retail Holdings, LLC):**

_____     Date: 6/12/2024
Rachel L. Schaller
BLANK ROME LLP
444 W. Lake St., Suite 1650
Chicago, Illinois 60606


**For Macy's Corporate Services, Inc (n/k/a Macy's Corporate Services, LLC):**

_____     Date: 6/12/2024
Rachel L. Schaller
BLANK ROME LLP
444 W. Lake St., Suite 1650
Chicago, Illinois 60606

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE, individually, and on behalf of all others similarly situated, | CIVIL ACTION NO.   2:23-CV-250 |
| Plaintiff, | **CLASS ACTION** |
| vs. | |
| HIGHMARK, INC., a Pennsylvania Corporation, | **[JURY TRIAL DEMANDED]** |
| Defendant. | |

Representative Plaintiff alleges as follows:

## INTRODUCTION

1.      Representative Plaintiff John Doe ("Representative Plaintiff"), brings this class action against Defendant Highmark, Inc. ("Highmark" or "Defendant") for their failure to properly secure and safeguard Representative Plaintiff's and Class Members' protected health information and personally identifiable information stored within Defendant's information network, including, without limitation, full name, address, date of birth, phone number, email address, financial information, Social Security number, and health enrollment information like group name, identification number, claims/treatment information such as claim numbers, dates of service, procedures, prescription information (these types of information, *inter alia*, being thereafter

1

referred to, collectively, as "protected health information" or "PHI"[1] and "personally identifiable

information" or "PII").[2]

      2.      With this action, Representative Plaintiff seeks to hold Defendant responsible for

the harms it caused and will continue to cause Representative Plaintiff and at least 300,000 others

similarly situated persons in the massive and preventable cyberattack purportedly discovered by

Defendant on December 13, 2022, and December 15, 2022, by which cybercriminals infiltrated

Defendant's inadequately protected network servers and accessed highly sensitive PHI/PII and

financial information belonging to both adults and children, which was being kept unprotected (the

"Data Breach").

      3.      Representative Plaintiff further seeks to hold Defendant responsible for not

ensuring that the PHI/PII was maintained in a manner consistent with industry, the Health

Insurance Portability and Accountability Act of 1996 ("HIPPA") Privacy Rule (45 CFR, Part 160

and Parts A and E of Part 164), the HIPPA Security Rule (45 CFR Part 160 and Subparts A and C

of Part 164), and other relevant standards.

      4.      While Defendant claims to have discovered the breach as early as December 13,

2022, Defendant did not begin informing victims of the Data Breach until February 13, 2023 and

---

[1]   Personal health information ("PHI") is a category of information that refers to an individual's medical records and history, which is protected under the Health Insurance Portability and Accountability Act. *Inter alia*, PHI includes test results, procedure descriptions, diagnoses, personal or family medical histories and data points applied to a set of demographic information for a particular patient.

[2]   Personally identifiable information ("PII") generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual. PII also is generally defined to include certain identifiers that do not on its face name an individual, but that are considered to be particularly sensitive and/or valuable if in the wrong hands (for example, Social Security numbers, passport numbers, driver's license numbers, financial account numbers).

failed to inform victims when or for how long the Data Breach occurred. Indeed, Representative

Plaintiff and Class Members were wholly unaware of the Data Breach until they received letters

from Defendant informing them of it. The notice received by Representative Plaintiff was dated

February 13, 2023.

5.     Defendant acquired, collected, and stored Representative Plaintiff's and Class

Members' PHI/PII and/or financial information. Therefore, at all relevant times, Defendant knew,

or should have known, that Representative Plaintiff and Class Members would use Defendant's

services to store and/or share sensitive data, including highly confidential PHI/PII.

6.     HIPAA establishes national minimum standards for the protection of individuals'

medical records and other personal health information. HIPAA, generally, applies to health

plans/insurers, health care clearinghouses, and those health care providers that conduct certain

health care transactions electronically, and sets minimum standards for Defendant's maintenance

of Representative Plaintiff's and Class Members' PHI/PII. More specifically, HIPAA requires

appropriate safeguards be maintained by organizations such as Defendant to protect the privacy of

personal health information and sets limits and conditions on the uses and disclosures that may be

made of such information without customer/patient authorization. HIPAA also establishes a series

of rights over Representative Plaintiff's and Class Members' PHI/PII, including rights to examine

and obtain copies of their health records, and to request corrections thereto.

7.     Additionally, the HIPAA Security Rule establishes national standards to protect

individuals' electronic personal health information that is created, received, used, or maintained

by a covered entity. The HIPAA Security Rule requires appropriate administrative, physical, and

technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.

8.    By obtaining, collecting, using, and deriving a benefit from Representative Plaintiff's and Class Members' PHI/PII, Defendant assumed legal and equitable duties to those individuals. These duties arise from HIPAA and other state and federal statutes and regulations as well as common law principles. Representative Plaintiff does not bring claims in this action for direct violations of HIPAA, but charges Defendant with various legal violations merely predicated upon the duties set forth in HIPAA.

9.    Defendant disregarded the rights of Representative Plaintiff and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that Representative Plaintiff's and Class Members' PHI/PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PHI/PII of Representative Plaintiff and Class Members was compromised through disclosure to an unknown and unauthorized third party—an undoubtedly nefarious third party that seeks to profit off this disclosure by defrauding Representative Plaintiff and Class Members in the future. Representative Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they are entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

10.     Jurisdiction is proper in this Court under 28 U.S.C. §1332 (diversity jurisdiction). Specifically, this Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action where the amount in controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one other Class Member is a citizen of a state different from Defendant.

11.     Supplemental jurisdiction to adjudicate issues pertaining to state law is proper in this Court under 28 U.S.C. §1367.

12.     Defendant is headquartered and routinely conducts business in the Commonwealth where this district is located, has sufficient minimum contacts in this Commonwealth , and has intentionally availed itself of this jurisdiction by marketing and selling products and services, and by accepting and processing payments for those products and services within this State.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events that gave rise to Representative Plaintiff's claims took place within this District, and Defendant does business in this Judicial District.

## PLAINTIFF

14.     Representative Plaintiff is an adult individual and, at all relevant times herein, a resident and citizen of the Commonwealth  in which this judicial district is located. Representative Plaintiff is a victim of the Data Breach.

15.     Defendant received highly sensitive personal, medical, and financial information from Representative Plaintiff. As a result, Representative Plaintiff's information was among the data accessed by an unauthorized third-party in the Data Breach.

16.    Representative Plaintiff received—and was a "consumer" for purposes of obtaining services from Defendant within this state.

17.    At all times herein relevant, Representative Plaintiff is and was a member of each of the Classes.

18.    As required in order to obtain services from Defendant, Representative Plaintiff provided Defendant with highly sensitive personal, financial, health and insurance information.

19.    Representative Plaintiff's PHI/PII was exposed in the Data Breach because Defendant stored and/or shared Representative Plaintiff's PHI/PII and financial information. His PHI/PII and financial information was within the possession and control of Defendant at the time of the Data Breach.

20.    Representative Plaintiff received a letter from Defendant, dated February 13, 2023, stating that his PHI/PII and/or financial information was involved in the Data Breach (the "Notice").

21.    As a result, Representative Plaintiff spent time dealing with the consequences of the Data Breach, which included and continues to include, time spent verifying the legitimacy and impact of the Data Breach, exploring credit monitoring and identity theft insurance options, self-monitoring his/her/their accounts and seeking legal counsel regarding his options for remedying and/or mitigating the effects of the Data Breach. This time has been lost forever and cannot be recaptured.

22.    Representative Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PHI/PII—a form of intangible property that she/he/they entrusted to Defendant, which was compromised in and as a result of the Data Breach.

23.      Representative Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has anxiety and increased concerns for the loss of privacy, as well as anxiety over the impact of cybercriminals accessing, using, and selling his PHI/PII and/or financial information.

24.      Representative Plaintiff have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PHI/PII and financial information, in combination with his name, being placed in the hands of unauthorized third parties/criminals.

25.      Representative Plaintiff has a continuing interest in ensuring that his PHI/PII and financial information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## DEFENDANT

26.      Defendant Highmark, Inc. is a corporation located at 120 Fifth Avenue Place, Suite 2114, Pittsburgh, Pennsylvania 15222.

27.      Defendant is one of America's leading health insurance organizations and fourth-largest overall Blue Cross Blue Shield Association-affiliated organization, covering the insurance needs of approximately 6.8 million members in Pennsylvania, Delaware, New York, and West Virginia.[3]

28.      The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged here are currently

---

[3] Highmark's Corporate Profile, "*About Us*," https://www.highmark.com/about/our-story.html (last accessed Feb. 14, 2023).

unknown to Representative Plaintiff. Representative Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of such his responsible parties when its identities become known.

<u>**CLASS ACTION ALLEGATIONS**</u>

29.    Representative Plaintiff brings this action pursuant to the provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and the following classes/subclass(es) (collectively, the "Class"):

> <u>**Nationwide Class:**</u>
>
> "All individuals within the United States of America whose PHI/PII and/or financial information was exposed to unauthorized third-parties as a result of the data breach discovered by Defendant on December 13 and 15, 2022."
>
> <u>**Pennsylvania Subclass:**</u>
>
> "All individuals within the Commonwealth of Pennsylvania whose PII/PHI was stored by Defendant and/or was exposed to unauthorized third parties as a result of the data breach discovered by Defendant on December 13 and 15, 2022."

30.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to its departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

31.     Also, in the alternative, Representative Plaintiff requests additional Subclasses as necessary based on the types of PII/PHI that were compromised.

32.     Representative Plaintiff reserves the right to amend the above definition or to propose subclasses in subsequent pleadings and motions for class certification.

33.     This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation and membership in the proposed classes is easily ascertainable.

a.     <u>Numerosity</u>: A class action is the only available method for the fair and efficient adjudication of this controversy. The members of the Plaintiff Classes are so numerous that joinder of all members is impractical, if not impossible. Representative Plaintiff is informed and believes and, on that basis, alleges that the total number of Class Members is in the hundreds of thousands of individuals. Membership in the classes will be determined by analysis of Defendant's records.

b.     <u>Commonality</u>: Representative Plaintiff and the Class Members share a community of interests in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

1)     Whether Defendant had a legal duty to Representative Plaintiff and the Classes to exercise due care in collecting, storing, using and/or safeguarding their PII/PHI;

2)     Whether Defendant knew or should have known of the susceptibility of its data security systems to a data breach;

3)     Whether Defendant's security procedures and practices to protect its systems were reasonable in light of the measures recommended by data security experts;

4)     Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

5)    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

6)    Whether Defendant adequately, promptly, and accurately informed Representative Plaintiff and Class Members that their PII/PHI had been compromised;

7)    How and when Defendant actually learned of the Data Breach;

8)    Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the PII/PHI of Representative Plaintiff and Class Members;

9)    Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

10)   Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Representative Plaintiff and Class Members;

11)   Whether Representative Plaintiff and Class Members are entitled to actual and/or statutory damages and/or whether injunctive, corrective and/or declaratory relief and/or an accounting is/are appropriate as a result of Defendant's wrongful conduct; and

12)   Whether Representative Plaintiff and Class Members are entitled to restitution as a result of Defendant's wrongful conduct.

c.    <u>Typicality</u>: Representative Plaintiff's claims are typical of the claims of the Plaintiff Classes. Representative Plaintiff and all members of the Plaintiff Classes sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

d.    <u>Adequacy of Representation</u>: Representative Plaintiff in this class action is an adequate representative of each of the Plaintiff Classes in that the Representative Plaintiff has the same interest in the litigation of this case as the Class Members, is committed to vigorous prosecution of this case and has retained competent counsel who are experienced in conducting litigation of this nature. Representative Plaintiff is not subject to any individual defenses unique from those conceivably applicable to other Class Members or the classes in its entirety. Representative Plaintiff anticipate no management difficulties in this litigation.

      e.      <u>Superiority of Class Action</u>: Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member makes or may make it impractical for members of the Plaintiff Classes to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought, by each individual member of the Plaintiff Classes, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants. The prosecution of separate actions would also create a risk of inconsistent rulings which might be dispositive of the interests of the Class Members who are not parties to the adjudications and/or may substantially impede their ability to adequately protect their interests.

34.     This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Class Members, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class in its entirety. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly and Representative Plaintiff's challenge of these policies and practices hinges on Defendant's conduct with respect to the Class in its entirety, not on facts or law applicable only to Representative Plaintiff.

35.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PHI/PII and/or financial information of Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

36.     Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

## COMMON FACTUAL ALLEGATIONS

### The Cyberattack

37.    In the course of the Data Breach, one or more unauthorized third-parties accessed Class Members' sensitive data including, but not limited to full name, mailing address, data of birth, Medicaid identification number, medication names, prescriber name, and appeal number. Representative Plaintiff was among the individuals whose data was accessed in the Data Breach.

38.    According to the Data Breach Notification, which Defendant filed with the Office of the Attorney General for the State of Maine, 300,000 persons were affected by the Data Breach.[4]

39.    Representative Plaintiff was provided the information detailed above upon his receipt of a letter from Defendant, dated February 13, 2023. Representative Plaintiff was not aware of the Data Breach—or even that Defendant was still in possession of their data until receiving that letter.

### Defendant's Failed Response to the Breach

40.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Representative Plaintiff's and Class Members' PII and financial information with the intent of engaging in misuse of the PII and financial information, including marketing and selling Representative Plaintiff's and Class Members' PII.

41.    Not until roughly two months after it claims to have discovered the Data Breach did Defendant begin sending the Notice to persons whose PHI/PII and/or financial information Defendant confirmed was potentially compromised as a result of the Data Breach. The Notice provided basic details of the Data Breach and Defendant's recommended next steps.

---

[4]    Data Breach Notifications, https://apps.web.maine.gov/online/aeviewer/ME/40/67bb2ced-9a70-4248-b728-68a92a56c860.shtml (last accessed February 14, 2023).

42. The Notice included, *inter alia*, the claims that Defendant had learned of the Data Breach on December 13, 2022, completed a review thereafter.

43. Upon information and belief, the unauthorized third-party cybercriminals gained access to Representative Plaintiff's and Class Members' PHI/PII and financial information with the intent of engaging in misuse of the PHI/PII and financial information, including marketing and selling Representative Plaintiff's and Class Members' PHI/PII.

44. Defendant had and continues to have obligations created by HIPAA, applicable federal and state law as set forth herein, reasonable industry standards, common law, and its own assurances and representations to keep Representative Plaintiff's and Class Members' PHI/PII confidential and to protect such PHI/PII from unauthorized access.

45. Representative Plaintiff and Class Members were required to provide their PHI/PII and financial information to Defendant in order to receive healthcare, and as part of providing healthcare, Defendant created, collected, and stored Representative Plaintiff and Class Members with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

46. Despite this, Representative Plaintiff and the Class Members remain, even today, in the dark regarding what particular data was stolen, the particular malware used, and what steps are being taken, if any, to secure their PHI/PII and financial information going forward. Representative Plaintiff and Class Members are, thus, left to speculate as to where their PHI/PII ended up, who has used it and for what potentially nefarious purposes. Indeed, they are left to further speculate as to the full impact of the Data Breach and how exactly Defendant intends to

enhance its information security systems and monitoring capabilities so as to prevent further breaches.

47.    Representative Plaintiff's and Class Members' PHI/PII and financial information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PHI/PII and financial information for targeted marketing without the approval of Representative Plaintiff and/or Class Members. Either way, unauthorized individuals can now easily access the PHI/PII and/or financial information of Representative Plaintiff and Class Members.

**Defendant Collected/Stored Class Members' PHI/PII and Financial Information**

48.    Defendant acquired, collected, and stored and assured reasonable security over Representative Plaintiff's and Class Members' PHI/PII and financial information.

49.    As a condition of its relationships with Representative Plaintiff and Class Members, Defendant required that Representative Plaintiff and Class Members entrust Defendant with highly sensitive and confidential PHI/PII and financial information. Defendant, in turn, stored that information of Defendant's system that was ultimately affected by the Data Breach.

50.    By obtaining, collecting, and storing Representative Plaintiff's and Class Members' PHI/PII and financial information, Defendant assumed legal and equitable duties and knew or should have known that they were thereafter responsible for protecting Representative Plaintiff's and Class Members' PHI/PII and financial information from unauthorized disclosure.

51.    Representative Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PHI/PII and financial information. Representative Plaintiff and Class Members relied on Defendant to keep their PHI/PII and financial information

14

confidential and securely maintained, to use this information for business and healthcare purposes

only, and to make only authorized disclosures of this information.

52.    Defendant could have prevented the Data Breach, which began no later than May

26, 2022, by properly securing and encrypting and/or more securely encrypting its servers

generally, as well as Representative Plaintiff's and Class Members' PHI/PII and financial

information.

53.    Defendant's negligence in safeguarding Representative Plaintiff's and Class

Members' PHI/PII and financial information is exacerbated by repeated warnings and alerts

directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks

in recent years.

54.    The healthcare industry has experienced a large number of high-profile

cyberattacks even in just the short period preceding the filing of this Complaint and cyberattacks,

generally, have become increasingly more common. More healthcare data breaches were reported

in 2020 than in any other year.[5] Additionally, according to the HIPAA Journal, the largest

healthcare data breaches have been reported in April 2021.[6]

55.    For example, Universal Health Services experienced a cyberattack on September

29, 2020 that appears similar to the attack on Defendant. As a result of this attack, Universal Health

Services suffered a four-week outage of its systems which caused as much as $67 million in

recovery costs and lost revenue.[7] Similarly, in 2021, Scripps Health suffered a cyberattack, an

---

[5]    https://www.hipaajournal.com/largest-healthcare-data-breaches-in-2020/ (last accessed
February 15, 2023).
[6]    https://www.hipaajournal.com/april-2021-healthcare-data-breach-report/ (last accessed
February 15, 2023).
[7]    https://ir.uhsinc.com/news-releases/news-release-details/universal-health-services-inc-
reports-2020-fourth-quarter-and (last accessed February 15, 2023).

event which effectively shut down critical health care services for a month and left numerous patients unable to speak to its physicians or access vital medical and prescription records.[8] A few months later, University of San Diego Health suffered a similar attack.[9]

56.    Due to the high-profile nature of these breaches, and other breaches of its kind, Defendant was and/or certainly should have been on notice and aware of such attacks occurring in the healthcare industry and, therefore, should have assumed and adequately performed the duty of preparing for such an imminent attack. This is especially true given that Defendant is a large, sophisticated operations with the resources to put adequate data security protocols in place.

57.    Yet, despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect Representative Plaintiff's and Class Members' PHI/PII and financial information from being compromised.

**Defendant Had an Obligation to Protect the Stolen Information**

58.    Defendant's failure to adequately secure Representative Plaintiff's and Class Members' sensitive data breaches duties it owes Representative Plaintiff and Class Members under statutory and common law. Under HIPAA, health insurance providers have an affirmative duty to keep patients' Protected Health Information private. As a covered entity, Defendant has a statutory duty under HIPAA and other federal and state statutes to safeguard Representative Plaintiff's and Class Members' data. Moreover, Representative Plaintiff and Class Members surrendered their highly sensitive personal data to Defendant under the implied condition that Defendant would keep

---

[8]    https://www.nbcsandiego.com/news/local/scripps-health-employees-regaining-access-to-internal-systems-hit-by-cyberattack-2/2619540/ (last accessed February 15, 2023).
[9]    https://www.nbcsandiego.com/news/local/data-breach-at-uc-san-diego-health-some-employee-email-accounts-impacted/2670302/ (last accessed February 15, 2023).

it private and secure. Accordingly, Defendant also has an implied duty to safeguard their data, independent of any statute.

59.    Because Defendant is covered by HIPAA (45 C.F.R. § 160.102), it is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

60.    HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

61.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

62.    HIPAA requires Defendant to "comply with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

63.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

64.    HIPAA's Security Rule requires Defendant to do the following:

    a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.   Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

    d.   Ensure compliance by its workforce.

65.    HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

66.    Moreover, the HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

67.    Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. See, e.g., *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

68.    In addition to its obligations under federal and state laws, Defendant owed a duty to Representative Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PHI/PII and financial information in Defendant's possession from being compromised, lost, stolen, accessed, and misused by

unauthorized persons. Defendant owed a duty to Representative Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the PHI/PII and financial information of Representative Plaintiff and Class Members.

69.    Defendant owed a duty to Representative Plaintiff and Class Members to design, maintain, and test its computer systems, servers, and networks to ensure that the PHI/PII and financial information in its possession was adequately secured and protected.

70.    Defendant owed a duty to Representative Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PHI/PII and financial information in its possession, including not sharing information with other entities who maintained sub-standard data security systems.

71.    Defendant owed a duty to Representative Plaintiff and Class Members to implement processes that would immediately detect a breach on its data security systems in a timely manner.

72.    Defendant owed a duty to Representative Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

73.    Defendant owed a duty to Representative Plaintiff and Class Members to disclose if its computer systems and data security practices were inadequate to safeguard individuals' PHI/PII and/or financial information from theft because such an inadequacy would be a material fact in the decision to entrust this PHI/PII and/or financial information to Defendant.

74.    Defendant owed a duty of care to Representative Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

75.     Defendant owed a duty to Representative Plaintiff and Class Members to encrypt and/or more reliably encrypt Representative Plaintiff's and Class Members' PHI/PII and financial information and monitor user behavior and activity in order to identity possible threats.

**Value of the Relevant Sensitive Information**

76.     While the greater efficiency of electronic health records translates to cost savings for providers, it also comes with the risk of privacy breaches. These electronic health records contain a plethora of sensitive information (*e.g.*, patient data, patient diagnosis, lab results, RX's, treatment plans) that is valuable to cyber criminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, PHI/PII and financial information are valuable commodities for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on a number of underground internet websites. Unsurprisingly, the healthcare industry is at high risk for and acutely affected by cyberattacks.

77.     The high value of PHI/PII and financial information to criminals is further evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[10] Experian reports

---

[10]    *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed February 15, 2021).

that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[11] Criminals can also purchase access to entire company data breaches from $999 to $4,995.[12]

78.     Between 2005 and 2019, at least 249 million people were affected by health care data breaches.[13] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[14] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03% of overall health data breaches, according to cybersecurity firm Tenable.[15]

79.     These criminal activities have and will result in devastating financial and personal losses to Representative Plaintiff and Class Members. For example, it is believed that certain PHI/PII compromised in the 2017 Experian data breach was being used, three years later, by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma. Such fraud will be an omnipresent threat for Representative Plaintiff and Class Members for the rest of their lives. They will need to remain constantly vigilant.

80.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other

---

[11]  *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed February 15, 2023).
[12]  *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last accessed February 15, 2023).
[13]  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133 (last accessed February 15, 2023).
[14]  https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last accessed February 15, 2023).
[15]  https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last accessed February 15, 2023).

App. 79

information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

81.    Identity thieves can use PHI/PII and financial information, such as that of Representative Plaintiff and Class Members which Defendant failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits, or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

82.    The ramifications of Defendant's failure to keep secure Representative Plaintiff's and Class Members' PHI/PII and financial information are long lasting and severe. Once PHI/PII and financial information is stolen, particularly identification numbers, fraudulent use of that information and damage to victims may continue for years. Indeed, the PHI/PII and/or financial information of Representative Plaintiff and Class Members was taken by hackers to engage in identity theft or to sell it to other criminals who will purchase the PHI/PII and/or financial information for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

83.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PHI/PII and/or financial information is stolen and when it is used.

According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[16]

84.    The harm to Representative Plaintiff and Class Members is especially acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive, and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[17]

85.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[18]

86.    When cyber criminals access financial information, health insurance information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendant may have exposed Representative Plaintiff and Class Members.

---

[16]    *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* http://www.gao.gov/new.items/d07737.pdf (last accessed February 15, 2023).
[17]    Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/ (last accessed February 15, 2023).
[18]    *Id.*

23

87.    A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[19] Almost half of medical identity theft victims lose its healthcare coverage as a result of the incident, while nearly one-third saw its insurance premiums rise, and forty percent were never able to resolve its identity theft at all.[20]

88.    And data breaches are preventable.[21] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[22] She/he/they added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[23]

89.    Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*."[24]

---

[19]    See Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed February 15, 2023).
[20]    *Id*.; see also Healthcare Data Breach: What to Know About them and What to Do After One, EXPERIAN, https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last accessed February 15, 2023).
[21]    Lucy L. Thompson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012)
[22]    *Id.* at 17.
[23]    *Id.* at 28.
[24]    *Id.*

90.    Here, Defendant knew of the importance of safeguarding PHI/PII and financial information and of the foreseeable consequences that would occur if Representative Plaintiff's and Class Members' PHI/PII and financial information was stolen, including the significant costs that would be placed on Representative Plaintiff and Class Members as a result of a breach of this magnitude. As detailed above, Defendant is a large, sophisticated organizations with the resources to deploy robust cybersecurity protocols. It knew, or should have known, that the development and use of such protocols were necessary to fulfill its statutory and common law duties to Representative Plaintiff and Class Members. Its failure to do so is, therefore, intentional, willful, reckless and/or grossly negligent.

91.    Defendant disregarded the rights of Representative Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its network servers were protected against unauthorized intrusions; (ii) failing to disclose that they did not have adequately robust security protocols and training practices in place to adequately safeguard Representative Plaintiff's and Class Members' PHI/PII and/or financial information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Representative Plaintiff and Class Members prompt and accurate notice of the Data Breach.

**FIRST CLAIM FOR RELIEF**
**Negligence**
**(On behalf of the Nationwide Class and the Pennsylvania Subclass)**

92.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth herein.

93.    At all times herein relevant, Defendant owed Representative Plaintiff and Class Members a duty of care, *inter alia*, to act with reasonable care to secure and safeguard their PHI/PII and financial information and to use commercially reasonable methods to do so. Defendant took on this obligation upon accepting and storing the PHI/PII and financial information of Representative Plaintiff and Class Members in its computer systems and on its networks.

94.    Among these duties, Defendant were expected:

   a.    to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the PHI/PII and financial information in its possession;

   b.    to protect Representative Plaintiff's and Class Members' PHI/PII and financial information using reasonable and adequate security procedures and systems that were/are compliant with industry-standard practices;

   c.    to implement processes to quickly detect the Data Breach and to timely act on warnings about data breaches; and

   d.    to promptly notify Representative Plaintiff and Class Members of any data breach, security incident, or intrusion that affected or may have affected their PHI/PII and financial information.

95.    Defendant knew that the PHI/PII and financial information was private and confidential and should be protected as private and confidential and, thus, Defendant owed a duty of care not to subject Representative Plaintiff and Class Members to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

96.    Defendant knew, or should have known, of the risks inherent in collecting and storing PHI/PII and financial information, the vulnerabilities of its data security systems, and the importance of adequate security. Defendant knew about numerous, well-publicized data breaches.

97.    Defendant knew, or should have known, that its data systems and networks did not adequately safeguard Representative Plaintiff's and Class Members' PHI/PII and financial information.

98.    Only Defendant was in the position to ensure that its systems and protocols were sufficient to protect the PHI/PII and financial information that Representative Plaintiff and Class Members had entrusted to it.

99.    Defendant breached its duties to Representative Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PHI/PII and financial information of Representative Plaintiff and Class Members.

100.    Because Defendant knew that a breach of its systems could damage thousands of individuals, including Representative Plaintiff and Class Members, Defendant had a duty to adequately protect its data systems and the PHI/PII and financial information contained therein.

101.    Representative Plaintiff's and Class Members' willingness to entrust Defendant with their PHI/PII and financial information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems and the PHI/PII and financial information it stored on them from attack. Thus, Defendant had a special relationship with Representative Plaintiff and Class Members.

102.    Defendant also had independent duties under state and federal laws that required Defendant to reasonably safeguard Representative Plaintiff's and Class Members' PHI/PII and financial information and promptly notify them about the Data Breach. These "independent duties" are untethered to any contract between Defendant and Representative Plaintiff and/or the remaining Class Members.

App. 85

103.    Defendant breached its general duty of care to Representative Plaintiff and Class

Members in, but not necessarily limited to, the following ways:

    a.    by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PHI/PII and financial information of Representative Plaintiff and Class Members;

    b.    by failing to timely and accurately disclose that Representative Plaintiff's and Class Members' PHI/PII and financial information had been improperly acquired or accessed;

    c.    by failing to adequately protect and safeguard the PHI/PII and financial information by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured PHI/PII and financial information;

    d.    by failing to provide adequate supervision and oversight of the PHI/PII and financial information with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PHI/PII and financial information of Representative Plaintiff and Class Members, misuse the PHI/PII and intentionally disclose it to others without consent.

    e.    by failing to adequately train its employees to not store PHI/PII and financial information longer than absolutely necessary;

    f.    by failing to consistently enforce security policies aimed at protecting Representative Plaintiff's and the Class Members' PHI/PII and financial information;

    g.    by failing to implement processes to quickly detect data breaches, security incidents, or intrusions; and

    h.    by failing to encrypt Representative Plaintiff's and Class Members' PHI/PII and financial information and monitor user behavior and activity in order to identify possible threats.

104.    Defendant's willful failure to abide by these duties was wrongful, reckless, and

grossly negligent in light of the foreseeable risks and known threats.

105.    As a proximate and foreseeable result of Defendant's grossly negligent conduct, Representative Plaintiff and Class Members have suffered damages and are at imminent risk of additional harms and damages (as alleged above).

106.    The law further imposes an affirmative duty on Defendant to timely disclose the unauthorized access and theft of the PHI/PII and financial information to Representative Plaintiff and Class Members so that they could and/or still can take appropriate measures to mitigate damages, protect against adverse consequences and thwart future misuse of their PHI/PII and financial information.

107.    Defendant breached its duty to notify Representative Plaintiff and Class Members of the unauthorized access by waiting months after learning of the Data Breach to notify Representative Plaintiff and Class Members and then by failing and continuing to fail to provide Representative Plaintiff and Class Members sufficient information regarding the breach. To date, Defendant has not provided sufficient information to Representative Plaintiff and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Representative Plaintiff and Class Members.

108.    Further, through its failure to provide timely and clear notification of the Data Breach to Representative Plaintiff and Class Members, Defendant prevented Representative Plaintiff and Class Members from taking meaningful, proactive steps to secure their PHI/PII and financial information, and to access their medical records and histories.

109.    There is a close causal connection between Defendant's failure to implement security measures to protect the PHI/PII and financial information of Representative Plaintiff and Class Members and the harm suffered, or risk of imminent harm suffered by Representative

Plaintiff and Class Members. Representative Plaintiff's and Class Members' PHI/PII and financial information was accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PHI/PII and financial information by adopting, implementing, and maintaining appropriate security measures.

110.    Defendant's wrongful actions, inactions, and omissions constituted (and continue to constitute) common law negligence.

111.    The damages Representative Plaintiff and Class Members have suffered (as alleged above) and will suffer were and are the direct and proximate result of Defendant's grossly negligent conduct.

112.    Additionally, 15 U.S.C. §45 (FTC Act, Section 5) prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PHI/PII and financial information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

113.    Defendant violated 15 U.S.C. §45 by failing to use reasonable measures to protect PHI/PII and financial information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PHI/PII and financial information it obtained and stored and the foreseeable consequences of the immense damages that would result to Representative Plaintiff and Class Members.

114.    Defendant's violation of 15 U.S.C. §45 constitutes negligence *per se.* Defendant also violated the HIPAA Privacy and Security rules which, likewise, constitutes negligence *per se.*

115.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PHI/PII and financial information is used; (iii) the compromise, publication, and/or theft of their PHI/PII and financial information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PHI/PII and financial information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to, efforts spent researching how to prevent, detect, contest, and recover from embarrassment and identity theft; (vi) lost continuity in relation to their healthcare; (vii) the continued risk to their PHI/PII and financial information, which may remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect Representative Plaintiff's and Class Members' PHI/PII and financial information in its continued possession; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PHI/PII and financial information compromised as a result of the Data Breach for the remainder of the lives of Representative Plaintiff and Class Members.

116.     As a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

117.    Additionally, as a direct and proximate result of Defendant's negligence and negligence *per se*, Representative Plaintiff and Class Members have suffered and will suffer the continued risks of exposure of their PHI/PII and financial information, which remain in Defendant's possession and are subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PHI/PII and financial information in its continued possession.

### SECOND CLAIM FOR RELIEF
### Breach of Implied Contract
### (On behalf of the Nationwide Class and the Pennsylvania Subclass)

118.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth therein.

119.    Through its course of conduct, Defendant, Representative Plaintiff and Class Members entered into implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Representative Plaintiff's and Class Members' PHI/PII and financial information.

120.    Defendant required Representative Plaintiff and Class Members to provide and entrust their PHI/PII and financial information as a condition of obtaining Defendant's services.

121.    Defendant solicited and invited Representative Plaintiff and Class Members to provide their PHI/PII and financial information as part of Defendant's regular business practices. Representative Plaintiff and Class Members accepted Defendant's offers and provided their PHI/PII and financial information to Defendant.

122.    As a condition of being direct customers/patients/employees of Defendant, Representative Plaintiff and Class Members provided and entrusted their PHI/PII and financial

information to Defendant. In so doing, Representative Plaintiff and Class Members entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such non-public information, to keep such information secure and confidential, and to timely and accurately notify Representative Plaintiff and Class Members if their data had been breached and compromised or stolen.

123.    A meeting of the minds occurred when Representative Plaintiff and Class Members agreed to, and did, provide their PHI/PII and financial information to Defendant, in exchange for, amongst other things, the protection of its PHI/PII and financial information.

124.    Representative Plaintiff and Class Members fully performed their obligations under the implied contracts with Defendant.

125.    Defendant breached the implied contracts it made with Representative Plaintiff and Class Members by failing to safeguard and protect its PHI/PII and financial information and by failing to provide timely and accurate notice to them that their PHI/PII and financial information was compromised as a result of the Data Breach.

126.    As a direct and proximate result of Defendant's above-described breach of implied contract, Representative Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

### THIRD CLAIM FOR RELIEF
**Breach of the Implied Covenant of Good Faith and Fair Dealing**
**(On behalf of the Nationwide Class and the Pennsylvania Subclass)**

127.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth therein.

128.    Every contract in this Commonwealth has an implied covenant of good faith and fair dealing. This implied covenant is an independent duty and may be breached even when there is no breach of a contract's actual and/or express terms.

129.    Representative Plaintiff and Class Members have complied with and performed all conditions of their contracts with Defendant.

130.    Defendant breached the implied covenant of good faith and fair dealing by failing to maintain adequate computer systems and data security practices to safeguard PHI/PII and financial information, failing to timely and accurately disclose the Data Breach to Representative Plaintiff and Class Members and continued acceptance of PHI/PII and financial information and storage of other personal information after Defendant knew, or should have known, of the security vulnerabilities of the systems that were exploited in the Data Breach.

131.    Defendant acted in bad faith and/or with malicious motive in denying Representative Plaintiff and Class Members the full benefit of their bargains as originally intended by the parties, thereby causing them injury in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(On behalf of the Nationwide Class and the Pennsylvania Subclass)**

132.    Each and every allegation of the preceding paragraphs is incorporated in this cause of action with the same force and effect as though fully set forth therein.

133.    By its wrongful acts and omissions described herein, Defendant has obtained a benefit by unduly taking advantage of Representative Plaintiff and Class Members.

134.    Defendant, prior to and at the time Representative Plaintiff and Class Members entrusted their PHI/PII and financial information to Defendant for the purpose of obtaining health services, caused Representative Plaintiff and Class Members to reasonably believe that Defendant would keep such PHI/PII and financial information secure.

135.    Defendant was aware, or should have been aware, that reasonable patients and consumers would have wanted their PHI/PII and financial information kept secure and would not have contracted with Defendant, directly or indirectly, had they known that Defendant's information systems were sub-standard for that purpose.

136.    Defendant was also aware that, if the substandard condition of and vulnerabilities in its information systems were disclosed, it would negatively affect Representative Plaintiff's and Class Members' decisions to seek services therefrom.

137.    Defendant failed to disclose facts pertaining to its substandard information systems, defects, and vulnerabilities therein before Representative Plaintiff and Class Members made their decisions to make purchases, engage in commerce therewith, and seek services or information. Instead, Defendant suppressed and concealed such information. By concealing and suppressing that information, Defendant denied Representative Plaintiff and Class Members the ability to make a rational and informed purchasing and health care decision and took undue advantage of Representative Plaintiff and Class Members.

138.    Defendant was unjustly enriched at the expense of Representative Plaintiff and Class Members. Defendant received profits, benefits, and compensation, in part, at the expense of

Representative Plaintiff and Class Members.  By contrast, Representative Plaintiff and Class Members did not receive the benefit of their bargain because they paid for products and/or health care services that did not satisfy the purposes for which they bought/sought them.

139.    Since Defendant's profits, benefits, and other compensation were obtained by improper means, Defendant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

140.    Representative Plaintiff and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Representative Plaintiff and Class Members may seek restitution.

## <u>RELIEF SOUGHT</u>

**WHEREFORE,** Representative Plaintiff, on behalf of himself and each member of the proposed National Class and the Pennsylvania Subclass, respectfully request that the Court enter judgment in their favor and for the following specific relief against Defendant as follows:

1.    That the Court declare, adjudge, and decree that this action is a proper class action and certify each of the proposed classes and/or any other appropriate subclasses under F.R.C.P. Rule 23 (b)(1), (b)(2), and/or (b)(3), including appointment of Representative Plaintiff's counsel as Class Counsel;

2.    For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined;

3.    That the Court enjoin Defendant, ordering them to cease and desist from unlawful activities;

4.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Representative Plaintiff's and Class Members' PII/PHI, and from refusing to issue prompt, complete, any accurate disclosures to Representative Plaintiff and Class Members;

5.    For injunctive relief requested by Representative Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Representative Plaintiff and Class Members, including but not limited to an Order:

   a.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

   b.    requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

   c.    requiring Defendant to delete and purge the PII/PHI of Representative Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Representative Plaintiff and Class Members;

   d.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Representative Plaintiff's and Class Members' PII/PHI;

   e.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

   f.    prohibiting Defendant from maintaining Representative Plaintiff's and Class Members' PII/PHI on a cloud-based database;

   g.    requiring Defendant to segment data by creating firewalls and access controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

   h.    requiring Defendant to conduct regular database scanning and securing checks;

i.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII/PHI, as well as protecting the PII/PHI of Representative Plaintiff and Class Members;

j.      requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

k.      requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

l.      requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves.

6.      For prejudgment interest on all amounts awarded, at the prevailing legal rate;

7.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law; and

8.      For all other Orders, findings, and determinations identified and sought in this Complaint.

## **JURY DEMAND**

Representative Plaintiff, individually and on behalf of the Plaintiff Class(es) and/or Subclass(es), hereby demands a trial by jury for all issues triable by jury.

38

Dated: February 15, 2023             Respectfully submitted,

By:    */s/ Gary F. Lynch*            
       Gary F. Lynch (PA ID 56887)
       Nicholas A. Colella (PA ID 332699)
       **LYNCH CARPENTER, LLP**
       1133 Penn Avenue, 5th Floor
       Pittsburgh, PA 15222
       T: (412) 322-9243
       gary@lcllp.com
       nickc@lcllp.com


       Daniel Srourian (CA S.B. #285678)*
       **SROURIAN LAW FIRM, P.C.**
       3435 Wilshire Blvd., Suite 1710
       Los Angeles, CA 90010
       Telephone:   (213) 474-3800
       Email:    daniel@slfla.com


       **Pro hac vice forthcoming*

       Attorneys for Representative Plaintiff(s) and the
       Plaintiff Class(es)

Daniel Z. Srourian
SROURIAN LAW FIRM
3435 Wilshire Boulevard, Suite 1710
Los Angeles, CA 90010
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
daniel@slfla.com

Patrick N. Keegan
KEEGAN AND BAKER LLP
2292 Faraday Avenue Suite 100
Carlsbad, CA 92009
Telephone: (760) 929-9303
Facsimile: (760) 929-9260
pkeegan@keeganbaker.com

[Additional Counsel on signature page]

*Attorneys for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| RYAN COLLINS and NELSON QUILES, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CONIFER VALUE-BASED CARE, LLC, CONIFER REVENUE CYCLE SOLUTIONS, <br><br> Defendants. | NO. 5:24-cv-2265 <br><br> **CLASS ACTION COMPLAINT:** <br> 1. **NEGLIGENCE;** <br> 2. **INVASION OF PRIVACY;** <br> 3. **UNJUST ENRICHMENT;** <br> 4. **VIOLATION OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT;** <br> 5. **UNFAIR BUSINESS PRACTICES IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§17200, ET SEQ; AND** <br><br> **DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT

Plaintiffs Ryan Collins and Nelson Quiles ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Conifer Value-Based Care, LLC and Conifer Revenue Cycle Solutions, (collectively referred to as "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1.      This consolidated class action arises from Defendants' failure to protect highly sensitive data, leading to a data breach in March 2022 and exposing the sensitive personal and medical information belonging to plaintiffs and thousands of other patients.

2.      Defendants are a collection of entities under Tenet Health Corporation (NYSE: THC), a diversified healthcare services company that collects, administers, and stores the healthcare records for millions of Americans, including the records of HIPPA covered entities across the country. This means that Defendants collect, administer, and store information and records not only on its own patients, but also patients that have never dealt with the company and do not know it has their information.

3.      Defendants collect and store this sensitive information, including the information at issue here, in coordination with two other Conifer entities, Tenet and Conifer Health Solutions LLC. Together, the four companies coordinate their data

CLASS ACTION COMPLAINT – 1

security efforts and efforts to notify patients and employees impacted by data breaches, as shown by Defendants' breach notices, which are all signed by the "Conifer Privacy Office" and originate from the same California office. In addition, Defendants base their operations in California with continuous and systematic contacts with the state.

4.    In collecting highly sensitive patient data on a vast scale, Defendants accepted duties to protect it under tort, contract, and statutory principles under California law. But despite accepting those duties, Conifer never implemented the security systems needed to fulfill them. This meant its security systems lacked the ability to prevent, detect, or stop data breaches from happening, allowing cybercriminals to access its systems for months undetected in two separate data breaches within two months.

5.    On March 21, 2022, Defendants discovered they had lost control over their consumers' highly sensitive personal information in a data breach perpetrated by cybercriminals with access to only a few email accounts. The number of total breach victims is unknown, but on information and belief, Defendants' data breach has impacted at least thousands of people, including patients and the current and former employees of Defendants' clients.

6.    The breach occurred between March 17, 2022, and March 22, 2022, when cybercriminals first accessed parts of Defendants' business email accounts through a phishing scam, and was not discovered by Defendants until March 21, 2022, four days later. Indeed, so inadequate was Defendants' cybersecurity that even

---

CLASS ACTION COMPLAINT – 2

after discovery, Defendants were still unable to stop cybercriminals from their pilfering for another day.

7.      Defendants struggled to identify what information was involved in the data breach and whom it belonged to. After investigation, Defendants found it had exposed details like Plaintiffs' and the Class's Social Security numbers, names, dates of birth, medical treatment information, diagnoses and symptoms, their doctors, insurance information, and prescriptions.

8.      On or about October 11, 2022—seven months after the March 2022 data breach occurred and when Defendants first learned of the data breach—Defendants finally began notifying Class Members about the breach.

9.      Following internal investigations, Defendants learned cybercriminals gained unauthorized access to their consumers' personally identifiable information ("PII") and protected health information ("PHI") (collectively with PII, "Sensitive Information") during the data breach.

10.     But Defendants' breach notice only exacerbated the harm Defendants caused patients. This is because the notice obfuscated the nature of the breach and the threat it posed—refusing to tell their victims how many people were impacted, how the breach happened, or why it took the Defendants several months to begin notifying victims that hackers had gained access to their highly sensitive consumer information.

11.     Defendants' failure to timely detect and report the data breach ("Data Breach") made patients vulnerable to identity theft without any warnings to monitor

---

CLASS ACTION COMPLAINT – 3

their financial accounts or credit reports to prevent unauthorized use of their Sensitive Information.

12.    Defendants knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of Sensitive Information misuse.

13.    As above and relevant here, Defendants maintain continuous and systemic contacts with California such that this Court has general personal jurisdiction over them. The decisions leading to the Data Breach originated from this state, the Data Breach notice was sent from this state, and Defendants have previously declined to challenge this Court's jurisdiction over them in related California litigation. *See* Doc. 48 from *Morales v. Conifer Health Solutions LLC*, Case No. 2:23-cv-01987.

14.    In failing to adequately protect their patients' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendants violated state and federal law and harmed thousands of patients.

15.    Plaintiffs and members of the proposed Class are victims of Defendants' negligence and inadequate cyber security measures. Specifically, Plaintiffs and members of the proposed Class trusted Defendants with their Sensitive Information. Defendants betrayed that trust. Defendants failed to properly use up-to-date security practices to prevent the Data Breach.

16.    Plaintiffs Ryan Collins and Nelson Quiles are Data Breach victims of the March 2022 data breach.

17.    Accordingly, Plaintiffs, on their own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit seeking injunctive relief, damages,

CLASS ACTION COMPLAINT – 4

and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendants' possession.

## **PLAINTIFFS**

18.    Plaintiff Ryan Collins is a natural person and citizen of Massachusetts, residing in Ashland, Massachusetts where he intends to remain. Mr. Collins is a March 2022 breach victim. Plaintiff Ryan Collins received Conifer Value-Based Care's notice letter, addressed in his first and last name with his residential address, dated October 11, 2022, entitled "Notice of Data Breach," signed "Zanib Arshed[,] Conifer Privacy Officer" an example of which is, attached as Exhibit A.

19.    Plaintiff Nelson Quiles is a natural person and citizen of Maryland, residing in Centreville, Maryland, where he intends to remain. Mr. Quiles is a March 2022 breach victim. Plaintiff Nelson Quiles received Conifer Value-Based Care's notice letter, addressed in his first and last name with his residential address, dated October 11, 2022, entitled "Notice of Data Breach," signed "Zanib Arshed[,] Conifer Privacy Officer."

## **DEFENDANTS**

20.    Defendant Conifer Value-Based Care, LLC is a Maryland LLC with its registered agent being at 330 N Brand Blvd., Glendale, CA. It can be served there. The sole member of Conifer Value-Based Care, LLC, is Conifer Health Solutions, LLC, a Delaware LLC. The members of Conifer Health Solutions, LLC are CommonSpirit Health and Conifer Holdings, Inc. CommonSpirit Health is a Colorado non-profit corporation with its principal place of business in Denver, Colorado. Conifer Holdings, Inc. is a Delaware corporation. Although Conifer

1   Value-Based Solutions has listed its "principal place of business" as located in

2   Frisco, Texas, it maintains systematic and continuous contacts in California such

3   that its principal place of business is in this state. Indeed, Conifer Value-Based

4   Care's headquarters are located at 15821 Ventura Boulevard, Suite 600 Encino, CA

5   91436. Conifer Value-Based Care manages its operations from that location,

6   including those leading to the incident at issue in this case.

7       21.    Defendant Conifer Revenue Cycle Solutions, LLC, is a "California

8   limited liability company" and its sole member is Conifer Health Solutions, LLC.

9   Defendant Conifer Revenue Cycle Solutions, LLC's sole member is Conifer Health

10  Solutions, LLC, which is a Delaware limited liability company. Conifer Health

11  Solutions, LLC has two members: CommonSpirit Health and Conifer Holdings, Inc.

12  CommonSpirit Health is a Colorado nonprofit corporation with its principal place of

13  business in Denver, Colorado. Conifer Holdings, Inc. is a Delaware corporation with

14  its principal place of business in Frisco, Texas. At all times relevant to this action,

15  Defendant Conifer Revenue Cycle Solutions, LLC was and is a business that

16  conducts business primarily in California like Conifer Value-Based Care, although

17  it is a citizen of other states.

18                          **JURISDICTION & VENUE**

19      22.    Jurisdiction is proper in this Court under 28 U.S.C. § 1332(d) because

20  CAFA provides the Court with original jurisdiction of this action. Under CAFA,

21  jurisdiction exits because the controversy exceeds the sum or value of $5,000,000,

22  exclusive of interest and costs, and is a class action in which plaintiffs, as citizens of

23  Maryland and Massachusetts, are citizens of different states than Defendants.

24
---

CLASS ACTION COMPLAINT – 6

23.    This Court has general personal jurisdiction over Defendants because they regularly conduct business in California, maintain systemic and continuous business here, the decisions leading to the Data Breach were made here, the Data Breach notices plaintiffs received originated from here, meaning their principal places of business are located here. Conifer Revenue Cycle Solutions is also a California limited liability company.

24.    In addition, Defendants have previously declined to challenge this Court's personal jurisdiction over them in related litigation. *See* Doc. 48 from *Morales v. Conifer Health Solutions LLC*, Case No. 2:23-cv-01987.

25.    Venue is proper in this Court because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## BACKGROUND FACTS

### *Defendants Collected and Stored the Sensitive Information of Plaintiffs and the Class*

### *The Data Breach*

26.    Plaintiffs and victims of the Data Breach are unsure how Defendants got their information but assume that one of their employers was Defendants' clients and provided Defendants with their Sensitive Information.

27.    On information and belief, Defendants collect and maintain consumers' unencrypted Sensitive Information in their computer systems.

28.    In collecting and maintaining Sensitive Information, Defendants implicitly agree they will safeguard the data using reasonable means according to their internal policies and federal law.

---

CLASS ACTION COMPLAINT – 7

29.     According to the Breach Notice, Conifer Value-Based Care, LLC "discovered that an unauthorized third party gained access to certain Microsoft Office 365-hosted business email accounts through phishing" on March 21, 2022. An internal investigation revealed that an unauthorized actor had gained access to portions of Conifer Value-Based Care's email accounts between March 17, 2022, and March 22, 2022.

30.     In other words, Defendants' investigation revealed that their network had been hacked by cybercriminals and that Defendants' inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to obtain files containing a treasure trove of thousands of their consumers' personal, private, and sensitive information, including but not limited to full names, home address, date of birth, Social Security number, health insurance subscriber number, medication information including diagnosis and treatment information, and health billings and claims information.

31.     Through their inadequate security practices, Defendants exposed Plaintiffs' and the Class's Sensitive Information to theft and sale on the dark web.

32.     On or about October 11, 2022—seven months after the Data Breach occurred—Defendants finally notified Plaintiffs and Class Members about the Data Breach. That notice came from Defendants' California "Conifer Privacy Office" under Conifer Health Solutions LLC's letterhead—evidencing how Conifer's entities coordinate data security efforts.

33.     Indeed, Defendants coordinated their data security decisions from California, including from its offices in Encino, California, the primary decisions

CLASS ACTION COMPLAINT – 8

leading to Defendants' data security failures occurred in this state, and Defendants'
breach response took place primarily in this state.

34.   Despite their duties and alleged commitments to safeguard Sensitive
Information, Defendants do not follow industry standard practices in securing
consumers' Sensitive Information, as evidenced by the Data Breach and stolen
Sensitive Information.

35.   In response to the Data Breach, Conifer contends it "has and continues
to enhance its security controls and monitoring practices as appropriate" and
"accelerated its implementation of multi-factor authentication for all business email
accounts within the environment." Although Defendants fail to expand on these
alleged "security controls and monitoring practices," such actions, as well as multi-
factor authentication, should have been in place *before* the Data Breach.

36.   Through the Breach Notice, Defendants also recognized the actual
imminent harm and injury that flowed from the Data Breach, so it encouraged breach
victims to "carefully review credit reports and statements sent from providers as well
as your insurance company" to avoid "unauthorized transactions" as well as
"incidents of identity theft or fraud."

37.   Defendants further recognized through the Breach Notice, their duty to
implement reasonable cybersecurity safeguards or policies to protect their
consumers' Sensitive Information, insisting that "Conifer takes privacy and security
very seriously" and "sincerely regrets that this incident occurred[.]'"

38.   On information and belief, Defendants have offered several months of
complimentary credit monitoring services to victims, which does not adequately

CLASS ACTION COMPLAINT – 9

address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves Sensitive Information that cannot be changed, such as Social Security numbers. Further, the breach exposed consumers' nonpublic, highly private information, a disturbing harm in and of itself.

39.    Even with complimentary credit monitoring services, the risk of identity theft and unauthorized use of Plaintiffs' and Class Members' Sensitive Information is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

40.    Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiffs' and the Class's Sensitive Information. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiffs' and the Class's financial accounts.

41.    On information and belief, Defendants failed to adequately train their IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing Defendants to lose control over their consumers' Sensitive Information. Defendants' negligence is evidenced by their failure to prevent multiple Data Breaches occurring mere months apart and stop cybercriminals from repeatedly accessing their consumers' Sensitive Information. Further, the Breach Notice makes clear that Defendants cannot, or will not, determine the full scope of the Data Breach.

CLASS ACTION COMPLAINT – 10

42.    Indeed, Defendants' negligence is only further shown by the fact that the March 2022 breach was the second in two months caused by Conifer.[1]

43.    Although discovered after the Data Breach that is the subject of this complaint, an internal investigation revealed that Conifer discovered a separate breach in April that had begun as early as January 20, 2022, and impacted thousands of current and former patients of Conifer's clients.

**_The Data Breach was a Foreseeable Risk of which Defendants were on Notice._**

44.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare and healthcare adjacent industry preceding the date of the breach.

45.    In light of recent high profile data breaches at other healthcare partner and provider companies, Defendants knew or should have known that their electronic records and consumers' Sensitive Information would be targeted by cybercriminals. In 2019, a record 1,473 data breaches occurred, resulting in approximately 164,683,455 sensitive records being exposed, a 17% increase from 2018.[2]

---

[1] When 2+2 = OMG: two hospitals, two breaches each, both discovered in the same month, Databreaches, https://www.databreaches.net/when-22-omg-two-hospitals-two-breaches-each-both-discovered-in-same-month/ (last visited December 14, 2023).

[2] https://www.idtheftcenter.org/wp-content/uploads/2020/01/01.28.2020_ITRC_
2019-End-of-Year-Data-Breach-Report_FINAL_Highres-Appendix.pdf (last accessed 12-10-2020).

---

CLASS ACTION COMPLAINT – 11

46.    Indeed, cyber-attacks, such as the one experienced by Defendants, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants.

47.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[3] The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[4]

48.    Indeed, cyberattacks against Defendants' industry have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[5]

49.    Cyberattacks on medical systems and healthcare partner and provider companies like Defendants have become so notorious that the FBI and U.S. Secret

---

[3]    2021 Data Breach Annual Report, ITRC, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last visited June 13, 2023).
[4] *Id.*
[5]    Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited June 13, 2023).

CLASS ACTION COMPLAINT – 12

Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[6]

50.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

### Plaintiff Collins' Experience

51.     Plaintiff Collins is a Data Breach victim of the Data Breach. He is unsure why Defendants are in possession of his Sensitive Information but assumed it was provided by his employer, Breezeline, one of Defendants' clients who utilizes Defendants' services to assist with health plans.

52.     Regardless, Defendants obtained and continues to maintain Plaintiff Collins' Sensitive Information and has a continuing legal duty and obligation to protect that Sensitive Information from unauthorized access and disclosure.

53.     Defendants deprived Plaintiff Collins of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it seven months after Defendants finally discovered the Data Breach.

54.     As a result of their inadequate cybersecurity, Defendants exposed Plaintiff Collins' Sensitive Information for theft by cybercriminals and sale on the dark web.

---

[6] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware(last visited June 13, 2023).

CLASS ACTION COMPLAINT – 13

55.    Plaintiff Collins suffered actual injury from the exposure of his
Sensitive Information —which violates his rights to privacy.

56.    Plaintiff Collins suffered actual injury in the form of damages to and
diminution in the value of his Sensitive Information. After all, Sensitive Information
is a form of intangible property—property that Defendants were required to
adequately protect.

57.    As a result of the Data Breach and the recommendations of Defendants'
Notice, Plaintiff Collins has spent time and made reasonable efforts to mitigate the
impact of the Data Breach, including but not limited to researching the Data Breach,
reviewing credit card and financial account statements, changing his online account
passwords, and monitoring his credit information as suggested by Defendant.

58.    Plaintiff Collins has and will spend considerable time and effort
monitoring his accounts to protect himself from identity theft. Plaintiff fears for his
personal financial security and uncertainty over what Sensitive Information was
exposed in the Data Breach. Plaintiff Collins has and is experiencing feelings of
anxiety, stress, fear, and frustration because of the Data Breach. This goes far beyond
allegations of mere worry or inconvenience; it is exactly the sort of injury and harm
to a Data Breach victim that the law contemplates and addresses.

59.    Plaintiff Collins is now subject to the present and continuing risk of
fraud, identity theft, and misuse resulting from his Sensitive Information being
placed in the hands of unauthorized third parties. This injury was worsened by
Defendants' delay in informing Plaintiff Collins and Class Members about the Data
Breach.

CLASS ACTION COMPLAINT – 14

1   60.    In fact, following the Data Breach, Plaintiff Collins has started

2   receiving spam calls and texts, suggesting that Plaintiff Collins' information has

3   been stolen and placed in the hands of cybercriminals.

4   61.    Plaintiff Collins has a continuing interest in ensuring that his Sensitive

5   Information, which, upon information and belief, remains backed up in Defendants'

6   possession, is protected and safeguarded from future breaches.

7   ***Plaintiff Quiles' Experience***

8   62.    Plaintiff Quiles is a Data Breach victim of the Data Breach. He is unsure

9   why Defendants are in possession of his Sensitive Information but assumed it was

10  provided by his employer, one of Defendants' clients who utilizes Defendants

11  services to assist with health plans.

12  63.    Regardless, Defendants obtained and continues to maintain Plaintiff

13  Quiles' Sensitive Information and has a continuing legal duty and obligation to

14  protect that Sensitive Information from unauthorized access and disclosure.

15  64.    Defendants deprived Plaintiff Quiles of the earliest opportunity to

16  guard himself against the Data Breach's effects by failing to notify him about it for

17  seven months after Defendants finally discovered the Data Breach.

18  65.    Plaintiff Quiles suffered actual injury from the exposure of his Sensitive

19  Information —which violates his rights to privacy.

20  66.    Plaintiff Quiles suffered actual injury in the form of damages to and

21  diminution in the value of his Sensitive Information. After all, Sensitive Information

22  is a form of intangible property—property that Defendants were required to

23  adequately protect.

24

CLASS ACTION COMPLAINT – 15

67.    Plaintiff Quiles does not recall ever learning that his Sensitive Information was compromised in a data breach incident, other than the breach at issue in this case.

68.    As a result of the Data Breach and the recommendations of Defendants' Notice, Plaintiff Quiles has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing credit card and financial account statements, changing his online account passwords, placing a credit freeze through the three main credit bureaus, and monitoring his credit information as suggested by Defendant.

69.    Plaintiff Quiles has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff Quiles fears for his personal financial security and uncertainty over what Sensitive Information was exposed in the Data Breach. Plaintiff Quiles has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

70.    Plaintiff Quiles is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from his Sensitive Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendants' delay in informing Plaintiff Quiles and Class Members about the Data Breach.

71.     Indeed, following the Data Breach, between April and May 2022, Plaintiff Quiles suffered a fraudulent charge of over $500 from Instacart on his Bank of America card that he did not authorize nor recognize.

72.     Plaintiff Quiles has also suffered numerous inquiries on his credit report that he does not recognize or authorize.

73.     Finally, following the Data Breach, Plaintiff Quiles has begun receiving significant amounts of spam calls and texts.

74.     Plaintiff Quiles has a continuing interest in ensuring that his Sensitive Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

75.     Plaintiffs and members of the proposed Class have suffered injury from the misuse of their Sensitive Information that can be directly traced to Defendants.

76.     The ramifications of Defendants' failure to keep Plaintiffs' and the Class's Sensitive Information secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, or other nonpublic financial information, without permission, to commit fraud or other crimes.

77.     The types of Sensitive Information compromised and potentially stolen in the Data Breach is highly valuable to identity thieves. The stolen Sensitive Information can be used to gain access to a variety of existing accounts and websites to drain assets, bank accounts or open phony credit cards.

CLASS ACTION COMPLAINT – 17

78.     Identity thieves can also use this data to harm Plaintiffs and Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health- related or criminal record fraud, face other types of harm and frustration.

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

79.     As a result of Defendants' failure to prevent the Data Breach, Plaintiffs and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.   The loss of the opportunity to control how their Sensitive Information is used;

CLASS ACTION COMPLAINT – 18

b. The diminution in value of their Sensitive Information;

c. The compromise and continuing publication of their Sensitive Information;

d. Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e. Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breaches, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f. Delay in receipt of tax refund monies;

g. Unauthorized use of stolen Sensitive Information; and

h. The continued risk to their Sensitive Information, which remains in the possession of Defendants and is subject to further breaches so long as Defendants fail to undertake the appropriate measures to protect the Sensitive Information in their possession.

80. Stolen Sensitive Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.[7]

---

[7] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experian, https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited July 7, 2023).

CLASS ACTION COMPLAINT – 19

81.     The value of Plaintiffs' and the proposed Class's Sensitive Information on the black market is considerable. Stolen Sensitive Information trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

82.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

83.     Of course, a stolen Social Security number – standing alone – can be used to wreak untold havoc upon a victim's personal and financial life.  The popular person privacy and credit monitoring service LifeLock by Norton notes "Five Malicious Ways a Thief Can Use Your Social Security Number," including 1) Financial Identity Theft that includes "false applications for loans, credit cards or bank accounts in your name or withdraw money from your accounts, and which can encompass credit card fraud, bank fraud, computer fraud, wire fraud, mail fraud and employment fraud; 2) Government Identity Theft, including tax refund fraud; 3) Criminal Identity Theft, which involves using someone's stolen Social Security number as a "get out of jail free card;" 4) Medical Identity Theft, and 5) Utility Fraud.

84.     It is little wonder that courts have dubbed a stolen Social Security number as the "gold standard" for identity theft and fraud. Social Security numbers

CLASS ACTION COMPLAINT – 20

1  are among the worst kind of PII to have stolen because they may be put to a variety

2  of fraudulent uses and are difficult for an individual to change.

3       85.     According to the Social Security Administration, each time an

4  individual's Social Security number is compromised, "the potential for a thief to

5  illegitimately gain access to bank accounts, credit cards, driving records, tax and

6  employment histories and other private information increases." [8] Moreover,

7  "[b]ecause many organizations still use SSNs as the primary identifier, exposure to

8  identity theft and fraud remains."[9]

9       86.     The Social Security Administration stresses that the loss of an

10 individual's Social Security number, as experienced by Plaintiff and some Class

11 Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to
> get other personal information about you. Identity thieves can use your
> number and your good credit to apply for more credit in your name.
> Then, they use the credit cards and don't pay the bills, it damages your
> credit. You may not find out that someone is using your number until
> you're turned down for credit, or you begin to get calls from unknown
> creditors demanding payment for items you never bought. Someone
> illegally using your Social Security number and assuming your identity
> can cause a lot of problems.[10]

---

[8] *See*
https://www.ssa.gov/phila/ProtectingSSNs.htm#:~:text=An%20organization's%20collection%20
and%20use,and%20other%20private%20information%20increases.
[9] *Id.*
[10] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*:
https://www.ssa.gov/pubs/EN-05-10064.pdf

CLASS ACTION COMPLAINT – 21

87.    In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[11] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[12]

88.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

89.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[13]

90.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social

---

[11] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/
[12] *See* https://www.investopedia.com/terms/s/ssn.asp
[13] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

CLASS ACTION COMPLAINT – 22

Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc.*, 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target her in fraudulent schemes and identity theft attacks.")

91.    Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[14]

92.    It can take victims years to spot identity or PII and PHI theft, giving criminals plenty of time to use that information for cash.

---

[14] *See* https://oag.ca.gov/idtheft/facts/your-ssn

CLASS ACTION COMPLAINT – 23

93.    One such example of criminals using Sensitive Information for profit is the development of "Fullz" packages.

94.    Cyber-criminals can cross-reference two sources of Sensitive Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.[15]

95.    The development of "Fullz" packages means that stolen Sensitive Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Sensitive Information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs' and the proposed Class's stolen Sensitive Information is being misused, and that such misuse is fairly traceable to the Data Breach.

96.    Defendants disclosed the Sensitive Information of Plaintiffs and the Class for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the Sensitive Information of Plaintiffs and members of the proposed Class to people engaged in disruptive and unlawful

---

[15] *Id.*

CLASS ACTION COMPLAINT – 24

1    business practices and tactics, including online account hacking, unauthorized use

2    of financial accounts, and fraudulent attempts to open unauthorized financial

3    accounts (*i.e.*, identity fraud), all using the stolen Sensitive Information.

4        97.    Defendants' use of outdated and insecure computer systems and

5    software that are easy to hack, and their failure to maintain adequate security

6    measures and an up-to-date technology security strategy, demonstrates a willful and

7    conscious disregard for privacy, and has exposed the Sensitive Information of

8    Plaintiffs and members of the proposed Class to unscrupulous operators, con artists,

9    and criminals.

10        98.    An active and robust legitimate marketplace for PII also exists. In 2019,

11    the data brokering industry was worth roughly \$200 billion.[16]

12        99.    In fact, the data marketplace is so sophisticated that consumers can

13    actually sell their non-public information directly to a data broker who in turn

14    aggregates the information and provides it to marketers or app developers.[17,18]

15        100.    Consumers who agree to provide their web browsing history to the

16    Nielsen Corporation can receive up to \$50.00 a year.[19]

17        101.    As a result of the Data Breach, Plaintiffs' and Class Members' Sensitive

18    Information, which has an inherent market value in both legitimate and dark markets,

19    has been damaged and diminished by its compromise and unauthorized release.

20    However, this transfer of value occurred without any consideration paid to Plaintiffs

---

[16] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/
[17] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[18] https://datacoup.com/
[19] https://digi.me/what-is-digime/

CLASS ACTION COMPLAINT – 25

or Class Members for their property, resulting in an economic loss. Moreover, the Sensitive Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

102.    Defendants' failure to properly notify Plaintiffs and members of the proposed Class of the Data Breach exacerbated Plaintiffs' and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their Sensitive Information and take other necessary steps to mitigate the harm caused by the Data Breach.

### *Defendants Failed to Adhere to FTC Guidelines*

103.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[20] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendants, should employ to protect against the unlawful exposure of Sensitive Information.

104.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[21] The guidelines explain that businesses should:

---

[20] Federal Trade Commission, *Start With Security*, (https://www.ftc.gov/
system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) viewed 9-9-2021.

[21] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, (https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf) viewed 9-9-2021.

---

CLASS ACTION COMPLAINT – 26

a.  protect the personal customer information that they keep;

b.  properly dispose of personal information that is no longer needed;

c.  encrypt information stored on computer networks;

d.  understand their network's vulnerabilities; and

e.  implement policies to correct security problems.

105.   The FTC publication, *Protecting Personal Information: A Guide for Business*, also recommends that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

106.   The FTC further recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures. [22]

107.   The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[22] Federal Trade Commission, *Start With Security*, (https://www.ftc.gov/
system/files/documents/plain-language/pdf0205-startwithsecurity.pdf) viewed 9-9-2021.

CLASS ACTION COMPLAINT – 27

108.    Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

109.    Defendants were at all times fully aware of their obligations to protect Plaintiffs and Class Members' Sensitive Information. Defendants were also aware of the significant repercussions that would result from its failure to do so.

### Defendants Violated HIPAA

110.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

111.    Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

112.    Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Sensitive Information like the data Defendants left unguarded. The HHS subsequently promulgated multiple regulations under authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. § 164.306(a)(1-4); 45 C.F.R. § 164.312(a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308(a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

CLASS ACTION COMPLAINT – 28

113.   Data Breaches such as the one Defendants experienced, is considered a breach under the HIPAA Rules because there is an access of PHI not permitted under the HIPAA Privacy Rule:

114.   A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." See 45 C.F.R. 164.40.

115.   Defendants' Data Breach resulted from a combination of insufficiencies that demonstrate Defendants failed to comply with safeguards mandated by HIPAA regulations.

**Plaintiffs and Class Members Suffered Damages**

116.   The compromised and stolen information of Plaintiffs and Class members is private and sensitive in nature and was left inadequately protected by Defendants. Defendants did not obtain Plaintiffs' and Class members' consent to disclose this data to any other person as required by applicable law and industry standards.

117.   The data breaches was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and Class members' Sensitive Information from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including the failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and Class members' sensitive personal information to protect against reasonably foreseeable threats to the security or integrity of such information.

CLASS ACTION COMPLAINT – 29

118.   Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, Defendants would have prevented intrusion into their information storage and security systems and, ultimately, the theft of Plaintiffs' and the Class Members' Sensitive Information.

119.   As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the data breaches on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.

120.   Defendants' wrongful actions and inaction directly and proximately caused the potential theft and dissemination into the public domain of Plaintiffs' and Class members' Sensitive Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    theft of their personal and financial information;

b.    unauthorized charges on their debit and credit card accounts;

CLASS ACTION COMPLAINT – 30

c.     the actual, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and misused via the sale of Plaintiffs' and Class members' information on the Internet's black market;

d.     the untimely and inadequate notification of the Data Breach;

e.     the improper disclosure of their Sensitive Information;

f.     loss of privacy;

g.     ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

h.     ascertainable losses in the form of deprivation of the value of their Sensitive Information, for which there is a well-established national and international market;

i.     ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

j.     loss of use of, and access to, their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and

CLASS ACTION COMPLAINT – 31

k.      the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

***Defendants Failed to Follow Industry Standards***

121.    A number of industry and national best practices have been published and should have been used as a go-to resource and authoritative guide when developing Defendants' cybersecurity practices.

122.    Several best practices have been identified that—at a minimum—should be implemented by businesses like Defendants. Best cybersecurity practices that are standard in the industry providing "administrative services to healthcare providers," include implementation of multi-factor authentication for business email accounts; engaging independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audit; installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Other

CLASS ACTION COMPLAINT – 32

industry standards best practices include: encryption (making data unreadable without a key); educating all employees and subjecting employees to regular phishing tests; requiring employees to use strong passwords and to regularly change passwords; and limiting which employees can access Sensitive Data.

123.    Defendants failed to meet the minimum standards of any of the following frameworks in effect at the time of the Data Breach: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

124.    These frameworks are applicable and accepted industry standards, and by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

125.    Defendants breached their obligations to Plaintiffs and the Class and/or were otherwise negligent and reckless because they failed to properly maintain and safeguard PII and PHI on its computer systems and networks. Defendants' unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a.    Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.    Failing to adequately protect PII and PHI of current and former customers;

CLASS ACTION COMPLAINT – 33

c.      Failing to adequately protect current and former customers' PII and PHI by implementation of multi-factor authentication for business email accounts;

d.      Failing to adequately protect current and former customers' PII and PHI by engaging independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audit;

e.      Failing to properly monitor its own data security systems for existing intrusions, brute-force attempts, and clearing of event logs;

f.      Failing to apply all available security updates;

g.      Failing to install the latest software patches, update its firewalls, check user account privileges, or ensure proper security practices;

h.      Failing to practice the principle of least-privilege and maintain credential hygiene;

i.      Failing to avoid the use of domain-wide, administrator-level service accounts;

j.      Failing to employ or enforce the use of strong randomized, just-in- time local administrator passwords; and

k.      Failing to properly train and supervise employees in the proper handling of inbound emails.

126.    As the result of computer systems in need of security upgrading and inadequate procedures for handling cybersecurity threats, Defendant negligently and unlawfully failed to safeguard Plaintiffs' and the Class's PII and/or PHI.

CLASS ACTION COMPLAINT – 34

**CLASS ACTION ALLEGATIONS**

127.    Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on behalf of themselves and all members of the proposed class, defined as follows:

> **Nationwide Class:** All persons residing in the United States whose Sensitive Information was compromised in the Data Breach, including all those who received Defendants' breach notice.

128.    The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which the Defendants or their parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

129.    Plaintiffs reserve the right to amend the Class definition or add a Class if further information and discovery indicate that other classes should be added and if the definition of the Class should be narrowed, expanded, or otherwise modified.

130.    Plaintiffs and members of the Class satisfy the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23:

a.    **Numerosity**. The exact number of Class members is unknown but is estimated to be up to thousands of consumers at this time, and individual

joinder in this case is impracticable. Class Members can be easily identified through Defendants' records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, unlawful trade practices, and class action controversies;

b. **Typicality**: Plaintiffs' claims are typical of the claims of other Class members in that Plaintiffs, and the Class Members sustained damages arising out of the Data Breaches, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiffs and the Class Members sustained similar injuries and damages, as a result of Defendants' uniform illegal conduct;

c. **Adequacy**: Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiffs have no interests that conflict with, or are antagonistic to those of, the Classe and Defendants have no defenses unique to Plaintiffs.

d. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

CLASS ACTION COMPLAINT – 36

i.      Whether Defendants had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's Sensitive Information;

ii.     Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

iii.    Whether Defendants were negligent in maintaining, protecting, and securing Sensitive Information;

iv.     Whether Defendants breached contract promises to safeguard Plaintiffs' and the Class's Sensitive Information;

v.      Whether Defendants took reasonable measures to determine the extent of the Data Breach after discovering them;

vi.     Whether Defendants' Breach Notice was reasonable;

vii.    Whether the Data Breach caused Plaintiffs and the Class injuries;

viii.   What the proper damages measure is; and

ix.     Whether Plaintiffs and the Class are entitled to damages, treble damages, or injunctive relief.

e.   **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants'

CLASS ACTION COMPLAINT – 37

actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

## CAUSES OF ACTION

### First Claim for Relief
**Negligence**
**(On Behalf of Plaintiffs and the Nationwide Class)**

131.   Plaintiffs and the members of the Nationwide Class incorporate the above allegations as if fully set forth herein.

132.   Plaintiffs and members of the Class entrusted their Sensitive Information to Defendants. Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care in safeguarding and protecting their Sensitive Information and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Defendants' security systems to ensure the Sensitive Information of Plaintiffs and the Class was adequately secured and protected,

---

CLASS ACTION COMPLAINT – 38

1    including using encryption technologies. Defendants further had a duty to implement

2    processes that would detect a breach of their security system in a timely manner.

3        133.    Defendants were under an independent duty to act with reasonable care

4    when they undertook to collect, create, and store Plaintiffs' and the Class's sensitive

5    data on their computer system, fully aware–as any reasonable entity of their size

6    would be–of the prevalence of data breaches and the resulting harm such a breach

7    would cause. The recognition of Defendants' duty to act reasonably in this context

8    is consistent with, *inter alia*, the Restatement (Second) of Torts § 302B (1965),

9    which recounts a basic principle: an act or omission may be negligent if the actor

10   realizes or should realize it involves an unreasonable risk of harm to another, even

11   if the harm occurs through the criminal acts of a third party.

12       134.    Defendants knew that the PII and PHI of Plaintiffs and the Class was

13   personal and sensitive information that is valuable to identity thieves and other

14   criminals. Defendants also knew of the serious harm that could happen if the

15   Sensitive Information of Plaintiffs and the Class was wrongfully disclosed.

16       135.    By being entrusted by Plaintiffs and the Class to safeguard their

17   Sensitive Information, Defendants have a special relationship with Plaintiffs and the

18   Class. Plaintiffs and the Class agreed to provide their Sensitive Information with the

19   understanding that Defendants would take appropriate measures to protect it and

20   would inform Plaintiffs and the Class of any security concerns that might call for

21   action by Plaintiffs and the Class. Defendant was in an exclusive position to

22   safeguard Plaintiffs' Sensitive Information and Plaintiffs had no way to verify or

23   influence Defendant's data security posture.

24

CLASS ACTION COMPLAINT – 39

136.    Defendants breached their duty to exercise reasonable care in safeguarding and protecting Plaintiffs' and the Class members' Sensitive Information by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite failures and intrusions, and allowing unauthorized access to Plaintiffs' and the other Class member's Sensitive Information.

137.    But for Defendants' wrongful and negligent breach of the duties they owed to Plaintiffs and the Class, their Sensitive Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendants' negligence was a direct and legal cause of the theft of the personal data of Plaintiffs and the Class and all resulting damages.

138.    The injury and harm suffered by Plaintiffs and the Class members was the reasonably foreseeable result of Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and the other Class members' Sensitive Information. Defendants knew their systems and technologies for processing and securing the Sensitive Information of Plaintiffs and the Class had numerous security vulnerabilities.

139.    As a result of this misconduct by Defendants, the Sensitive Information of Plaintiffs and the Class were compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their Sensitive Information was disclosed to third parties without their consent. Plaintiffs and Class members also suffered diminution in value of their Sensitive Information in that it is now easily available to hackers on the Dark Web. Plaintiffs and the Class have also suffered

CLASS ACTION COMPLAINT – 40

consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

140.    Plaintiffs also allege negligence under a second, negligence per se, theory.

141.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants have a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and the Class's Sensitive Information.

142.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect customers or, in this case, the Sensitive Information of their consumers. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiffs' and the members of the Class's Sensitive Information.

143.    Defendants breached their duties to Plaintiffs and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Sensitive Information.

144.    Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and their consumers, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendants were in a position to ensure that their

systems were sufficient to protect against the foreseeable risk of harm to Class
Members from the Data Breach.

145.   Defendants' duty to use reasonable security measures under HIPAA
required Defendants to "reasonably protect" confidential data from "any intentional
or unintentional use or disclosure" and to "have in place appropriate administrative,
technical, and physical safeguards to protect the privacy of protected health
information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical
information at issue in this case constitutes "protected health information" within
the meaning of HIPAA.

146.   Defendants' duty to use reasonable care in protecting confidential data
arose not only as a result of the statutes and regulations described above, but also
because Defendants are bound by industry standards to protect confidential Sensitive
Information.

147.   Defendants violated their duty under Section 5 of the FTC Act by
failing to use reasonable measures to protect Plaintiffs' and the Class's Sensitive
Information and not complying with applicable industry standards as described in
detail herein. Defendants' conduct was particularly unreasonable given the nature
and amount of Sensitive Information Defendants collected and stored and the
foreseeable consequences of a data breaches, including, specifically, the immense
damages that would result to individuals in the event of a breach, which ultimately
came to pass.

148.   The harm that has occurred is the type of harm the FTC Act is intended
to guard against. Indeed, the FTC has pursued numerous enforcement actions against

CLASS ACTION COMPLAINT – 42

businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

149.    Defendants violated their duty under HIPAA by failing to use reasonable measures to protect their PHI and by not complying with applicable regulations detailed *supra*. Here too, Defendants' conduct was particularly unreasonable given the nature and amount of Sensitive Information Defendants collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

150.    But for Defendants' wrongful and negligent breach of the duties owed to Plaintiffs and members of the Class, Plaintiffs and members of the Class would not have been injured.

151.    The injury and harm suffered by Plaintiffs and members of the Class were the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to meet their duties and that their breach would cause Plaintiffs and members of the Class to suffer the foreseeable harms associated with the exposure of their Sensitive Information.

152.    Had Plaintiffs and the Class known that Defendants did not adequately protect their Sensitive Information, Plaintiffs and members of the Class would not have entrusted Defendants with their Sensitive Information.

153.    Defendants' various violations and their failure to comply with applicable laws and regulations constitute negligence *per se*.

154.   As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of Sensitive Information; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen Sensitive Information, entitling them to damages in an amount to be proven at trial.

155.   Additionally, as a direct and proximate result of Defendants' negligence *per se*, Plaintiffs and Class members have suffered and will suffer the continued risks of exposure of their Sensitive Information, which remain in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect their Sensitive Information in their continued possession.

### Second Claim for Relief
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Nationwide Class)**

156.   Plaintiffs and the members of the Class incorporate the above allegations as if fully set forth herein.

157.   Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Sensitive Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

158.   Defendants owed a duty to Plaintiffs and Class Member to keep their Sensitive Information confidential.

---

CLASS ACTION COMPLAINT – 44

159.   The unauthorized disclosure and/or acquisition (i.e., theft) by a third party of Plaintiffs' and Class Members' Sensitive Information is highly offensive to a reasonable person.

160.   Defendants' reckless and negligent failure to protect Plaintiffs' and Class Members' Sensitive Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person. Defendants' failure to protect Plaintiffs' and Class Members' Sensitive Information acted with a knowing state of mind when they permitted the Data Breach because they knew their information security practices were inadequate.

161.   Defendants knowingly did not notify Plaintiffs' and Class Members in a timely fashion about the Data Breach.

162.   Because Defendants failed to properly safeguard Plaintiffs' and Class Members' Sensitive Information, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

163.   As a proximate result of Defendants' acts and omissions, the private Sensitive Information of Plaintiffs and the Class Members was stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages.

164.   Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Sensitive Information is still maintained by Defendants with their inadequate cybersecurity system and policies.

CLASS ACTION COMPLAINT – 45

165.   Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the Sensitive Information of Plaintiffs and the Class.

166.   Plaintiffs, on behalf of themselves and Class Members, seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of themselves and Class Members' Sensitive Information.

167.   Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest, and costs.

## **Third Claim for Relief**
## **Unjust Enrichment**
### **(On Behalf of Plaintiffs and the Nationwide Class)**

168.   Plaintiffs and the members of the Class incorporate the above allegations as if fully set forth herein.

169.   Plaintiffs and Class Members conferred a monetary benefit on Defendants when Defendants' clients provided Plaintiffs' and Class Members' Sensitive Information to Defendants, which Defendants collected.

170.   Defendants also accepted payment and other monetary benefits from Defendants' clients, who in turn passed the cost of Defendant's services on to Plaintiffs and Class Members, directly or indirectly.

CLASS ACTION COMPLAINT – 46

171.    Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Sensitive Information.

172.    Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to avoid their data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and the Class, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

173.    Under the principles of equity and good conscience, Defendants should not be permitted to retain the monetary value of the benefit belonging to Plaintiffs and Class Members, because Defendants failed to implement appropriate data management and security measures that are mandated by industry standards.

174.    Defendants acquired the monetary benefit and Sensitive Information through inequitable means in that they failed to disclose the inadequate security practices previously alleged. If Plaintiffs and Class Members knew that Defendants had not secured their Sensitive Information, they would not have agreed to have their Sensitive Information provided to Defendants.

175.    Plaintiffs and Class Members have no adequate remedy at law.

176.    As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will suffer injury, including, but not limited to: (i) the loss of the opportunity how their Sensitive Information is used; (ii) the compromise, publication, and/or theft of their Sensitive Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from

CLASS ACTION COMPLAINT – 47

identity theft, and/or unauthorized use of their Sensitive Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their Sensitive Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Sensitive Information in their continued possession and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Sensitive Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

177.   As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

178.   Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them.

### Fourth Claim for Relief
**Violation of the California Confidentiality of Medical Information Act ("CMIA") Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiffs and the Nationwide Class)**

179.   Plaintiffs incorporate the above allegations as if fully set forth herein.

180.    Each of the Defendants are an "entity who has negligently released confidential information or records" concerning Plaintiffs in violation of Civil Code § 56.36.

181.    At all times relevant to this action, Conifer Revenue Cycle Solutions, LLC provided "revenue cycle management and other administrative services clients and received and maintained, and continues to maintain, "medical information,"[23] within the meaning of subdivision (j) of Cal. Civil Code section 56.05 of Plaintiffs and Class Members who are "patients," within the meaning of subdivision (m) of Cal. Civil Code section 56.05.

182.    As a company "furnishing administrative services" to healthcare providers within the definition of subdivision (a) of Cal. Civil Code section 56.26, Conifer Revenue Cycle Solutions, LLC was under a duty to protect and maintain the confidentiality of the medical information regarding patients, and to ensure that medical information regarding Plaintiffs and the Class is not disclosed or disseminated or released without their authorization.[24]

183.    At all times relevant to this action, including the period prior to and on March 21, 2022, Defendants negligently failed to establish appropriate procedures to ensure the confidentiality and protection from unauthorized use and disclosure of that information, as required by Cal. Civil Code section 56.26, and negligently failed to protect and preserve confidentiality of Plaintiffs' and the Class Members' medical information in its possession against unauthorized disclosure

---

CLASS ACTION COMPLAINT – 49

and/or release, including, but not limited to, by failing to implement adequate and reasonable security controls and user authorization and authentication processes, by failing to implement multi-factor authentication for business email accounts, by failing to limit the types of data permitted to be transferred, by failing to encrypt or de-identify Plaintiffs' and Class Members' "medical information," within the meaning of subdivision (i) of Cal. Civil Code section 56.05, by maintaining Plaintiffs' and Class Members' "medical information," within the meaning of subdivision (i) of Cal. Civil Code section 56.05, for longer than is reasonably necessary, by failing to have adequate privacy policies and procedures in place, as required by the CMIA, under subdivision (a) of Cal. Civil Code section 56.26 and subparagraph (E) of paragraph (2) of subdivision (e) of Cal. Civil Code section 56.36, and by failing to properly and adequately educate and train its employees.

184.    Defendants knew, or should have known, that their computer systems and data security practices were inadequate to safeguard Plaintiffs and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, maintained in a nonencrypted and a nonredacted format, on Defendants' computer network and in "a single email account," from an unauthorized access and exfiltration, theft, or disclosure, and that such risk of an unauthorized access and exfiltration, theft, or disclosure was more likely than not. Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, maintained on Defendants' computer network and in "a single email

CLASS ACTION COMPLAINT – 50

account," by *inter alia* failing to encrypt Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, so in the event of an unauthorized access and exfiltration, theft, or disclosure of Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, could not be read by an unauthorized third party.

185.    Had Defendants taken appropriate preventive actions, implemented multi-factor authentication for business email accounts, encrypted Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, and fix the deficiencies in their policies and procedures, as required by the CMIA, before March 21, 2022, Defendants could have prevented Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, from being "accessed" by and disclosed to and actually viewed by "the unauthorized party" (who is not identified by Conifer Revenue Cycle Solutions, LLC) "on March 21, 2022."

186.    Because Defendants failed to take appropriate preventive actions, failed to implement multi-factor authentication for business email accounts, failed to encrypt Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, and failed to fix the deficiencies in their policies and procedures, as required by the CMIA, before March 21, 2022, Plaintiffs' and Class Members' "medical information" as defined by subdivision (i) of Cal. Civil Code section 56.05, in "a single email account" was "accessed" by and disclosed to and actually viewed by "the unauthorized party" (who is not identified by Defendants) "on March 21, 2022," without first obtaining an

CLASS ACTION COMPLAINT – 51

authorization, constituting a disclosure and a release in violation of Cal. Civil Code section 56.26 of the CMIA.

187.     As a direct and proximate result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members have and will continue to suffer damages as alleged herein, in amounts according to proof at trial.

188.     As a direct and proximate result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members are entitled to recover "compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation" under Cal. Civil Code section 56.35.

189.     As a result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs and Class Members seek compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation according to proof under Cal. Civil Code section 56.35.

190.     As a result of Defendants' above-described conduct in violation of Cal. Civil Code section 56.26 of the CMIA, Plaintiffs Ryan Collins and Nelson Quiles, individually, and on behalf of the Class, seek nominal damages of one thousand dollars ($1,000) for each violation under paragraph (1) of subdivision (b) of Cal. Civil Code section 56.36, and actual damages suffered, according to proof,

for each violation paragraph (2) of subdivision (b) of under Cal. Civil Code section 56.36.

191.    Defendants, through inadequate security, allowed unauthorized third-party access to Plaintiffs and each Class member's medical information, without the prior written authorization of Plaintiffs and the Class members, as required by Civil Code § 56.10 of the CMIA.

192.    In violation of Civil Code § 56.10(a), Defendants disclosed Plaintiffs and the Class members' medical information without first obtaining an authorization. Plaintiffs and the Class members' medical information was viewed by unauthorized individuals as a direct and proximate result of Defendants' violation of Civil Code § 56.10(a).

193.    In violation of Civil Code § 56.10(e), Defendants further disclosed Plaintiffs and the Class members' medical information to persons or entities not engaged in providing direct health care services to Plaintiffs or the Class members or their providers of health care or health care service plans or insurers or self-insured employers.

194.    Defendants violated Civil Code § 56.101 of the CMIA through their failure to maintain and preserve the confidentiality of the medical information of Plaintiffs and the Class.

195.    In violation of Civil Code § 56.101(a), Defendants created, maintained, preserved, stored, abandoned, destroyed, or disposed of Plaintiffs and the Class members' medical information in a manner that failed to preserve and breached the confidentiality of the information contained therein. Plaintiffs and the

CLASS ACTION COMPLAINT – 53

1    Class members' medical information was viewed by unauthorized individuals as a

2    direct and proximate result of Defendants' violation of Civil Code § 56.101(a).

3        196.    In violation of Civil Code § 56.101(a), Defendants negligently

4    created, maintained, preserved, stored, abandoned, destroyed, or disposed of

5    Plaintiffs and the Class members' medical information. Plaintiffs and the Class

6    members' medical information was viewed by unauthorized individuals as a direct

7    and proximate result of Defendants' violation of Civil Code § 56.101(a).

8        197.    Plaintiffs and the Class members' medical information that was the

9    subject of the Data Breach included "electronic medical records" or "electronic

10    health records" as referenced by Civil Code § 56.101(c) and defined by 42 U.S.C.

11    § 17921(5).

12        198.    In violation of Civil Code § 56.101(b)(1)(A), Defendants' electronic

13    health record system or electronic medical record system failed to protect and

14    preserve the integrity of electronic medical information. Plaintiffs and the Class

15    members' medical information was viewed by unauthorized individuals as a direct

16    and proximate result of Defendants' violation of Civil Code §56.101(b)(1)(A).

17        199.    Defendants violated Civil Code § 56.36 of the CMIA through their

18    failure to maintain and preserve the confidentiality of the medical information of

19    Plaintiffs and the Class.

20        200.    As a result of Defendants' above-described conduct, Plaintiffs and

21    the Class have suffered damages from the unauthorized disclosure and release of

22    their individual identifiable "medical information" made unlawful by Civil Code

23    §§ 56.10, 56.101, 56.36.

24

CLASS ACTION COMPLAINT – 54

201.    As a direct and proximate result of Defendants' above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, and violation of the CMIA, Plaintiffs and the Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, inter alia, (i) an imminent, immediate and the continuing increased risk of identity theft, identity fraud and medical fraud – risks justifying expenditures for protective and remedial services for which they are entitled to compensation, (ii) invasion of privacy, (iii) breach of the confidentiality of their PII/PHI, (iv) statutory damages under the California CMIA, (v) deprivation of the value of their PII/PHI, for which there is a well-established national and international market, and/or (vi) the financial and temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

202.    Plaintiffs, individually and for each member of the Class, seek nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2), injunctive relief, as well as punitive damages of up to $3,000 per Plaintiff and each Class member, and attorneys' fees, litigation expenses and court costs, pursuant to Civil Code § 56.35.

**Fifth Claim for Relief**

**Violation of California's Unfair Competition Law Cal. Bus. Code § 17200, *et seq.***

**(On behalf of Plaintiffs and the Nationwide Class)**

203.    Plaintiffs incorporate all previous paragraphs as if fully set forth below.

204.    Defendants engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

205.    Defendants' conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code § 1798.100, et seq. (the "CCPA"), and other above-described California statutes.

206.    Defendants stored the PHI and PII of Plaintiffs and the Class in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiffs and the Class's PHI and PII secure and prevented the loss or misuse of that PHI and PII.

207.    Defendants failed to disclose to Plaintiffs and the Class that their PHI and PII was not secure. However, Plaintiffs and the Class were entitled to assume, and did assume, that Defendants had secured their PHI and PII. At no time were Plaintiffs and the Class on notice that their PHI and PII was not secure, which Defendants had a duty to disclose.

CLASS ACTION COMPLAINT – 56

208.    Defendants also violated California Civil Code § 1798.150 by failing to employ reasonable security measures, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiffs and the Class's PHI and PII.

209.    Defendants' decisions regarding data security, including those leading to the Data Breach, were made in California as California is the state where defendants headquarter their operations.

210.    Had Defendants complied with these requirements, Plaintiffs and the Class would not have suffered the damages related to the data breach.

211.    Defendants' conduct was unlawful, in that it violated the Consumer Records Act.

212.    Defendants' conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

213.    Defendants' conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PHI and PII.

214. Defendants also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g.*, Cal. Civ. Code § 1798.1 ("The Legislature declares that all individuals have a right of privacy in information pertaining to them.  The increasing use of computers has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code § 1798.81.5(a) ("It is the

CLASS ACTION COMPLAINT – 57

1    intent of the Legislature to ensure that personal information about California

2    residents is protected."); Cal. Bus. & Prof. Code § 22578 ("It is the intent of the

3    Legislature that this chapter [including the Online Privacy Protection Act] is a

4    matter of statewide concern."). Defendants' acts and omissions thus amount to a

5    violation of the law.

6          215.    Instead, Defendants made the PHI and PII of Plaintiffs and the Class

7    accessible to scammers, identity thieves, and other malicious actors, subjecting

8    Plaintiffs and the Class to an impending risk of identity theft. Additionally,

9    Defendants' conduct was unfair under the UCL because it violated the policies

10   underlying the laws set out in the prior paragraph.

11         216.    As a result of those unlawful and unfair business practices, Plaintiffs

12   and the Class suffered an injury-in-fact and have lost money or property.

13         217.    The injuries to Plaintiffs and the Class greatly outweigh any alleged

14   countervailing benefit to consumers or competition under all of the circumstances.

15         218.    There were reasonably available alternatives to further Defendants'

16   legitimate business interests, other than the misconduct alleged in this complaint.

17         219.    Therefore, Plaintiffs and the Class are entitled to equitable relief,

18   including restitution of all monies paid to or received by Defendants; disgorgement

19   of all profits accruing to Defendants because of their unfair and improper business

20   practices; a permanent injunction enjoining Defendants' unlawful and unfair

21   business activities; and any other equitable relief the Court deems proper. Further,

22   Plaintiffs demand injunctive relief requiring Defendants to improve their

23   cybersecurity practices to meet industry standards and those required by law,

24

CLASS ACTION COMPLAINT – 58

1  including under common law, as the class's PII remains in Defendants' possession

2  while Defendants have failed to implement the security measures needed to protect

3  it.

4  ## PRAYER FOR RELIEF

5  Plaintiffs and members of the Class demand a jury trial on all claims so triable

6  and request that the Court enter an order:

7      A.    Certifying this case as a class action on behalf of Plaintiffs and the

8      proposed Class, appointing Plaintiffs as class representatives, and

9      appointing their counsel to represent the Class;

10      B.    Awarding declaratory and other equitable relief as is necessary to

11      protect the interests of Plaintiffs and the Class;

12      C.    Awarding injunctive relief as is necessary to protect the interests of

13      Plaintiffs and the Class;

14      D.    Enjoining Defendants from further deceptive practices and making

15      untrue statements about the Data Breach and the stolen Sensitive

16      Information;

17      E.    Awarding Plaintiffs and the Class damages that include applicable

18      compensatory, exemplary, punitive damages, and statutory damages, as

19      allowed by law;

20      F.    Awarding restitution and damages to Plaintiffs and the Class in an

21      amount to be determined at trial;

22      G.    Awarding attorneys' fees and costs, as allowed by law;

23      H.    Awarding prejudgment and post-judgment interest, as provided by law;

24

CLASS ACTION COMPLAINT – 59

I.     Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.     Granting such other or further relief as may be appropriate under the circumstances.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: October 23, 2024                    Respectfully Submitted,

By: /s/ *Daniel Srourian*
          Daniel Z. Srourian
          SROURIAN LAW FIRM
          3435 Wilshire Boulevard, Suite 1710
          Los Angeles, CA 90010
          Telephone: (213) 474-3800
          Facsimile: (213) 471-4160
          daniel@slfla.com

          Patrick N. Keegan
          KEEGAN AND BAKER LLP
          2292 Faraday Avenue Suite 100
          Carlsbad, CA 92009
          Telephone: (760) 929-9303
          Facsimile: (760) 929-9260
          pkeegan@keeganbaker.com

          Raina C. Borrelli
          STRAUSS BORRELLI PLLC
          980 N. Michigan Ave., Ste. 1610
          Chicago, Illinois 60611
          raina@straussborrelli.com

CLASS ACTION COMPLAINT – 60

Melissa R. Emert
KANTROWITZ GOLDHAMER AND
GRAIFMAN PC
135 Chestnut Ridge Road, Suite 200
Montvale, NJ 07645
Telephone: (845) 356-2570
memert@kgglaw.com

M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
CLAYEO C. ARNOLD
A PROFESSIONAL CORPORATION
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Fax: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

John J. Nelson (SBN 317598)
MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC
280 S. Beverly Drive
Beverly Hills, CA 90212
Telephone: (858) 209-6941
jnelson@milberg.com

*Attorneys for Plaintiffs and the Proposed
Class*

CLASS ACTION COMPLAINT – 61

Exhibit A



VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street, PO Box 187
Burlington VT 05402
802-863-3467
www.vermontjudiciary.org

CIVIL DIVISION

Case No. 226-3-20 Cncv

| State of Vermont vs. Clearview AI, Inc. |
| --- |

# RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Title:       Clearview's Motion for Summary Judgment (Motion: 13)
Filer:       Timothy C. Doherty, Jr., Tristram J. Coffin, Christian S. Chorba, and Kelsey I.
             Schweitzer, Esqs.
Filed Date:  January 16, 2024

This case concerns the use of facial recognition technology by Clearview AI, Inc. The State filed its complaint in March 2020, alleging that Clearview's use of the technology constituted an unfair and deceptive practice in violation of the Vermont Consumer Protection Act ("the VCPA" or "the Act"). Clearview moved to dismiss the case, and the court dismissed a portion of the complaint in September 2020. The State moved for partial summary judgment in November 2022, and, after allowing the parties time to pursue additional discovery, the court denied the State's motion in December 2023. Clearview now moves for summary judgment on all remaining counts of the complaint.

Discussion

Clearview raises several arguments in support of its motion, but the court finds that it need only address the issue of venue. The State filed this action pursuant to the Consumer Protection Act, which permits the Attorney General to bring an action in the name of the State if it believes that any person is engaging in, or has engaged in, unfair or deceptive acts or practices. "The action may be brought in the Superior Court of the

Entry Regarding Motion                                                    Page **1** of **5**
226-3-20 Cncv State of Vermont vs. Clearview AI, Inc.

App. 160

county in which [the defendant] resides, has a place of business, or is doing business." 9 V.S.A. § 2458(a). Clearview raised venue as a basis to support its motion to dismiss in 2020, but the standard for such a motion is merely whether the facts alleged, if proven, would be sufficient. Based on the State's pleading that "Clearview does business in Chittenden County," the court found venue properly alleged. *See* Ruling on Defendant's Motion to Dismiss at 5-6 (September 10, 2020) (Toor, J.). Contrary to the State's argument, that does not bar Clearview from raising the issue again.[1] The issue now is whether the alleged facts supporting venue have been proven by the evidence before the court.

In its Statement of Undisputed Material Facts ("SUMF"), Clearview asserts that it "does not, and has not, done business in Vermont." SUMF ¶ 2. It states that it has no employees or servers in Vermont, it has no customers in Vermont, it is not recruiting customers in Vermont, it has no trial users in Vermont, and no Vermont agency has ever used its search engine. Id. ¶¶ 3-7. All of these assertions are supported by admissible evidence. The State failed to provide a paragraph-by-paragraph response to these facts,

---

[1] Objections to venue may be made "by raising the objection as a defense in the responsive pleading," and "[o]ften, a party who has raised a proper objection to venue will make use of discovery or engage in settlement discussions before pressing for a decision on the venue objection." 14D Fed. Prac. & Proc. Juris. § 3829 (4th ed.). Venue and personal jurisdiction may be addressed on summary judgment "when intertwined with the merits." 10A Fed. Prac. & Proc. Civ. § 2713 (4th ed.). Where a defendant raises the issue in its answer, it "[does] not waive its venue objection and the objection is properly raised in this motion for summary judgment." Rogen v. Memry Corp., 886 F. Supp. 393, 396 (S.D.N.Y. 1995); *see also* Tyco Int'l Ltd. v. Walsh, No. 02 CIV. 4633 (DLC), 2003 WL 553580, at *2 (S.D.N.Y. Feb. 27, 2003) ("There are generally three means by which a party may challenge venue or personal jurisdiction: 1) a timely motion under Rule 12(b), . . . 2) a motion under Rule 56, . . . or 3) a request for an adjudication of disputed jurisdictional facts, either at a hearing pursuant to Rule 12(d), . . . or in the course of a trial on the merits.").

Entry Regarding Motion                                                    Page **2** of **5**
226-3-20 Cncv State of Vermont vs. Clearview AI, Inc.

App. 161

as required by V.R.C.P. 56(c)(2), with the result that the court may deem them undisputed in accordance with V.R.C.P. 56(e)(2).[2]

The court has, nonetheless, attempted to consider whether the State's separate statement of disputed facts actually counters any of the facts submitted by Clearview. However, that statement is extremely challenging to work with, as it cites to a statement of facts from a 2022 motion, which refers to documents such as an exhibit attached to another exhibit, and deposition excerpts that the court cannot find. As far as the court can make out, the most that the State's actual evidence shows as to connections to Vermont is that one bank in Vermont briefly used an unpaid trial account four years ago, Clearview registered as a data broker in Vermont, it has sent marketing material to law enforcement and security professionals in Vermont, it has had data breached in connection with some national businesses that have branches in Vermont, and it does not have the ability to identify whether any of the photos in its database are of Vermont residents. The State cites Clearview's Privacy Policy (Exhibit 8 to Aceves Affidavit)[3] as support for Clearview's having scraped photos of Vermonters from the internet, but points to no specific place in that 15-page document as support for this statement. Statement of Disputed Facts ¶¶ 12-15. It alleges that the Mulcaire Deposition shows that "Vermonters' photographs are likely included in Clearview's database," yet the deposition page it cites is not included.  Id. ¶ 18. In any case, none of this identifies any actual contacts in *Chittenden County*. As a result, there is no basis for venue here.

---

[2] The State moved to amend to take a second shot at the facts.  The court denied the motion because the State "offer[ed] no reason for its failure to comply with Rule 56 the first time around." *See* Entry Order dated April 17, 2024 (Toor, J.).

[3] It is unclear what "Exhibit 8" the State meant, but this is the only one the court can find.

Entry Regarding Motion                                                      Page 3 of 5
226-3-20 Cncv State of Vermont vs. Clearview AI, Inc.

App. 162

Clearview argues that this entitles it to summary judgment. Motion at 29. The State contends that "accepting Clearview's venue argument would only mean transferring the action to Washington County." Opposition at 16. The court disagrees with both sides.

First, unless a rule or statute provides for transfer, the court has no authority to move a civil case to another county.[4] *See* U.S. Bank Trust Nat'l. Ass'n v. Gittens, No. 22-CV-00199, 2022 WL 1242621, at *1 (Vt. Super. Ct., Mar. 10, 2022) (Toor, J.); Cavalry SPV 1, LLC v. White, No. 23-SC-00788, 2023 WL 3939270, at *1 (Vt. Super. Ct., June 01, 2023) (Richardson, J.) ("Plaintiff does not cite to any authority in this Court that allows it to transfer venue from one county to another."). The State points to no such rule or statute.

Second, the usual remedy for a lack of venue is dismissal, not judgment on the merits. *See, e.g.*, 12 V.S.A. § 402(a); *accord* Kiwijet, LLC v. Mena Technics Co. W.L.L., No. 2:21-CV-8630-SK, 2022 WL 20401312, at *1, n.1 (C.D. Cal. Dec. 16, 2022) (treating summary judgment motion as one to dismiss because it raised jurisdictional issues); Meench v. Raymond Corp., 283 F. Supp. 68, 69 (E.D. Pa. 1968) ("It is proper to consider [a summary judgment] motion, when based upon an allegation of a lack of personal jurisdiction, as a motion to dismiss."). The court sees no reason to veer from the usual course here.

Because the court lacks venue, it does not address the substantive claims in the motion. *See, e.g.*, Dalton v. 3M Co., No. CV 10-113-SLR-SRF, 2013 WL 4886658, at *3 (D. Del. Sept. 12, 2013), report and recommendation adopted, No. CV 10-113-SLR/SRF,

---

[4] This is in contrast to federal law, which provides for *either* dismissal or transfer to another district. 28 U.S.C. 1406(a).

Entry Regarding Motion                                                    Page 4 of 5
226-3-20 Cncv State of Vermont vs. Clearview AI, Inc.

App. 163

2013 WL 5486813 (D. Del. Oct. 1, 2013) ("The court must resolve the preliminary issues of transfer of venue and choice of law before addressing the substantive merits of Defendants' motions for summary judgment."); McGrone v. Austin, No. CV 21-472 (RC), 2022 WL 888194, at *3 (D.D.C. Mar. 25, 2022) ("The Court's conclusion that venue cannot lie in the District of Columbia for McGrone's Title VII claims renders it unable to adjudicate the case further."); Maersk Line A/S v. Carew, 588 F. Supp. 3d 493, 501 (S.D.N.Y. 2022) ("The Court begins with Carew's motion to dismiss or transfer venue because if she were to prevail on that motion, another court would need to decide the merits.").

<u>Order</u>

This case is dismissed for lack of venue in this county.

Electronically signed on April 25, 2024 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge

Entry Regarding Motion                                                                 Page **5** of **5**
226-3-20 Cncv State of Vermont vs. Clearview AI, Inc.

App. 164